UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

**********************************

JULIANA RODRIGUEZ MOREL

      Plaintiff

v.                                                    Case No. 1:22-cv-00200-PB

THE TRAVELERS CASUALTY AND

SURETY COMPANY OF AMERICA

      Defendant

**********************************

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Juliana Rodriguez Morel, ***by and through her representatives, Daniel Rodriguez and Natasha Urena, and her attorneys, Backus, Meyer & Branch, LLP***, to respectfully submit this First Amended Complaint for Declaratory Judgment stating as follows:

### PRELIMINARY STATEMENT

1.     With this ***First Amended*** Complaint for Declaratory Judgment, Juliana Rodriguez Morel ["Ms. Rodriguez Morel"], ***through her representatives,*** is seeking declarations under RSA 491:22 and ***28 U.S.C. §2201*** that Travelers Casualty and Surety Company of America ["Travelers"] must pay for losses stemming from her "employment claims" against her former employer, Travelers' insured.

2.     Ms. Rodriguez Morel worked for an entity called Credit Adjustments, Inc. from August 31, 2018 to February 11, 2019.  On March 4, 2021, Credit Adjustments, Inc. changed its name to Mammoth Tech, Inc. ["Mammoth"] <u>See</u> Exhibit A.  For the purposes of this complaint,

Credit Adjustments, Inc. and Mammoth are one and the same and the entity shall be referred to as Mammoth.

3.     Mammoth held an employment practices liability ["EPL"] insurance policy with Travelers providing coverage for any "employment claim" first noticed to Mammoth between the dates of December 4, 2020 and August 5, 2021.  See Exhibit B at provision I, A.; see Exhibit C at Item 2; see Exhibit D at page 1 (Effective Date "12/04/2020").

4.     Importantly, "employment claim," as defined by the policy, does not mean, generally, "any assertion of a wrongful employment practice against an insured."     Rather, "employment claim" is defined to mean separately identified, specific types of documents that assert certain identified wrongful employment practices.  See Exhibit B at provision II, F.

5.     Per the policy,

***Employment Claim*** means:

1.     a written demand for monetary damages or non-monetary relief;

2.     a civil proceeding commenced by service of a complaint or similar pleading;

3.     a criminal proceeding commenced by filing of charges;

4.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency; provided that in the context of an audit conducted by the Office of Federal Contract Compliance Programs, **Employment Claim** will be limited to a Notice of Violation or Order to Show Cause or written demand for monetary damages or non-monetary relief;

5.     an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of a **Claimant**, or against an **Insured Person** serving in an **Outside Position** by or on behalf of or for the benefit of an **Outside Claimant**, for a **Wrongful Employment Practice**; provided that **Employment Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

See id.

6.      On December 5, 2020, <u>within the policy coverage period</u> of December 4, 2020 to August 5, 2021, Ms. Rodriguez Morel delivered to Mammoth "a written demand for monetary damages" for wrongful employment practices by Mammoth.  <u>See</u> Exhibit E.

7.      After her demand was rejected on February 17, 2021, <u>also within the policy coverage period</u>, Ms. Rodriguez Morel "commenced" a "civil proceeding [in **New Hampshire's** federal court] by service of a complaint" upon Mammoth citing several wrongful employment practices by Mammoth.  <u>See</u> Exhibit F.

8.      Travelers must pay on behalf of Mammoth because Ms. Rodriguez Morel first noticed to Mammoth "employment claims" as the term is defined by the Travelers policy, to mean the <u>documents</u> of "written demand" and "[served] civil complaint," on December 5, 2020 and February 17, 2021, respectively.  Both of these dates are <u>within</u> the policy coverage period. ***Traveler's must pay the amount Mammoth was ordered to pay in this Court's March 27, 2023, default judgment order that was issued pursuant to Ms. Rodriguez Morel's civil complaint against Mammoth filed in this Court*.  <u>See Exhibit J.</u>**

### PARTIES

9.      Ms. Rodriguez Morel is a citizen of this state residing in Manchester, New Hampshire.

10.      Travelers is a foreign corporation headquartered at One Tower Square, Hartford, Connecticut.

11.      Travelers is authorized by the New Hampshire Insurance Department to do business in New Hampshire, and it has sold insurance in New Hampshire, including to Mammoth, which has a principal place of business in Manchester, New Hampshire.

## JURISDICTION & VENUE

12.    *This Court has subject matter jurisdiction over Plaintiff's claim for declaratory relief under the federal Declaratory Judgment Act (28 U.S.C. § 2201).  28 U.S.C. § 1331 provides that this Court has subject matter jurisdiction over federal questions.  Plaintiff asserts a claim posing a federal question in that she seeks coverage determination under 28 U.S.C. § 2201 related to a default judgment order issued pursuant to a civil complaint filed in this Court that included judgment on claims made under federal law:  the Americans with Disabilities Act Amendments Act and Title VII.  This Court additionally has diversity, subject matter jurisdiction over Plaintiff's claims for relief under 28 U.S.C § 2201 and NH RSA 491:22.  28 U.S.C. § 1332 provides for federal court jurisdiction where the parties are of different states and the amount in controversy exceeds $75,000.*

13.    This Court has personal jurisdiction over Travelers under RSA 510:4 because Travelers transacts business in New Hampshire.

14.    *Venue is proper under 28 USC § 1391(b)(2) where a substantial part of the events or omissions giving rise to the claims occurred in New Hampshire.*

15.    Ms. Rodriguez Morel has standing to bring this action.  RSA 491:22, I provides "Any person claiming a present legal or equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties."  Ms. Rodriguez Morel, with a pending lawsuit based on her Mammoth employment is a "person with …a present legal …. right or title" to the employment practices liability insurance contract held between Travelers and Mammoth.  Travelers has "claim[ed] adversely to such right or title" by issuing a coverage declination letter.  See Exhibit G; see also Twardosky v. State Farm Ins. Co., No. 07-E-136, 2008 WL 6466550 (N.H.Super. Aug. 18, 2008)(recognizing that a third-party

beneficiary to an insurance contract has standing to bring a petition under RSA 491:22, I).
*Meanwhile, 28 U.S.C § 2201(a) provides that "in a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of <u>any interested party</u> seeking such declaration." Emphasis added.*

## FACTS

### I. <u>Mammoth's EPL Insurance Coverage</u>

16.    Mammoth held Private Company Directors and Officers Liability ["PCDOL"] insurance with Travelers from August 5, 2020 to August 5, 2021. <u>See</u> Exhibit C.

17.    Effective December 4, 2020, Mammoth added EPL coverage to its existing policy with Travelers. <u>See</u> Exhibit D.

18.    That EPL coverage provides for "claims made coverage with defense expenses included in the limit of liability." <u>See</u> Exhibit B at page 1.

19.    The EPL coverage further provides that Travelers: "will pay on behalf of the **Insured**, **Loss** for any **Employment Claim** first made during the **Policy Period** …. for a **Wrongful Employment Practice**." <u>See</u> <u>id</u>. at provision I, A.

20.    "**Insured**" is defined under the EPL coverage as the "Insured Organization" (Mammoth), including its "Insured Persons" (Mammoth employees and agents). <u>See</u> <u>id</u>. at provision II, I – K.

21.    "**Loss**" is defined to include defense expenses and money that Mammoth is legally obligated to pay as a result of a "claim"[1] made against Mammoth.  See id. at provision II, L.

22.    "**Employment Claim**," is defined to mean any of the following:

1.    a written demand for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by filing of charges;

4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency; provided that in the context of an audit conducted by the Office of Federal Contract Compliance Programs, **Employment Claim** will be limited to a Notice of Violation or Order to Show Cause or written demand for monetary damages or non-monetary relief;

5.    an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

See id. at provision II, F.

23.    Despite stating that "**Policy Period**" is defined in the EPL coverage definitions section, see id. at provision II ("wherever appearing in this Liability Coverage, the following words and phrases in bold type will have the meanings set forth in section II, Definitions"), "**Policy Period**" is not actually defined in the definitions section.   See id. at provision II.

24.    "**Policy Period**" is however identified on the underlying PCDOL declarations page as being August 5, 2020 to August 5, 2021.  See Exhibit C.

25.    Where the effective date of the EPL coverage is "12/04/2020," see Exhibit D, the applicable "**Policy Period**" for EPL coverage is understood to be December 4, 2020 to August 5, 2021.

---

[1] The policy equates "claim" with "employment claim."  See Exhibit B at provision II, A.

26.    "**Wrongful Employment Practice**" is defined by the EPL coverage to mean any of the following:

a. Discrimination;

b. Retaliation;

c. Wrongful termination, including wrongful constructive termination;

d. Failure or refusal to create and enforce adequate workplace or employment policies and procedures;

e. Wrongful discipline; and

f. Employment-related wrongful infliction of emotional distress.

See Exhibit B at provision II, Y-Z

27.    A "**Claim**" (which is the same as "**Employment Claim**") is deemed to be made on the earliest date that any Insured Executive Officer first receives written notice of such "**Claim**" (or "**Employment Claim**").  See id. at provision II, A.


## II.  Ms. Rodriguez Morel's Employment Claims

28.    On March 19, 2019, Ms. Rodriguez Morel filed a pro se administrative Charge at the New Hampshire Commission for Human Rights ["Commission"].[2]  See Exhibit H.

29.    Ms. Rodriguez Morel indicated in the Charge form checkboxes only that she believed she had suffered "sex" discrimination and "retaliation," and she alleged simply that she had been pregnant, that she informed her supervisors of her pregnancy, that she was disciplined and denied leave needed for pregnancy reasons, and that she was ultimately terminated.  See id.

---

[2] The Charge was dually-filed such that it was also filed at the EEOC.

30.    The Charge did <u>not</u> explain how these allegations satisfied prima facie elements of Title VII and RSA 354-A claims, but instead concluded only vaguely that Ms. Rodriguez Morel had been discriminated against by way of "failure to accommodate, differential treatment, and [sic] retaliation.[3]" <u>See</u> <u>id</u>. page 2, ¶¶ 25-26.

31.    Ms. Rodriguez Morel was <u>not</u> required to explicate specific violations of law in her Charge to preserve her ability to state specific legal claims, even additional legal claims, later in a civil lawsuit.  <u>See</u> <u>Massaquoi v. 20 Maitland St. Operations LLC</u>, No. 18-CV-296-LM, 2018 WL 6201714, at *3 (D.N.H. Nov. 28, 2018)(reasoning a pro se employee at the agency "is not required to comprehensively set for with literary exactitude all of the facts and theories upon which his or her claim is based" and that the employee's later "civil suit may encompass acts of discrimination which the … [agency] investigation could reasonably be expected to uncover").

32.    Ms. Rodriguez Morel thus only vaguely asserted sex discrimination and retaliation and she clearly did <u>not</u> plead that Mammoth had committed "wrongful discharge" under New Hampshire common law[4] or "disability" discrimination under the Americans with Disabilities Act Amendments Act [ADAAA] or RSA 354-A.  Ms. Rodriguez Morel additionally did <u>not</u> plead that Mammoth's discipline and attendance policies (allowing for no more than six absences in employment, total) imposed gender-discriminatory "disparate impact" upon (child-bearing) women in violation of Title VII.

33.    The Charge was served on Mammoth and it remained at the Commission and the EEOC until October 19, 2020, when Ms. Rodriguez Morel, then with counsel, removed it, notifying the Commission and Mammoth of her intent to file a civil complaint in court.

---

[3] Retaliation is not a form of discrimination but a separate cause of action.
[4] Neither The New Hampshire Commission for Human Rights nor the EEOC has jurisdiction over wrongful discharge claims

34.     Before filing the complaint, however, Ms. Rodriguez Morel, through counsel, delivered to Mammoth's counsel a written demand for damages that incorporated a draft (not filed and served) civil complaint.  This demand was sent on December 5, 2020.  See Exhibit E.

35.     This was the first time that Ms. Rodriguez Morel notified Mammoth of an "**Employment Claim**" meaning specifically a "written demand for monetary damages or non-monetary relief" for the "**Wrongful Employment Practices**" of "discrimination", "retaliation", "wrongful discipline," and "employment-related wrongful infliction of emotional distress."  See Exhibit B at provision II, F and Y; see also ¶¶ 22, 26 supra.

36.     The demand was also the first time that Ms. Rodriguez Morel notified Mammoth of an "**Employment Claim**" of any type (i.e. charge, demand, or served civil complaint) for the "**Wrongful Employment Practices**" of: "disability" discrimination; "disparate impact" discrimination in violation of Title VII[5]; and common law "wrongful discharge."  See Exhibit E. at incorporated draft complaint Counts III, IV, and V.  These theories were not previously identified in her pro se administrative Charge, nor were they required to be.

37.     Mammoth's counsel sent an email indicating that he "communicat[ed] the demand" with the Insured, Mammoth, sometime between December 5, 2020 and December 22, 2020.  See Exhibit I.

38.     In other words, counsel indicated the "**Employment Claim**" of specifically the written demand was received by a Mammoth Executive Officer, during the "**Policy Period**" of December 4, 2020 to August 5, 2021.  See Exhibits C, D and I.

---

[5] "Wrongful Employment Practice" as defined in the EPL coverage includes "failure or refusal to create and enforce adequate workplace or employment policies and procedures" such that they do not disparately impact employees.

39.    On January 15, 2021, Ms. Rodriguez Morel filed her civil complaint in New Hampshire's federal court, and she served the complaint via Mammoth's counsel on February 17, 2021.  See Exhibit F.

40.    With the service of the filed complaint, this was the first time that Ms. Rodriguez Morel notified Mammoth of her "**Employment Claim**" meaning specifically "a civil proceeding commenced by service of a complaint or similar pleading" for the "**Wrongful Employment Practices**" of: "discrimination"; "retaliation"; "wrongful discipline"; "employment-related wrongful infliction of emotional distress"; "disability" discrimination; "disparate impact"; and common law "wrongful discharge."  See Exhibit B at provision II, F and Y; see ¶¶ 22, 26 supra; see Exhibit F (filed complaint Counts I – VI).

## III.  Travelers' Denial of Coverage

41.    Notwithstanding that Ms. Rodriguez Morel first made her "**Employment Claims**" discussed herein at paragraphs 35-36 and 39-40 within the "**Policy Period**" of December 4, 2020 to August 5, 2021, Travelers nevertheless denied coverage on grounds that Ms. Rodriguez Morel first made her "**Employment Claims**" on or before November 19, 2020.  See Exhibit G, page 2. ***Travelers did not notify of the denial and therefore any coverage dispute until February 4, 2022. See Exhibit G, page 1.***  Travelers appears to be arguing that a Mammoth Executive became aware of Ms. Rodriguez Morel's Charge of Discrimination on November 19, 2020, before the "**Policy Period**," thereby foreclosing any coverage for "**Employment Claims**" made by Ms. Rodriguez Morel afterward and within the "**Policy Period**."  Id.

### COUNT I: PETITION FOR DECLARATORY JUDGMENT UNDER RSA 491:22

42.     Ms. Rodriguez Morel realleges and incorporates by reference each of the above and below paragraphs as if set forth fully herein.

43.     Travelers' denial is improper.  Where an "**Employment Claim**" under Travelers' EPL coverage contract is "a formal administrative or regulatory proceeding commenced by the filing of a notice of charges," <u>or</u> a "written demand for monetary damages," <u>or</u> "a civil proceeding commenced by service of a complaint or similar pleading," i.e. a <u>type of document,</u>  and where Ms. Rodriguez Morel did <u>not,</u> actually, make her "written demand for monetary damages" or serve her "[civil] complaint" *before* the start of the "**Policy Period**, " December 4, 2020, but instead, first notified Mammoth of specifically these "**Employment Claims**" on December 5, 2020 and February 17, 2021, well <u>within</u> the "**Policy Period**" of December 4, 2020 to August 5, 2021, these "**Employment Claims**" should be covered.

44.     Travelers cites no policy language in its declination letter at Exhibit G showing that its separately identified "**Employment Claims**" of <u>various document types</u>, e.g. charge, demand, and civil complaint, *overlap*  or substitute for one another such that if one type of "**Employment Claim**" document is delivered prior to the "**Policy Period,**" the Insured has <u>no coverage</u> springing from any *other* type of "**Employment Claim**" document delivered within the "**Policy Period.**" Clearly such "overlap" resulting in coverage exclusion would have been important information to communicate to Mammoth in the EPL policy language and at the time of policy purchase. However, Travelers can point to no such language because it does not exist in the policy and Travelers never intended at the time of contract to deny coverage on the overlap/exclusion basis that it is asserting now.

45.     In any case, Ms. Rodriguez Morel's "**Employment Claims,**" i.e her written demand and served civil complaint, both provably delivered to a Mammoth Officer (or "Insured

Person" agent) <u>within</u> the "**Policy Period,**" do <u>not</u> overlap with Ms. Rodriguez Morel's administrative Charge substantively, i.e. by subject matter.  <u>See</u> Exhibits E, F, H, and I.  Ms. Rodriguez Morel did <u>not</u> make any "**Employment Claim**" alluding to the "**Wrongful Employment Practices**" of specifically *disability* discrimination, "wrongful termination," and "failure or refusal to create and enforce adequate [lawful] workplace or employment policies and procedures" (disparate impact) until, at the earliest, December 5, 2020, <u>within</u> the "**Policy Period**." <u>Id.</u>

46.    The Court should therefore declare that Travelers is obligated to pay for all losses resulting from Ms. Rodriguez Morel's "**Employment Claims**" -  her "written demand" and served "civil complaint" - which were first brought to Mammoth's attention within the "**Policy Period**" that Travelers established for Mammoth.  Travelers agreed in its contract with Mammoth to defend against and pay for losses resulting from such "employment claims."

<u>**COUNT II: PETITION FOR DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 (a)**</u>

*47.    Ms. Rodriguez Morel realleges and incorporates by reference each of the above and below paragraphs as if set forth fully herein.*

*48.    For the same contract-term based reasons articulated in Count I herein, Travelers is without basis for denying coverage under its insurance contract issued to Mammoth.*

*49.     28 U.S.C § 2201 permits any interested party to seek from this Court declaration as to her rights and other legal relations, so long as she does so in relation to a case of actual controversy within this Court's jurisdiction and files an appropriate pleading.*

*50.    As discussed supra, Plaintiff Rodriguez Morel filed a civil action in this Court asserting violations of federal law which resulted in this Court's default judgment on these*

*claims. These events give rise to federal question jurisdiction and the ability of the Plaintiff to see relief in this Court under the federal Declaratory Judgment Act at 28 U.S.C. § 2201.*

*51.   The Court should therefore declare under both RSA 491:22 and 28 U.S.C. § 2201 that Travelers is obligated to pay for all losses resulting from Ms. Rodriguez Morel's "Employment Claims" - her "written demand" and served "civil complaint" - which were first brought to Mammoth's attention within the "Policy Period" that Travelers established for Mammoth. Travelers agreed in its contract with Mammoth to defend pay for losses resulting from such "employment claims." These losses, including Plaintiff's attorney's fees and litigation costs from the underlying action, are identified in the default order at Exhibit J.*

*52.   Plaintiff further seeks attorney's fees and costs under 28 U.S.C. § 2201. The availability of attorney's fees in diversity cases depends upon state law, and this holds true in declaratory judgment actions." Town of Peterborough v. Hartford Fire Ins. Co., 824 F. Supp. 1102, 1112 (D.N.H. 1993)(citing Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 259 n. 31 (1975) and Titan Holdings Syndicate v. City of Keene, N.H., 898 F.2d 265, 273 (1st Cir.1990)). Attorney's fees are available pursuant to RSA 491:22–b to a party in an action brought under 28 U.S.C. § 2201 where such action may also be brought under RSA 491:22, as in this case. See Town of Peterborough, 824 F. Supp at 1112.*

## PRAYER FOR RELIEF

WHEREFORE, Ms. Rodriguez Morel respectfully prays that this Honorable Court:

A.   Declare that Travelers Casualty and Surety Company of America must pay for losses resulting from Ms. Rodriguez Morel's "**Employment Claims**" (written demand and served civil complaint), *as shown in this Court's default judgment order at Exhibit J*;

B.      Award Ms. Rodriguez Morel her reasonable attorney's fees and costs **for this**

**declaratory judgment action** pursuant to RSA 491:22-b **and 28 U.S.C. § 2201**; and

C.      Grant such further relief as this Honorable Court deems just and equitable.

Respectfully submitted,
JULIANA RODRIGUEZ MOREL
By her attorneys,

**BACKUS, MEYER & BRANCH, LLP**

Dated: _____, 2024                    By:    /s/ Megan Douglass
Megan Douglass, NH Bar #19501
**116 Lowell Street**
**Manchester, NH 03104**
**(603) 668-7272**
**mdouglass@backusmeyer.com**


**PLAINTIFF'S EXHIBIT**
A

Filing fee: $35.00
Use black print or type.

## State of New Hampshire

Filed
Date Filed : 04/05/2021 04:30:00 PM
Effective Date : 04/05/2021 04:30:00 PM
Filing # : 5341569    Pages : 1
Business ID : 594386
William M. Gardner
Secretary of State
State of New Hampshire

RSA 293-A:15.04

### APPLICATION FOR AMENDED CERTIFICATE OF AUTHORITY
### FOR PROFIT FOREIGN CORPORATION

PURSUANT TO THE PROVISIONS of the New Hampshire Business Corporation Act, the undersigned corporation hereby applies for an Amended Certificate of Authority to transact business in New Hampshire and for that purpose submits the following statement:

**FIRST:** The name of the corporation is: Credit Adjustments, Inc.

**SECOND:** The name the corporation is currently using in the state of New Hampshire is: CAI OF OHIO

**THIRD:** The state or country of incorporation is: Ohio

**FOURTH:** The date the corporation was authorized to transact business in the state of New Hampshire is: April 4, 2008 .

**FIFTH:** This application is filed for the following reason (complete all applicable items);

  a. The corporation has changed its corporate name to: Mammoth Tech, Inc.

  b. The name the corporation will hereafter use in the state of New Hampshire is changed to: Mammoth Tech, Inc.

  c. The corporation has changed its period of duration to:

  d. The corporation has changed the state or country of its incorporation to

Mammoth Tech, Inc.
(Corporate Name)

(Signature)

Michael Osborne
(Print or type name)

President
(Title)

Date signed: 3/4/2021

DISCLAIMER: All documents filed with the Corporation Division become public records and will be available for public inspection in either tangible or electronic form.

Mailing Address - Corporation Division, NH Dept. of State, 107 N Main St, Rm 204, Concord, NH 03301-4989
Physical Location - State House Annex, 3rd Floor, Rm 317, 25 Capitol St, Concord, NH

Form 42  (9/2015)





**PLAINTIFF'S EXHIBIT**
tabbies
13

*EMPLOYMENT PRACTICES LIABILITY COVERAGE*

*THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.*

**I.    INSURING  AGREEMENT**

    **A.**    The Company will pay on behalf of the **Insured**, **Loss** for any **Employment Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Employment Practice**.

    **B.**    If ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, the Company will pay on behalf of the **Insured**, **Loss** for any **Third Party Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Third Party Wrongful Act**.

**II.    DEFINITIONS**

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in section II. DEFINITIONS:

    **A.**    *Claim* means an **Employment Claim** or, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, a **Third Party Claim**.  A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim**  will be deemed to have been made on the date such  **Insured Person**  first received written notice of the  **Claim**.

    **B.**    *Claimant* means:

        1.    a past, present or future **Employee** of or applicant for employment with the **Insured Organization**;

        2.    a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of a past, present or future **Employee** or applicant for employment with the **Insured Organization**; or

        3.    any **Independent Contractor**.

    **C.**    *Discrimination* means any actual or alleged:

        1.    violation of any employment discrimination law; or

        2.    disparate treatment of, or the failure or refusal to hire a **Claimant** or **Outside Claimant** because he or she is or claims to be a member of a class which is or is alleged to be legally protected.

    **D.**    *Employee* means a natural person whose labor or service is engaged by and directed by the **Insured Organization** and:

        1.    who is on the payroll of the **Insured Organization**, including:

            a.    any in-house general counsel of the **Insured Organization**; and

        b.     any other full-time, part-time, and seasonal worker;

2.     who is a volunteer or temporary worker; or

3.     whose services have been leased by the **Insured Organization**.

**Independent Contractors** are not **Employees**. The status of an individual as an **Employee** will be determined as of the date of the alleged **Wrongful Act**.

E.     ***Employment Agreement*** means any express or implied employment agreement regardless of the basis in which such agreement is alleged to exist, other than a collective bargaining agreement.

F.     ***Employment Claim*** means:

1.     a written demand for monetary damages or non-monetary relief;

2.     a civil proceeding commenced by service of a complaint or similar pleading;

3.     a criminal proceeding commenced by filing of charges;

4.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency; provided that in the context of an audit conducted by the Office of Federal Contract Compliance Programs, **Employment Claim** will be limited to a Notice of Violation or Order to Show Cause or written demand for monetary damages or non-monetary relief;

5.     an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of a **Claimant**, or against an **Insured Person** serving in an **Outside Position** by or on behalf of or for the benefit of an **Outside Claimant**, for a **Wrongful Employment Practice**; provided that **Employment Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

G.     ***Executive Officer*** means an officer, member of the board of directors, natural person partner, principal, risk manager, **LLC Manager**, in-house general counsel, member of the staff of the human resources department of the **Insured Organization** or a functional equivalent thereof.

H.     ***Independent Contractor*** means any natural person who is not an **Employee** but who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement. The status of an individual as an **Independent Contractor** will be determined as of the date of the alleged **Wrongful Act**.

I.     ***Insured*** means the **Insured Persons** and the **Insured Organization**.

J.     ***Insured Organization*** means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

K.     ***Insured Person*** means any natural person who was, is or becomes an **Employee**, duly elected or appointed member of the board of directors, officer, member of the board of trustees, member of the board of regents, member of the board of governors, natural person partner, **LLC Manager** or a functional equivalent thereof of the **Insured Organization** for **Wrongful Acts** committed in the discharge of his or her duties as such, or while serving in an **Outside Position**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

L.    ***Loss*** means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and postjudgment interest; and legal fees and expenses of a **Claimant** or **Outside Claimant** awarded pursuant to a court order or judgment. "**Loss**" does not include:

1.    civil or criminal fines; sanctions; liquidated damages other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act; payroll or other taxes; or damages, penalties or types of relief deemed uninsurable under applicable law;

2.    future compensation, including salary or benefits, for a **Claimant** or **Outside Claimant** who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the **Claimant** or **Outside Claimant** to whom such sums are to be paid, but fails to do so;

3.    medical, pension, disability, life insurance, **Stock Benefit** or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of:

a.    medical, pension, disability, life insurance, or other similar employee benefits; or

b.    **Stock Benefits** of an **Insured Organization** whose equity or debt securities are not publicly traded, including on a stock exchange or another organized securities market,

as consequential damages for a **Wrongful Act**; or

4.    any amount allocated to non-covered loss pursuant to Section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

M.    ***Outside Claimant*** means:

1.    a past, present or future **Outside Employee** of or applicant for employment with an **Outside Entity**;

2.    a governmental entity or agency, including the Equal Employment Opportunity Commission or similar federal, state or local agency, when acting on behalf of or for the benefit of present or former **Outside Employees** or applicants for employment; or

3.    any natural person independent contractor who performs labor or service for the **Outside Entity** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Outside Entity**.

N.    ***Outside Employee*** means a natural person whose labor or service is engaged by and directed by an **Outside Entity** and:

1.    who is on the payroll of an **Outside Entity**, including:

a.    any in-house general counsel of the **Outside Entity**; and

b.    any other full-time, part-time, and seasonal worker;

2.      who is a volunteer or temporary worker; or

3.      whose services have been leased by the **Outside Entity**.

The status of an individual as an **Outside Employee** will be determined as of the date of the alleged **Wrongful Employment Practice**.

O.    *Outside Entity* means a corporation or organization:

1.      other than the **Insured Organization**, which is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

2.      specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

P.    *Outside Position* means service by an **Insured Person** as a member of the board of directors, officer, member of the board of trustees, member of the board of managers, member of the board of regents, member of the board of governors or a functional equivalent thereof with an **Outside Entity**, but only during such time that such service is with the knowledge, consent, and at the specific request of the **Insured Organization**.

Q.    *Retaliation* means any actual or alleged **Wrongful Termination** or other adverse employment action against a **Claimant** or **Outside Claimant** on account of such **Claimant's** or **Outside Claimant's** exercise or attempted exercise of rights protected by law, refusal to violate any law, disclosure or threat to disclose to a superior or to any governmental agency alleged violations of the law, or on account of the **Claimant** or **Outside Claimant** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

R .    *Sexual Harassment* means any actual or alleged unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature:

1.      which is made a term or condition of a **Claimant's** or **Outside Claimant's** employment or advancement;

2.      which the submission to or rejection of is used as a basis for decisions affecting the **Claimant** or **Outside Claimant**; or

3.      which has the purpose or effect of creating an intimidating, hostile or offensive work environment.

S.    *Stock Benefit* means compensation provided to **Employees** in the form of equity or debt securities or rights to purchase equity or debt securities or the value thereof, including any grant of stock, restricted stock, stock options or warrants, phantom stock, stock appreciation rights, or performance shares.

T.    *Subsidiary* means:

1.      any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.      any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.      any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly fifty percent (50%) of the issued and outstanding voting stock and whose management and operation the **Insured**

**Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.    subject to the provisions set forth in Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

U.    ***Third Party Claim*** means:

1.    a written demand for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order, service of summons, or similar document;

4.    an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

5.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding,

against an **Insured** by or on behalf of or for the benefit of any natural person other than a **Claimant** for a **Third Party Wrongful Act**; provided that **Third Party Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement or any type of criminal proceeding.

V.    ***Third Party Wrongful Act*** means, with respect to any natural person other than a **Claimant**, any actual or alleged:

1.    violation of any federal, state or local law or statute or any common law prohibiting any kind of discrimination; or

2.    unwelcome sexual advances, requests for sexual favors or any other conduct of a sexual nature which violates the civil rights of any such person.

W.    ***Workplace Harassment*** means any actual or alleged harassment, other than **Sexual Harassment**, which creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive work environment.

X.    ***Wrongful Act*** means:

1.    a **Wrongful Employment Practice** occurring in the course of or arising out of a **Claimant's** employment, application for employment or performance of services with the **Insured Organization**;

2.    a **Wrongful Employment Practice** by an **Insured Person** in his or her **Outside Position** occurring in the course of or arising out of an **Outside Claimant's** employment, application for employment or performance of services with an **Outside Entity**; or

3.    a **Third Party Wrongful Act**, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage has been purchased.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

Y.    ***Wrongful Employment Practice*** means any actual or alleged:

    1.    **Discrimination**;

    2.    **Retaliation**;

    3.    **Sexual Harassment**;

    4.    **Workplace Harassment**;

    5.    **Wrongful Termination**;

    6.    breach of **Employment Agreement**;

    7.    violation of the Family Medical Leave Act;

    8.    employment-related misrepresentation;

    9.    employment-related defamation, including libel or slander, or invasion of privacy;

    10.    failure or refusal to create or enforce adequate workplace or employment policies and procedures, employ or promote, including wrongful failure to grant bonuses or perquisites, or grant tenure;

    11.    wrongful discipline, wrongful demotion, denial of training, deprivation of career opportunity, denial or deprivation of seniority, or evaluation;

    12.    employment-related wrongful infliction of emotional distress; or

    13.    negligent hiring, supervision of others, training, or retention committed or allegedly committed by any **Insured**, but only if such act is alleged in connection with a **Wrongful Employment Practice** set forth in 1. through 12. above; provided that the **Claim** alleging the negligent hiring, supervision of others, training, or retention is brought by or on behalf of any **Claimant** or **Outside Claimant**.

Z.    ***Wrongful Termination*** means the actual, alleged or constructive termination of an employment relationship between a **Claimant** and the **Insured Organization**, or the actual or constructive termination of an employment relationship between an **Outside Claimant** and an **Outside Entity**, in a manner or for a reason which is contrary to applicable law or public policy, or in violation of an **Employment Agreement**.

## III.    EXCLUSIONS

A.    **EXCLUSIONS APPLICABLE TO ALL LOSS**

    1.    The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

    2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, or loss of consortium; provided that this exclusion will not apply to that portion of a **Claim** seeking **Loss** for emotional distress, mental anguish, humiliation, or loss of reputation.

    3.    The **Company** will not be liable for **Loss** for any **Claim**:

a. based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

b. based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

c. brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

provided that this exclusion will not apply to **Claims** for **Retaliation**.

4. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

5. The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

7. The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation; or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), National Labor Relations Act (NLRA) or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; provided that this exclusion will not apply to **Claims** for **Retaliation**.

8. The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

9. The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or **Outside Employee** or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA; provided that this exclusion will not apply to **Claims** for **Retaliation**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

11. The Company will not be liable for **Loss** for any **Third Party Claim**:

a.  alleging price discrimination, or other violation of any antitrust or unfair trade practices law; or

b.  against an **Insured Person** solely due to their service in an **Outside Position**.

12.  The Company will not be liable for **Loss** for any **Claim** for any liability under any agreement governing the terms of the labor or service of an **Independent Contractor**, temporary worker or leased employee with the **Insured Organization** or for liability under any agreement governing the terms of the labor or service of any natural person independent contractor who performs labor or service solely for the **Outside Entity** on a full-time basis pursuant to a written contract or agreement.

13.  The Company will not be liable for **Loss** for any **Claim** for violation of responsibilities, duties or obligations imposed on an **Insured** under any **Wage and Hour Law**; provided that this exclusion will not apply to:

a.  **Claims** for **Retaliation**; or

b.  any actual or alleged violation of the Equal Pay Act.

**B.    EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

2.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking severance pay, damages or penalties under an express written **Employment Agreement**, or under any policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services.

---

**IV.    CONDITIONS**

**A.    SETTLEMENT**

1.  The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that:

a.  the **Insured** and the party bringing a **Claim** hereunder consent to the first settlement offer recommended by the Company (the "Settlement Offer") within thirty (30) days of being made aware of such offer by the Company; and

b.  the amount of such Settlement Offer:

i.  is less than the remaining applicable limit of liability available at the time; and

ii.  combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention;

the Retention will be retroactively reduced by ten percent (10%) with respect to such **Claim**.

2.    If the **Insured** does not consent to the Settlement Offer within thirty (30) days of being made aware of such offer by the Company:

    a.    the Retention will not be reduced as provided in paragraph 1. above even if consent is given to the same or subsequent Settlement Offer; and

    b.    the **Insured** will be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

**B.    OTHER INSURANCE**

1.    This **Liability Coverage** is primary, except as expressly stated otherwise in this **Liability Coverage**.

2.    Except as stated in paragraph 3. of section IV. CONDITIONS B., this **Liability Coverage** will apply only as excess insurance over, and will not contribute with any insurance that applies to any **Claim**:

    a.    against any leased or temporary worker; or

    b.    for a **Third Party Wrongful Act**.

3.    With respect to **Claims** against **Insured Persons** for **Wrongful Employment Practices** in their **Outside Positions**, this **Liability Coverage** will apply only as excess insurance over, and will not contribute with:

    a.    any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**; or

    b.    indemnification to which an **Insured Person** is entitled from any **Outside Entity** other than the **Insured Organization**.

4.    This **Liability Coverage** will not be subject to the terms of any other insurance.

**C.    OUTSIDE POSITIONS - LIMIT OF LIABILITY**

If any **Claim** against an **Insured Person** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for any **Loss**, for such **Claim** will not exceed the largest single available limit of liability under such coverage.





**Wrap+®**

### *PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS*

**POLICY NO. 107298906**

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

## THE LIABILITY COVERAGES ARE WRITTEN ON A CLAIMS-MADE BASIS. THE LIABILITY COVERAGES COVER ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.

| ITEM 1 | **NAMED INSURED:**<br><br>**CREDIT ADJUSTMENTS, INC**<br><br>D/B/A:<br><br><br>Principal Address:<br>**1250 GENEVA BLVD**<br>**DEFIANCE, OH 43512-4303** |
|---|---|
| ITEM 2 | **POLICY PERIOD:**<br><br>Inception Date:  **August 5, 2020**          Expiration Date: **August 5, 2021**<br><br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| ITEM 3 | **ALL NOTICES OF CLAIM OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE OR MAIL AS SET FORTH BELOW:**<br>**Email: BSIclaims@travelers.com**<br>**Fax: (888) 460-6622**<br><br>**Mail: Travelers Bond & Specialty Insurance Claim**<br>      **385 Washington St. – Mail Code 9275-NB03F**<br>      **St Paul, MN  55102** |
| ITEM 4 | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>Private Company Directors and Officers Liability |

©2009 The Travelers Companies, Inc. All Rights Reserved

| ITEM 5 | Only those coverage features marked "☒ Applicable" are included in this policy. |
|---|---|

| PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY | | |
|---|---|---|
| **Limit of Liability:** | **$2,000,000** | for all **Claims** |
| **Supplemental Personal Indemnification Coverage:** | ☒ Applicable | ☐ Not Applicable |
| **Supplemental Personal Indemnification Limit of Liability:** | **$1,000,000** | for all **Claims** |
| **Additional Defense Coverage:** | ☐ Applicable | ☒ Not Applicable |
| **Additional Defense Limit of Liability:** | **Not Covered** | for all **Claims** |
| **Investigation Expense Limit of Liability:** | **$250,000** | for all **Claims** |
| **Retention:** | | |
| | **$0** | for each **Claim** under Insuring Agreement A. |
| | **$10,000** | for each **Claim** under Insuring Agreement B. |
| | **$10,000** | for each **Claim** under Insuring Agreement C. |
| **Prior and Pending Proceeding Date:** | **August 5, 2020** | |
| **Continuity Date:** | **August 5, 2020** | |

| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:** | |
|---|---|---|
| | **$15,250.00** | Policy Premium |
| | **N/A** | Annual Installment Premium |

| ITEM 7 | **TYPE OF LIABILITY COVERAGE:** |
|---|---|
| | ☐ Reimbursement |
| | ☒ Duty-to-Defend |
| | Only the type of liability coverage marked "☒" is included in this policy. |

| ITEM 8 | **LIABILITY COVERAGE EXTENDED REPORTING PERIOD:** |
|---|---|
| | Additional Premium Percentage: **75 %** |
| | Additional Months: **12** |
| | (If exercised in accordance with section **III. CONDITIONS, O. EXTENDED REPORTING PERIOD** of the Liability Coverage Terms and Conditions) |

| ITEM 9 | **LIABILITY COVERAGE RUN-OFF EXTENDED REPORTING PERIOD:** |
|---|---|
| | Additional Premium Percentage:  **Not Applicable** |
| | Additional Months:                        **Not Applicable** |
| | (If exercised in accordance with section **III. CONDITIONS, K. CHANGE OF CONTROL** of the Liability Coverage Terms and Conditions) |
| **ITEM 10** | **ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY:** |
| | ☐ Applicable |
| | ☒ Not Applicable |
| | Only those coverage features marked "☒  Applicable" are included in this policy. |
| **ITEM 11** | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
| | **ACF-7006-0511; AFE-19029-0719; AFE-19030-0719; LIA-3001-0109; LIA-7097-0109; LIA-10001-0610; LIA-19002-1111; LIA-19030-0712; LIA-19097-0315; LIA-19109-0415; LIA-19137-0517; LIA-4023-0218; PDO-3001-0109; PDO-7061-0109; PDO-19004-0512; PDO-19009-0612; PDO-19032-1112; PDO-7064-1013; PDO-19052-0314; PDO-19018-0517; PDO-19006-0517; PDO-19053-0119; LIA-7116-0109; LIA-7313-0109; LIA-7330-0109; LIA-5034-1107** |

**THE DECLARATIONS, THE APPLICATION, THE LIABILITY COVERAGE TERMS AND CONDITIONS, THIS LIABILITY COVERAGE, AND ANY ENDORSEMENTS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE INSURED.**

_____
Countersigned By
IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

Executive Vice President                    Corporate Secretary

| THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY |
|---|

## POLICY CHANGES ENDORSEMENT

**PLAINTIFF'S EXHIBIT**

This endorsement changes the following:

Private Company Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability

**It is agreed that:**

1. As of the Effective Date of this endorsement, the Declarations is amended as indicated below by ☒:

☐ **ITEM 1**:

    ☐ **NAMED INSURED/INSURANCE REPRESENTATIVE:**

    ☐ D/B/A:

    ☐ Principal Address:

☐ **ITEM 2**:

**POLICY PERIOD:**

Inception Date:               Expiration Date:

12:01 A.M. local time both dates at the Principal Address stated in ITEM 1.

☒ **ITEM 5**:

    ☐ **PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY**  (but only for **Claims** first made on or after the Effective Date of this endorsement)

| | | | | |
|---|---|---|---|---|
| ☐ **Limit of Liability:** | | | for all **Claims** | |
| ☐ **Supplemental Personal Indemnification Coverage:** | ☐ Applicable | | ☐ Not Applicable | |
| ☐ **Supplemental Personal Indemnification Limit of Liability:** | | for all **Claims** | | |
| ☐ **Additional Defense Coverage:** | ☐ Applicable | | ☐ Not Applicable | |

Issuing Company:  Travelers Casualty and Surety Company of America      Effective Date: 12/04/2020

Policy Number: 107298906

☐ **Additional Defense Limit of Liability:**                                                    for all **Claims**

☐ **Investigation Expense Limit of Liability:**                                                 for all **Claims**

☐ **Retention:**                                                                                                    for each **Claim** under Insuring Agreement A.
for each **Claim** under Insuring Agreement B.
for each **Claim** under Insuring Agreement C.

☐ **Prior and Pending Proceeding Date:**

☐ **Continuity Date:**

☒ **EMPLOYMENT PRACTICES LIABILITY** (but only for **Claims** first made on or after the Effective Date of this endorsement)

☒ **Limit of Liability:**          $2,000,000                              for all **Claims**

☒ **Third Party Claim Coverage**:    ☒  Applicable          ☐  Not Applicable

☒ **Additional Defense Coverage:**   ☐  Applicable          ☒  Not Applicable

☒ **Additional Defense Limit of Liability:**          Not Applicable                 for all **Claims**

☒ **Retention:**                 $25,000                              for each **Claim** under Insuring Agreement A.
                                         $25,000                              for each **Claim** under Insuring Agreement B., if applicable

☒ **Prior and Pending Proceeding Date:**          **Claims** for **Wrongful Employment Practices:**December 04, 2015
                                                                           **Claims** for **Third Party Wrongful Acts:**December 04, 2015

☒ **Continuity Date:**          **Claims** for **Wrongful Employment Practices:**December 04, 2015
                                             **Claims** for **Third Party Wrongful Acts:**December 04, 2015

☒ **FIDUCIARY LIABILITY** (but only for **Claims** first made and any **Settlement Program Notice** first received on or after the Effective Date of this endorsement)

☒ **Limit of Liability:**          $1,000,000                              for all **Claims**

☒ **Settlement Program Limit of Liability:**          $250,000                 for each **Settlement Program Notice**, which amount is included within, and not in addition to, any applicable limit of liability

© 2019 The Travelers Indemnity Company. All rights reserved.

| ☒ | **HIPAA Limit of Liability:** | $1,000,000 | which amount is included within, and not in addition to, any applicable limit of liability |
| --- | --- | --- | --- |

☒ **Additional Defense Coverage:**  ☐ Applicable  ☒ Not Applicable

☒ **Additional Defense Limit of Liability:**  Not Applicable  for all **Claims**

☒ **Retention:**  $0  for each **Claim** under Insuring Agreement A

$0  for each **Settlement Program Notice** under Insuring Agreement B

☒ **Prior and Pending Proceeding Date:**  December 04, 2020

☒ **Continuity Date:**  December 04, 2020

☒ **ITEM 6**:

   ☒ **PREMIUM FOR THE POLICY PERIOD FOR ALL COVERAGES:**

      $32,581.00  Policy Premium

☐ **ITEM 7**:

   ☐ **TYPE OF CLAIM DEFENSE FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

      ☐ Reimbursement

      ☐ Duty-to-Defend

      ☐ Varies by Coverage - See Expanded Claim Defense Options Endorsement

   Only the type of CLAIM DEFENSE marked "☒" is included in this policy.

☐ **ITEM 8**:

   ☐ **EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

   Additional Premium Percentage:

   Additional Months:

   (If exercised in accordance with the applicable EXTENDED REPORTING PERIOD)

☐ **ITEM 9**:

   **RUN-OFF EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

   Additional Premium Percentage:

Additional Months:

(If exercised in accordance with the applicable CHANGE OF CONTROL condition)

☐ **ITEM 10:**

**ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001):

☐ Applicable

☐ Not Applicable

Only those coverage features marked "☒ Applicable" are included in this policy.

☐ **ITEM 12:**

**LIABILITY COVERAGE SHARED LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001)**:**

☐ Applicable ☐ Not Applicable

for all **Claims** under the following Liability Coverages that are subject to the Terms & Conditions in LIA-3001:

If the **Liability Coverages** selected in ITEM 12 are also **Scheduled Coverages** selected in ITEM 13, then the amount of the **Liability Coverage Shared Limit of Liability** set forth in ITEM 12 is part of, and not in addition to, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages** set forth in ITEM 13.

☐ **ITEM 13:**

**SHARED LIMIT OF LIABILITY/LIMIT OF INSURANCE FOR SCHEDULED COVERAGES:**

☐ Applicable ☐ Not Applicable

for all **Claims** and limits of insurance under the following **Scheduled Coverages**:

The Company's maximum liability for the **Policy Period** for all **Claims** and limits of insurance under the **Scheduled Coverages** listed in ITEM 13 will not exceed the amount of the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**. Any Additional Defense Limit of Liability, Supplemental Personal Indemnification Limit of Liability, or Identity Fraud Expense Reimbursement Limit of Insurance is in addition to, and not part of, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**.

2. As of the Effective Date of this endorsement, this policy is amended as indicated below by ☒:

☒ Forms and endorsements added:
ACF-7007-0811; EPL-19020-0712; EPL-19050-0316; EPL-19057-0517; EPL-19058-0517; EPL-19059-0517; EPL-19060-0517; EPL-19063-0319; EPL-3001-0109; EPL-7059-0109; EPL-7110-0109; FRI-19030-0712; FRI-19065-1112; FRI-19086-0414; FRI-19093-1015; FRI-19103-0517; FRI-3001-0109; LIA-19002-1111; LIA-19137-0517; LIA-7097-0109; LIA-7305-0112; LIA-7330-0109

☒ Forms and endorsements deleted:

© 2019 The Travelers Indemnity Company. All rights reserved.

LIA-19002-1111; LIA-19137-0517; LIA-7097-0109; LIA-7330-0109

☒     Forms and endorsements amended:

LIA-10001-0610

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

© 2019 The Travelers Indemnity Company. All rights reserved.

**Megan Douglass**

**PLAINTIFF'S EXHIBIT**
E

| | |
|---|---|
| **From:** | Megan Douglas |
| **Sent:** | Saturday, December 05, 2020 2:54 PM |
| **To:** | Richard Lehmann |
| **Subject:** | RE: Rodriguez Morel (f/k/a/ Morel Mariano) v. CAI of Ohio |
| **Attachments:** | Rodriguez Morel 12.5.20 demand.pdf |

Hi Rick:

Attached is Ms. Rodriguez Morel's demand.

I look forward to discussing this with you.

**Megan Douglass, Esq.**
**Douglas, Leonard & Garvey, P.C.**
**14 South Street**
**Concord, NH 03301**
**603-224-1988**

ATTENTION: This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Richard Lehmann
**Sent:** Thursday, November 19, 2020 12:29 PM
**To:** Megan Douglas <mdouglass@nhlawoffice.com>
**Subject:** Re: Rodriguez Morel (f/k/a/ Morel Mariano) v. CAI, Inc.

Of course we will review any demand you are inclined to make.

Richard J. Lehmann (Bar No. 9339)
Lehmann Law Office, PLLC
3 North Spring Street
Suite 200
Concord, NH 03301
(603) 731-5435
rick@nhlawyer.com

**From:** Megan Douglas <mdouglass@nhlawoffice.com>
**Date:** Thursday, November 19, 2020 at 12:13 PM
**To:** Richard Lehmann <rick@nhlawyer.com>
**Subject:** FW: Rodriguez Morel (f/k/a/ Morel Mariano) v. CAI, Inc.

1

**Resent-From:** Proofpoint Essentials <do-not-reply@proofpointessentials.com>
**Resent-To:** <rick@nhlawyer.com>
**Resent-Date:** Thursday, November 19, 2020 at 12:05 PM

Hi:

Just following up on this.  Is your client interested in reviewing a demand?

**Megan Douglass, Esq.**
**Douglas, Leonard & Garvey, P.C.**
**14 South Street**
**Concord, NH  03301**
**603-224-1988**

ATTENTION:  This message is intended only for the designated recipient(s).  It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections.  If you are not a designated recipient, you may not review, copy or distribute this message.  If you receive this in error, please notify the sender by reply e-mail and delete this message.  Thank you.

**From:** Megan Douglass
**Sent:** Friday, November 06, 2020 7:22 PM
**To:** 'Richard Lehmann' <rick@nhlawyer.com>
**Subject:** Rodriguez Morel (f/k/a/ Morel Mariano) v. CAI, Inc.

Hello Rick:

Please find the attached DRAFT complaint.  There may be some minor flaws, tweeks, cites that need to be put in etc.  Trust that these will be corrected and of course all exhibits attached In the event I file this.

On this subject, we received the right to sue notice last Friday, so we have 80 days, give or take, to resolve this pre-suit, if CAI is interested in attempting that.

I can also follow this up with a demand including damages calculation.   Please let me know your thoughts.

Thanks.

**Megan Douglass, Esq.**
**Douglas, Leonard & Garvey, P.C.**
**14 South Street**
**Concord, NH  03301**
**603-224-1988**

ATTENTION:  This message is intended only for the designated recipient(s).  It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections.  If you are not a designated recipient, you may not review, copy or distribute this message.  If you receive this in error, please notify the sender by reply e-mail and delete this message.  Thank you.

# DL&G   DOUGLAS, LEONARD & GARVEY, P.C.

## A T T O R N E Y S

Charles G. Douglas, III*
C. Kevin Leonard
Carolyn S. Garvey
Benjamin T. King**
Megan E. Douglass
Samantha J. Heuring

14 SOUTH STREET, SUITE 5
CONCORD, NEW HAMPSHIRE 03301

Telephone:  603-224-1988
Facsimile:  603-229-1988
Email:  mail@nhlawoffice.com
www.nhlawoffice.com

\*   also admitted in MA
\*\* also admitted in ME

December 5, 2020

<u>VIA EMAIL ONLY</u>

Richard Lehmann
Lehman Law Office, PLLC
3 North Spring Street
Suite 200
Concord, N.H. 03301

RE:  <u>Juliana Rodriguez Morel v. CAI of Ohio (d/b/a Credit Adjustments, Inc.)</u>

Dear Rick:

Thank you for reviewing Ms. Rodriguez Morel's draft complaint.  What follows is Ms. Rodriguez Morel's pre-suit demand which is subject to FRE 408 as an offer to accept consideration in compromise of claims.  Ms. Rodriguez Morel reserves the right to withdraw or amend this demand after she files suit.

Because you already have the draft complaint, I will not rehash the facts supporting Ms. Rodriguez Morel's claims.  Instead, I will focus on why I believe Ms. Rodriguez Morel will successfully *prove* her claims.   I am optimistic about Ms. Rodriguez Morel's success where CAI outlines three primary defenses on page 1 of its Human Rights Commission, Verified Response:

I.   That it did not treat Ms. Rodriguez Morel differently under its policies;

II.  That it "never received any notice or documentation that Ms. Rodriguez Morel's pregnancy was anything other than a normal one"; and,

III. That Ms. Rodriguez Morel was not "temporarily disabled" and therefore not entitled to take leave without disciplinary consequence under New Hampshire law because the doctors' notes she submitted (proving she was absent for pregnancy-related reasons under doctors' orders) actually show she was capable of working.

1

Based on evidence in Ms. Rodriguez Morel's possession thus far, it does not appear that these defenses will be sustainable. I'll address each in turn concluding with an explication of damages.

I. <u>Documentary Evidence Shows that CAI *Did*, in Fact, Treat Its Pregnant Employee Differently Under its Policies</u>

Ms. Rodriguez Morel already possesses policy documents and written warnings showing that she received occurrences and discipline contrary to CAI's policies. The policy and warning documents together show that Ms. Rodriguez Morel was entitled under CAI's policies to <u>avoid</u> occurrences under her circumstances, but her supervisors nevertheless tallied occurrences and issued discipline <u>after learning of her pregnancy</u>. Specifically, CAI counted two occurrences for consecutive absences, same reason, on December 27 and 28 when only one should have been counted under its written policy. CAI also counted an occurrence for Ms. Rodriguez Morel's absence period January 8, 9 and 10, though such a three-day absence period should have resulted in "no consequences at all" to Ms. Rodriguez Morel. <u>See Verified Response</u>, page 4 (explaining that under the "personal leave" policy three absences with medical verification should not result in any occurrence or discipline). CAI's disparate treatment is further discussed at draft complaint paragraphs: 16-22; 47-54; 58-61; and 106-115.

II. <u>Witnesses and CAI's Own Admissions Corroborate that It *Did* Receive Notice that Ms. Rodriguez Morel's Pregnancy was "Other than Normal."</u>

CAI concedes that its management knew of Ms. Rodriguez Morel's pregnancy as early as December 2018. <u>See</u> Verified Response, page 1 (stating that Ms. Rodriguez Morel disclosed her pregnancy to Lauren Cochrane in December 2018). CAI also acknowledges its awareness of <u>several</u> workday absences for Ms. Rodriguez Morel, in December 2018 and through January 2019, from which it reasonably should have inferred that she was suffering from severe and debilitating pregnancy-related symptoms. Additionally, Suzanne Guzman and others working in and around Ms. Rodriguez Morel from December 2018 through to February 2019 will testify as to how alarmingly ill Ms. Rodriguez Morel <u>appeared to be at work</u>; they will testify to repeatedly seeing Ms. Rodriguez Morel running to the bathroom and hearing her retch in the bathroom. Given CAI's admitted understanding of Ms. Rodriguez Morel's pregnancy as early as in December 2018, its acknowledgment of a pattern of illness related absences for Ms. Rodriguez Morel in December 2018 through to mid-February 2019, and Ms. Rodriguez Morel's co-workers' testimony, that she was visibly and audibly ill at work during this time period, it is <u>not</u> at all likely that CAI will be credible in asserting that it had no notice that her pregnancy was "anything other than a normal one."

Moreover, CAI gave Ms. Rodriguez Morel disability certification paperwork <u>on its own initiative</u>, after it noticed Ms. Rodriguez Morel had several periods of pregnancy-related absence. The only reason why it did not receive notice of disability in the form of the doctor completed paperwork, was because it pre-emptively and discriminatorily terminated Ms. Rodriguez Morel before she had an opportunity to return the paperwork to CAI.

Ms. Rodriguez Morel now *does* possess a doctor's letter certifying that her pregnancy was distinct from "a normal one" and that she suffered significant pregnancy complications.

2

III. Ms. Rodriguez Morel *Was* Temporarily Physically Disabled Due to Pregnancy, as Confirmed By Her Physicians, and Therefore *Was* Entitled Under New Hampshire Law to Take Leave Without Discipline.

   CAI's "not temporarily disabled" defense, that apparently relies on a distinction between "normal" and "other than normal" pregnancy and Ms. Rodriguez Morel's doctors' notes restoring her to work (after a period of pregnancy-related absence), is not likely to withstand judicial scrutiny. In fact, this may be the unusual case where summary judgment is granted for the *plaintiff*, because CAI's disciplining Ms. Rodriguez Morel for taking leave under her undisputed factual circumstances so clearly violates New Hampshire law.

   The plain language of New Hampshire law permits female employees to take leave for a period of temporary physical disability resulting from "pregnancy, childbirth or related medical conditions." See RSA 354-A:7, VI (b). Thus mere "pregnancy" or "normal pregnancy" that has caused a period of temporary physical disability as confirmed by a medical practitioner does entitle a New Hampshire employee to leave time for the period of physical disability.   Ms. Rodriguez Morel presently has the evidence she needs to show both that she was entitled to leave under RSA 354-A:7, VI (b) and that she was unlawfully disciplined for taking it.   She possesses doctors' notes taking her out of work for her pregnancy-related incapacity, which CAI admits to having received and reviewed, and she possesses her warning documents and CAI's Verified Response stating explicitly that CAI disciplined her for her absences covered by the doctors' notes.

   Hawaii has an administrative rule very similar to RSA 354-A:7, VI (b), stating:

   "(a) **Disability** due to and resulting from **pregnancy, childbirth, or related medical conditions** shall be considered by the employer to be **justification for a leave**, with or without pay, by the female employee **for a reasonable period of time**. 'Reasonable period of time' as used in this section **shall be determined by the employee's physician**, with regard for the employee's physical condition and the job requirements."

   See Sam Teague, Ltd. v. Hawai'i Civil Rights Com'n, 971 P.2d 1104 (Haw. 1999)(citing HAR § 12-46-108 (1992))(emphasis added).

The Hawaiian Supreme Court, interpreting this rule, concluded that the rule:

   "provide[d] for … reasonable leave time required **due to pregnancy** or childbirth...". See id. (emphasis added).

   The New Hampshire Court adjudicating Ms. Rodriguez Morel's case will similarly conclude that Ms. Rodriguez Morel's pregnancy-related illness periods coupled with her doctor's removal of her from work for the pregnancy-related illness periods means that CAI could not discipline Ms. Rodriguez Morel for her absences from work pursuant to her doctors' recommendations without violating New Hampshire law.

IV. <u>CAI is exposed to Having to Pay an estimated $445,000 in Damages and Attorney's Fees and Costs After Ms. Rodriguez Morel's Successful Trial of Her Case.</u>

    A.    <u>Back Wages</u>

    If Ms. Rodriguez Morel is successful in any of her termination or constructive discharge claims (Counts 1 – 6) she will be awarded back wages. CAI paid Ms. Rodriguez Morel $20.46/hour and she worked fulltime. At 40 hours a week, her weekly pay was $818.40. Ms. Rodriguez Morel has been out of work and diligently working toward re-employment for approximately 95 weeks. Her back wage losses are $77,748 and continue to accrue. In this employment market it may take an additional 4-5 months for Ms. Rodrigues Morel to find an administrative position similar to that which she held at CAI. Another five months of unemployment would result in additional $17,718.36 in wage losses.

    B.    <u>Compensatory Damages</u>

    If Ms. Rodriguez Morel prevails on Counts 1, 2, 3, 5 or 6 she is eligible for compensatory damages, for her emotional harm suffered due to CAI's unlawful/discriminatory actions. In <u>McPadden v. Walmart</u> (1:14-cv-00457-SM, verdict issued January 2016), Judge McAuliffe upheld a $500,000 compensatory damages award for a plaintiff that suffered similarly to Ms. Rodriguez Morel. Maureen McPadden, like Ms. Rodriguez Morel, suffered physically due to stress caused by her employer's unlawful actions, and like Ms. Rodriguez Morel, Ms. McPadden suffered the indignity of being fired *after* challenging her employer's unlawful practices. Even if the jury were to award Ms. Rodriguez Morel *half* as much for her pain and suffering as it awarded Ms. McPadden, CAI would still be exposed to having to pay $250,000 in compensatory damages.

    C.    <u>Attorney's Fees</u>

    While presently fees and costs remain modest, Ms. Rodriguez Morel's attorney's fees could exceed $100,000 after plaintiff's successful trial of her case.

    D.    <u>Demand Total</u>

    Ms. Rodriguez Morel will argue for <u>enhanced compensatory and punitive damages,</u> especially given the evidence discussed in section II <u>supra</u>, tending to show CAI's knowing and callous treatment of its pregnant, ill and debilitated employee. However, setting these damages aside at this pre-suit stage, CAI's estimated damages exposure is:

     $95,000 in back wages
$250,000 in compensatory damages
$<u>100,000</u> in attorneys' fees and costs

    $445,000  =  TOTAL

    In the interest of resolving this matter pre-suit, Ms. Rodriguez Morel offers to fully and finally release CAI from the claims asserted against it in her draft complaint, as well as from any other claims which Ms. Rodriguez Morel might presently have against CAI, in exchange for consideration in the amount of $325,000.

Thank you for your attention to this letter and we look forward to your response.

Sincerely,

/s/ *Megan Douglass*

Megan Douglass

Cc:  Juliana Rodriguez Morel

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JULIANA RODRIGUEZ MOREL | |
| f/k/a JULIANA MOREL MARIANO, | |
|     Plaintiff | |
| v. | JURY TRIAL REQUESTED |
| CAI OF OHIO | |
| d/b/a CREDIT ADJUSTMENTS INC., | |
|     Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **COMPLAINT**

## I.    **INTRODUCTION**

This is an ADAA, Title VII, RSA 354-A, and wrongful discharge case.  Plaintiff Juliana Rodriguez Morel suffered debilitating pregnancy symptoms at work, including bleeding, headaches, nausea, and vomiting.   Ms. Rodriguez Morel had to take intermittent leave from work due to her symptoms.  Defendant CAI of Ohio, Ms. Rodriguez Morel's employer, disciplined and ultimately terminated Ms. Rodriguez Morel for taking the leave.  When Ms. Rodriguez Morel demanded a termination letter, to prove she had been terminated due to her pregnancy, CAI disingenuously offered reinstatement without offering any accommodation to Ms. Rodriguez Morel's pregnancy or pregnancy-related medical condition under its attendance and discipline policies.  Ms. Rodriguez Morel foresaw that if she accepted reinstatement, she would continue to suffer discipline and would be terminated, again, due to her pregnancy.  In lieu of returning to suffer looming indignities and termination, she filed an administrative complaint for constructive discharge.

1

## II.    PARTIES

1.      The Plaintiff, Juliana Rodriguez Morel ["Ms. Rodriguez Morel"] resides in Manchester, New Hampshire.

2.      Defendant, CAI of Ohio ["CAI"], is a foreign profit corporation with a principal office in Defiance, Ohio.

3.      CAI operates branch offices in California and in Manchester, New Hampshire, and it employs greater than five hundred employees.

4.      CAI is a "receivables management" company known for healthcare and student loan collections.

5.      CAI has a contract for federal student loan collections which requires it to take affirmative action to recruit, hire, promote, and retain individuals with disabilities.  See 29 U.S.C. § 793.  See 41 C.F.R. § 60-741.44.

6.      Ms. Rodriguez Morel applied for employment and was employed by CAI under her former name, Juliana Morel Mariano.

7.      Ms. Rodriguez Morel disclosed to CAI that she had a disability, diagnosed depression and anxiety, prior to her hire.  See Exhibit A.

8.      CAI employed Ms. Rodriguez Morel as an "Administrative Team Member" in its Manchester office from approximately August 27, 2018 until February 11, 2019.

9.      Ms. Rodriguez Morel's duties included maintaining collection accounts.

10.     Ms. Rodriguez Morel worked full time.  She was scheduled to work 8AM to 5PM, on Mondays, Wednesdays, and Fridays, and 12PM to 9PM, on Tuesdays and Thursdays.

11.     Ms. Rodriguez Morel was a conscientious employee who received superior performance evaluations which she stored in her locker at work.

2

### III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over Ms. Rodriguez Morel's ADAA and Title VII claims pursuant to 28 U.S.C. § 1331, providing for district court original jurisdiction over civil actions arising from the laws of the United States.

13.    This Court has supplemental jurisdiction over Ms. Rodriguez Morel's RSA 354-A and wrongful discharge claims under 28 U.S.C. § 1367.  The state law claims so relate to the ADAA and Title VII claims that they form the same case or controversy.

14.    Alternatively, this Court has jurisdiction over the state law claims under 28 U.S.C. § 1332 (a)(1).  The claims in controversy each exceed the sum or value of $75,000, exclusive of interest and costs, and each is between citizens of different States.

15.    This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

### IV.    STATEMENT OF FACTS

#### A.    CAI's "No Fault" and "Call In" Attendance Policies

16.    For the period of Ms. Rodriguez Morel's employment with CAI, CAI had a "no fault" attendance policy.  <u>See</u> Exhibit B.

17.    Under the policy, CAI counted "occurrences" of employee absence from work.  An "occurrence" was counted regardless of reason for absence, with the only exceptions being for absence due to work-related illnesses or injury, or absence permitted under the Family Medical Leave Act or the Americans with the Disabilities Act.  <u>See</u> <u>id.</u>

18.    The policy did <u>not</u> exempt absences permitted by California or New Hampshire state law.  <u>See</u> <u>id</u>.

3

19.    Under the "no fault" policy, two consecutive workday absences taken for the same reason (that was not related to a work-related illness or injury or was not permitted by the FMLA or ADAA) were counted as a <u>single</u> occurrence.  <u>See id.</u>

20.    "An occurrence of three consecutive days or more" required medical verification and/or a request for leave of absence.  <u>See id.</u>

21.    Employees were advised that "repeated occurrences" would result in them being placed "on the Company's Disciplinary Program."  <u>See id</u>.

22.    CAI additionally had a "call in" policy requiring employees to notify CAI of their anticipated absences.

23.    In advance of absence, employees were to call in to an attendance line at CAI headquarters, and identify themselves, the date or dates of their anticipated absence, and the reason for their absence.

24.    Employees generally reported their absence information via recorded voice mail message to an attendance line.

**B.**    **<u>Ms. Rodriguez Morel's Pregnancy Symptoms and Their Affect on Her Work</u>**

25.    On December 10 and 11, 2018, Ms. Rodriguez Morel sought medical care for abdominal pain and vaginal bleeding.  Her providers confirmed she was approximately seven weeks pregnant and informed that she was at risk for miscarriage.

26.    Ms. Rodriguez Morel relayed this information to her friend and direct supervisor, Suzanne Guzman.  She asked Ms. Guzman whether CAI upper management should be informed of her pregnancy.  Ms. Guzman suggested that Ms. Rodriguez Morel wait to disclose her pregnancy to upper management because she suspected that management would be displeased to learn of the pregnancy.

27.    On Monday, December 17 and Tuesday, December 18, 2018, Ms. Rodriguez Morel worked partial days.

4

28.    On Thursday, December 20, 2018, Ms. Rodriguez Morel was suffering from a pregnancy-related headache at work and she wanted to go home.  Ms. Rodriguez Morel contacted Stacy Morrision, a Human Resources Administrator at headquarters in Ohio, to ask for her occurrence total.

29.    On December 21, 2018, Ms. Morrison reported to Ms. Rodriguez Morel that she had accrued one occurrence.  See Exhibit C.

30.    On or about that same day, Friday, December 21, 2018, Ms. Rodriguez Morel told Ms. Guzman that she was experiencing "morning sickness" including headaches, nausea, and vomiting. Anticipating her inability to work due to these symptoms, Ms. Rodriguez Morel asked Ms. Guzman about CAI's maternity leave policies.

31.    Ms. Guzman advised that Ms. Rodriguez Morel might be entitled to leave due to her symptoms, and she suggested that Ms. Rodriguez Morel consult with "Doug," the Manchester office's Human Resources contact.

32.    Ms. Guzman next took vacation leave, from December 26 to 28, 2018, and in her absence Steven Snarski supervised Ms. Rodriguez Morel.

33.    On Wednesday, December 26, 2018, Ms. Rodriguez Morel became violently ill at work, with a severe headache, recurrent nausea, and vomiting.  Ms. Rodriguez Morel was not permitted to have a trash can at her work area, so she had to repeatedly get up and run to the bathroom to vomit.

34.    Ms. Rodriguez Morel eventually decided to inform Mr. Snarski that she was pregnant and that she was very ill due to her pregnancy.  She identified her symptoms and asked to go home.  Mr. Snarski instructed Ms. Rodriguez Morel to email both Ms. Guzman and Administrative Manager, Lauren Cochrane, as to her need to leave work before departing from work.

35.    Remembering Ms. Guzman's concern about disclosing her pregnancy to management, Ms. Rodriguez Morel sent an email identifying her symptoms but not her pregnancy.  See Exhibit D.  She next left work, and called out sick on Thursday, December 27 and Friday, December 28, 2018,

5

following "call in" protocols for these days.  She reported to the attendance line that she needed to remain out of work simply because her symptoms from the 26th persisted.

36.     Though she was still quite ill with recurrent vomiting, Ms. Rodriguez Morel returned to work on her next scheduled workday, Monday, December 31, 2018.  She again found herself frequently having to leave her work station to vomit in the ladies room.  Her vomiting, at times, was so loud that other workers took notice and inquired as to her well being.

37.     On one occasion when Ms. Rodriguez Morel was walking back to her work area, Ms. Cochrane stopped her and asked whether she was okay.  Ms. Cochrane said that an employee had notified her that Ms. Rodriguez Morel was vomiting in the bathroom.

38.     Ms. Rodriguez Morel initially replied only that she was "fine."  However, as her vomiting persisted, Ms. Rodriguez Morel felt compelled to explain her behavior in running to the bathroom; she disclosed to Ms. Cochrane that she was pregnant and that she was suffering from severe morning sickness, including headache, nausea and vomiting.

39.     Ms. Cochrane offered little support or suggestion other than to ask Ms. Rodriguez Morel whether she was sure she was pregnant because "birth control pills can sometimes cause pregnancy tests to be false positive."

40.     Ms Rodriguez Morel left Ms. Cochrane's office feeling humiliated and anxious, but she worked her next scheduled workdays, vomiting throughout, because she understood she must to keep her job.

41.     On Tuesday, January 8, 2019, Ms. Rodriguez Morel was at work, continuing to experience vomiting and abdominal pain, when she also noticed blood in her urine.

42.     Very alarmed, she reported these symptoms to Ms. Cochrane who allowed her to leave work to go to the hospital.

43.     At the hospital, Ms. Rodriguez Morel was treated with an anti-nausea injection and tested for urinary tract and kidney conditions.   After determining that Ms. Rodriguez Morel's symptoms

6

stemmed from her pregnancy, doctors discharged her with a doctor's note taking her out of work until Friday, January 11, 2019.  See Exhibit E.

44.    Ms. Rodriguez Morel was absent from work on Tuesday, January 8; Wednesday, January 9; and Thursday, January 10, 2019.  She notified of her absences on the attendance line by calling in on the 9th, advising that she was suffering illness related to her "pregnancy" and that she would be out of work under doctor's orders until the 11th.

45.    From this point forward, when Ms. Rodriguez Morel called the attendance line, she clearly advised that she was "pregnant" and that she was suffering illness related to her "pregnancy." Moreover, whenever Ms. Rodriguez Morel was taken out of work by her doctors, for her symptoms expected to last several days, she reported her multiple anticipated absences on only the first day of her anticipated absence period.

46.    At no time did any CAI employee advise Ms. Rodriguez Morel that it was against CAI policy for her to report her entire anticipated period of absence on only the first day of absence, nor did any CAI employee advise Ms. Rodriguez Morel that she was required to call in to the absence line each day of an anticipated absence period.

### C.    Ms. Rodriguez Morel Suffers First and Second Written Warnings for Her Pregnancy-Related Absences

47.    Ms. Rodriguez Morel returned to work on Friday, January 11, 2019 and gave her doctor's note to Ms. Cochrane.  See id.  Later that day, she was called to a meeting with Ms. Cochrane and Michelle McNeil, CAI Vice President of Contract Administration, wherein Ms. Cochrane issued Ms. Rodriguez Morel two written warnings.   Ms. Rodriguez Morel received a first written warning for "occurrences" accrued for absences on December 17, 18, 26, 27, 28, see Exhibit F, and a second written warning for an occurrence that accrued due to her absences on January 8 and 9, see Exhibit G.

7

48.     Ms. Rodriguez Morel received 2.5 occurrences for her absences taken December 26, 27, and 28, see Exhibit F, despite the no fault policy specifying that absence on two consecutive workdays for the same underlying reason amounted to just one occurrence.[1]

49.     Ms. Rodriguez Morel questioned why she was being disciplined for absences related to pregnancy complications.  Ms. Cochrane explained that in order for the absences to not give rise to discipline under CAI's no fault attendance policy, Ms. Rodriguez Morel would have had to have been on leave, with medical verification for the leave, "for three days."

50.     Ms. Rodriguez Morel did have a doctor's note covering her for absences for three workdays - January 8, 9 and 10.  See Exhibit E.   Ms. Cochrane nevertheless counted 1 occurrence for Ms. Rodriguez Morel's absences on January 8 and 9 (ignoring the 10th) and issued the second warning based on this occurrence.   See Exhibit G.

51.     Explaining the warnings, Ms. McNeil interjected her beliefs that New Hampshire was a "no fault state" and that this meant there was "no good or bad reason for not coming to work under the law."

52.     Ms. Cochrane offered a "no fault" example, stating: "It's like when I locked my keys in my car at Dunkin Donuts and was late to work.  I was not excused for my lateness."

53.     Ms. Rodriguez Morel responded that her situation was different because she had to leave work to go to the hospital because she was pregnant, in pain, bleeding, and potentially miscarrying.  Her supervisors answered that none of these were valid excuses for avoiding discipline under the "no fault" policy.

54.     Ms. Rodriguez Morel emailed Ms. Morrison at CAI headquarters to verify that Ms. Cochrane's and Ms. McNeil's information was accurate.    Ms. Morrison confirmed that, in CAI's view, Ms.

---

[1] Properly calculated in accordance with CAI written policy, only *1.5* occurrences, at most, should have been counted for Ms. Rodriguez Morel's absences - .5 for the 26th, and 1 for the 27th and 28th.

Rodriguez Morel had no pregnancy-related leave entitlement, and that she could be disciplined under the "no fault" attendance policy if supervisors prohibited her from taking leave and she nevertheless took leave for pregnancy reasons.  See Exhibit H.

      **D.**    **Ms. Rodriguez Morel Receives a Final Written Warning for Her Pregnancy-Related Absences**

55.    On Friday, January 18, 2019 Ms. Rodriguez Morel had been extremely ill for two days.  She called out of work complying with CAI's protocols, including by advising of her pregnancy-related symptoms, and she again sought care in an emergency room.

56.    Ms. Rodriguez Morel was again diagnosed with vomiting, headache, and lower abdominal pain due to pregnancy.  She was given a doctor's note removing her from work for <u>four</u> days or until January 22, 2018.  See Exhibit I.  On or about Monday January 21, 2019, Ms. Rodriguez Morel called the attendance line to advise of her medically recommended absence from work, due to pregnancy-related illness, until Tuesday, January 22, 2019.

57.    Ms. Rodriguez Morel returned to work on Tuesday, January 22, 2018 and emailed her doctor's note to Ms. Guzman and Ms. Cochrane, stating explicitly her pregnancy, her symptoms, and her hospitalization for these symptoms.  See Exhibit J.

58.    Ms. Rodriguez Morel did not anticipate discipline related to this leave, relying on Ms. Cochrane's representation that leave for three days or longer with medical verification would <u>not</u> result in an occurrence or discipline.   Nevertheless, Ms. Cochrane issued Ms. Rodriguez Morel a "final written warning" due to an occurrence being counted for absences on Friday, January 18 and Monday, January 21.  See Exhibit K.

59.    Ms. Rodriguez Morel asked Ms. Cochrane why she received an occurrence and discipline for her absences on January 18 and 21 when her doctor's note removed her from work for greater than three days (January 18, 19, 20 and 21).  Ms. Cochrane responded that an occurrence was counted and discipline was issued because only two of the days covered by the note - January 18 and January 21 -

were scheduled workdays for Ms Rodriguez Morel. Ms. Cochrane explained that to qualify for the

three-day, medical-verification exception to occurrence and discipline, Ms. Rodriguez Morel's

doctor's note would have had to have covered three scheduled workdays.

60.     CAI's policy, as written, does <u>not</u> actually require medical verification for specifically three

consecutive *work*-day absences in order to trigger occurrence exemption. <u>See</u> Exhibit B.

61      Ms. Rodriguez Morel emailed Ms. Morrison inquiring as to the accuracy of Ms. Cochrane's

interpretation of the three-day, medical verification rule. She received no response.

     **E.**     **<u>Ms. Rodriguez Morel's Supervisor Denies Her Discretionary Leave Due to Her</u>**
          **<u>Disciplinary Status</u>**

62.     On Wednesday, January 23, 2019, Ms. Rodriguez Morel was again extremely sick at work with

vomiting. She contacted her physician who suggested that she seek immediate medical care.

63.     Ms. Rodriguez Morel consulted "Doug," the Manchester Human Resources employee, to

obtain permission to leave work to see her doctor. She explained to Doug that she was pregnant and

very ill with vomiting, and asked if she would receive another occurrence if she left work to obtain

medical care. Doug responded that he would need to consult with Human Resources in Ohio before he

could offer advice.

64.     While waiting for Doug's response, Ms. Rodriguez Morel emailed both Ms. Guzman and Ms.

Cochrane, to inform of her symptoms and to ask for permission to take *vacation* leave from work in

order to seek immediate medical attention. <u>See</u> Exhibit L.

65.     Ms. Cochrane responded icily, "we are unable to approve your vacation request due to

coverage. Thank you." <u>See</u> Exhibit M.

66.     Ms. Rodriguez Morel consulted with Ms. Guzman, who intimated that she thought an employee

should seek necessary medical care regardless of any work consequences. Ms. Rodriguez Morel thus

left work to obtain care.

67.    At the emergency room, Ms. Rodriquez Morel was treated for several hours for acute vomiting and was issued a doctor's note taking her out of work from Wednesday, January 23 through Monday, January 28, 2019. See Exhibit N. Ms. Rodriguez Morel "called in" for this absence period on Monday, January 24th only.

68.    Ms. Rodriguez Morel returned to work on Tuesday, January 29, 2019, submitted her doctor's note to Ms. Cochrane, and did not receive any discipline. However, Ms. Rodriguez Morel needed permission to attend an upcoming *well* doctor's visit for the purpose of adjusting her anxiety and depression medications in light of her pregnancy.

69.    Doug reported on the 29th to Ms. Rodriguez Morel that headquarters had relayed to him that because Ms. Rodriguez Morel was not FMLA eligible, she could face discipline if she left work for medical care without supervisor approval. Doug therefore suggested to Ms. Rodriguez Morel that she seek supervisor approval for leave to attend her planned well doctor's visit. Doug recommended that Ms. Rodriguez Morel submit a request via "UltiPro," CAI's online, leave-request system,

70.    Ms. Rodriguez Morel submitted an UltiPro request, for her visit scheduled for January 31, 2019. She received a response indicating that Ms. Cochrane was denying the request because she was "on attendance/production warning [and] not eligible for unapproved down time." See Exhibit P.

71.    Ms. Rodriguez Morel attended the visit anyway. She obtained a doctor's note, evidencing that her visit was related to her previously disclosed mental health disability. See Exhibit Q. She anxiously submitted the note to Ms. Cochrane and waited for repercussions under the "no fault" attendance policy.

### E.    Ms. Cochrane and Ms. McNeil Seek to Terminate Ms. Rodriguez Morel For Her Pregnancy-Related Absences

72.    Upon information and belief, after receiving the note, Ms. Cochrane and/or Ms. McNeil contacted Keith Carr, CAI's Human Resources Manager, to inquire as to whether Ms. Rodriguez Morel could be terminated under the "no fault" attendance policy due to her January 31, 2019 absence.

11

73.     Upon information and belief, Mr. Carr advised that if disabled, due to pregnancy or otherwise, Ms. Rodriguez Morel must be afforded reasonable accommodation to her disability, including accommodation with regard to her attendance.   Upon information and belief, Mr. Carr instructed Ms. McNeil to give Ms. Rodriguez Morel disability certification paperwork, for completion by her medical providers, in order to determine whether accommodation should be afforded.

74.     On Friday, February 1, 2019, at approximately 5 PM, Ms. McNeil again summoned Ms. Rodriguez Morel to her office.  Ms. McNeil ominously informed Ms. Rodriguez Morel that she knew Ms. Rodriguez Morel left work on January 31, 2019 without approval.  Yet, rather than terminating Ms. Rodriguez Morel (as Ms. Rodriguez Morel anticipated), Ms. McNeil handed over the disability certification paperwork for completion by Ms. Rodriguez Morel's medical providers.

75.     Ms. Rodriguez Morel told Ms. McNeil she would bring the paperwork to her next doctor's visit scheduled for Friday, February 8, 2019.

### F.      Ms. Rodriguez Morel is Terminated Before She Can Submit the Disability Certification Paperwork

76.     On Monday, February 4, 2019, Ms. Rodriguez Morel was again seriously ill with morning sickness.   She called in following CAI's call-in protocol, including by notifying of her pregnancy-related symptoms.

77.      On Tuesday, February 5, 2019, Ms. Rodriguez Morel was again so debilitated with headache, nausea and vomiting that she again sought care in an emergency room.   Ms. Rodriguez Morel called the CAI attendance line to advise of her pregnancy-related absence.

78.     Consistent with her previous three visits for emergency care, in as many weeks, Ms. Rodriguez Morel was again diagnosed with chronic headache and vomiting associated with pregnancy.  Ms. Rodriguez Morel was additionally diagnosed with a "placental abnormality in [the] second trimester."

79.    Ms. Rodriguez Morel's emergency room treatment provider removed her from work, from

Tuesday, February 5 until Saturday February 9, 2019, and provided her with a doctor's note stating the

same.

80.    Ms. Rodriguez Morel called in to the attendance line on the morning of Wednesday February 6,

2019 to notify CAI that her doctor had removed her from work for the remainder of the workweek

(including Thursday, February 7 and Friday, February 8) due to pregnancy-related symptoms.

81.    CAI boxed up Ms. Rodriguez Morel's personal effects in her work area on Thursday, February

7, 2019.  Ms. Rodriguez Morel learned this from her co-workers on Friday, February 8, 2019.

82.    On Monday, February 11, 2019, Ms. Rodriguez Morel was highly anxious reporting to work,

afraid that she would be terminated, but she promptly reported to work with her doctor's note.

83.    Ms. Rodriguez Morel arrived to discover that her key card had been deactivated, and she was

ushered to a meeting with Ms. Cochrane and Ms. McNeil.  The supervisors informed her that she had

been terminated for "no call no show" on Thursday, February 7 and Friday, February 8, 2019.

84.    Ms. Rodriguez Morel protested that she had properly left a message on the attendance line,

informing of her medically verified, pregnancy-related absences on February 6th, 7th and 8th.  She

presented her doctor's note as evidence supporting the call, but Ms. Cochrane and Ms. McNeil refused

to take the note, stating that the termination decision came from Human Resources and that there was

nothing they could do.

85.    Ms. Rodriguez Morel, very upset and interested in vindicating her rights, requested a letter

stating that CAI had terminated her.  Ms. Cochrane and Ms. McNeil again referred Ms. Rodriguez

Morel to Human Resources in Ohio.  The supervisors presented Ms. Rodriguez Morel with items from

her locker, less her superior performance evaluations which had been stored there, and demanded that

she leave the premises.

13

86.     That afternoon, Ms. Rodriguez Morel called Human Resources and left a voice mail message,

stating that she had reported to work, that she had been terminated for "no call no show," and that she

needed a letter confirming her termination.  Ms. Rodriguez Morel further stated that the termination

was unjust because she had, in fact, called in to the attendance line on Monday the 4th, Tuesday the 5th

and Wednesday 6th,  and that on the 6th she had advised that she would be absent, on February 7 and

February 8, 2019, for pregnancy reasons, pursuant to a doctor's note,

87.     Nearly three hours later, a CAI Human Resource employee contacted Ms. Rodriguez Morel to

inform her that Human Resources had made "a mistake."  The employee informed that Human

Resources had reviewed its attendance line messages and discovered that Ms. Rodriguez Morel had, in

fact, reported her absences for February 7 and February 8, 2019.   The employee advised that she went

ahead and reinstated Ms. Rodriguez Morel, so that "it would be like nothing ever happened."  The

employee also unsettlingly advised that CAI would "not hold" Ms. Rodriguez Morel's February 11

absence, due to her termination, "against [her]" as yet another "occurrence."

88.     Ms. Rodriguez Morel tearfully responded: that she could not go on "like nothing ever

happened"; that the stress of not knowing whether she would be fired under the attendance policy was

unbearable for her in her condition; and that she had been extremely embarrassed and humiliated by

the "mistaken" termination.

89.     The Human Resources employee responded only that if Ms. Rodriguez Morel failed to report

the following workday, she would be marked as having abandoned her job and she would be

terminated.

90.     Ms. Rodriguez Morel replied that she needed to consider her situation.  She called the New

Hampshire Commission for Human Rights, extremely distraught, and ultimately decided to not return

to CAI and to instead timely filed a complaint for constructive discharge.

14

91.     CAI recruited and hired an administrative team member to replace Ms. Rodriguez Morel with same skills and qualifications as Ms. Rodriguez Morel.  See Exhibit R.

92.     Ms. Rodriguez Morel removed her charge from the Commission after 180 days in order to proceed with a civil action, as is permitted by RSA 354-A:21-a.

93.     Ms. Rodriguez additionally received a right to sue notice from the EEOC, see Exhibit S, and this complaint is timely filed within 90 days of her receipt of the notice.


**COUNT I – Violation of RSA 354-A:7, VI (b)**
**Failure to Permit Leave of Absence Due to Temporary Disability due to Pregnancy**

94.     The preceding paragraphs are re-alleged and incorporated herein.

95.     RSA 354-A:7, VI (b) provides "An employer shall permit a female employee to take leave of absence for the period of temporary physical disability resulting from pregnancy… or related medical conditions."

96.     CAI's "no fault" attendance policy did not comport with RSA 354-A:7, VI (b).  Instead of "permitting" employees to take leave of absence for temporary disability resulting from pregnancy and related medical conditions, the policy *penalized* employees for taking such leave.  CAI supervisors applied the policy to count "occurrences" and to issue discipline to Ms. Rodriguez Morel for her absences due to pregnancy-related temporary disability.

97.     As of late December 2018, Ms. Rodriguez Morel was rendered unable to work, by headache, nausea, vomiting, abdominal pain and bleeding, all due to her pregnancy and medical conditions related to her pregnancy.  She was temporarily disabled due to pregnancy or related medical conditions.

98.     Ms. Rodriguez Morel formally notified Ms. Cochrane of her temporary disability due to pregnancy on or about December 31, 2018.

15

99.    Ms. Rodriguez Morel's temporary disability due to pregnancy caused her to be absent from work for several days in late December 2018, several days in January 2019, and several days m February 2019.

100.    Though Ms. Rodriguez Morel sufficiently notified of her pregnancy-related temporary disability beginning in late December 2018 and continuing until her termination on February 11, 2019, Ms. Cochrane applied CAI's "no fault" attendance policy to count occurrences for Ms. Rodriguez Morel's absences which she knew to be due to her temporary disability.  On the basis of these occurrences, Ms. Cochrane issued Ms. Rodriguez Morel first, second and final written warnings.

101.    By applying its "no fault" policy to take repeated disciplinary action against Ms. Rodriguez Morel, CAI violated NH RSA 354-A:7, VI (b) and caused Ms. Rodriguez Morel significant emotional harm.

102.    Applying the policy in contravention of RSA 354-A:7, VI (b) resulted in Ms. Rodriguez Morel's decision to reject CAI's offer of reinstatement, i.e. contributed to Ms. Rodriguez Morel's constructive discharge.

103.    To sustain a claim for constructive discharge under Title VII, the plaintiff must prove that her employer imposed "working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." Landrau-Romero v. Banco Popular De Puerto Rico, 209 F.3d 10 (1st Cir. 2000).   The New Hampshire Supreme Court finds Title VII cases instructive in evaluating a claim of constructive discharge under New Hampshire law. See Order, Anna Tilton & Andrew Christie v. N.H. Sec. of State, No. 2011-CV-407 at p. 8 n. 1 (Merrimack Super. Ct.) (April 27, 2012).

104.    CAI made no changes to its "no fault" attendance policy when it offered to reinstate Ms. Rodriguez Morel.  Rather, CAI *emphasized* the policy, when it, without compunction, advised that it

would not "hold against" Ms. Rodriguez Morel an "occurrence" for her absence caused by CAI's action - its "mistaken" termination of Ms. Rodriguez Morel.

105.    Ms. Rodriguez Morel, who remained pregnant and suffering from pregnancy-related medical conditions at the time of the disingenuous offer of reinstatement, therefore reasonably foresaw looming additional discipline and ultimate termination by application of the "no fault" policy, and she thus reasonably felt compelled to forsake employment at CAI.

### COUNT II – Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, VI (c)
### Discrimination in Terms, Conditions, and Privileges of Employment due to Sex

106.    The preceding paragraphs are re-alleged and incorporated herein.

107.    It is an unlawful for an employer to discriminate against an employee in terms, conditions, and privileges of employment because of the employee's sex. 42 U.S.C § 2000e-2(a)(1).  RSA 354-A:7,VI (c).

108.    "Because of sex" includes because of "pregnancy, childbirth, or related medical conditions." 42 U.S.C § 2000e (k).   RSA 354-A:7, VI (a).

109.    CAI's "no fault" attendance policy incorporated the term, condition, or privilege of employment, of *avoiding* "occurrences" (and discipline resulting from occurrences) if employees fulfilled certain conditions.  For example, if an employee met the condition of being absent for two consecutive workdays for the same reason, an employee could avoid an occurrence being counted for each absence.  Similarly, if an employee met the condition of medical need for absence for "three consecutive days or more," and provided medical verification or submitted a request for leave for the absence, an employee could avoid any occurrence being counted at all.

17

110.    Notwithstanding that Ms. Rodriguez Morel met these conditions and qualified for exception to

occurrences, CAI nevertheless counted occurrences for her, its <u>pregnant</u> employee, and issued first,

second, and final written warnings based on these occurrences.

111.    For example, after Ms. Rodriguez Morel notified Ms. Cochrane of her pregnancy and

pregnancy-related symptoms on or about December 31, 2018 and again on January 8, 2019, and after

she notified *headquarters* of her pregnancy and pregnancy-related symptoms on the "call in" line on

January 9, 2019, CAI issued Ms. Rodriguez Morel a first written warning based on <u>2</u> occurrences

counted for absences on December 27 and 28, 2018, when it should have counted just 1 occurrence for

these dates per its policy of counting just one occurrence for two workdays missed for the same reason.

112.    CAI also issued a second written warning based on an occurrence counted for Ms. Rodriguez

Morel's absences on January 8, 9, and 10, 2019, though <u>no</u> occurrence should have been counted

because Ms. Rodriguez Morel had medical need for these absences of "three consecutive days or

more," and she requested leave for these days, on the attendance line on January 9, 2019, with medical

verification for the leave in hand.

113.    CAI additionally issued a final written warning based on an occurrence counted for Ms.

Rodriguez Morel's absences on January 18 and 21, 2019, even though she requested on the attendance

line a leave of absence from January 18 through January 21, 2019 (*four* days of medical need), and she

submitted to CAI medical verification for her inability to work for these four days.

114.    CAI discriminated against Ms. Rodriguez Morel by denying her, due to her pregnancy, the

term, condition or privileged of employment of avoiding discipline under its "no fault" attendance

policy that it afforded other workers.    Ms. Rodriguez Morel has stated a prima facie case for disparate

treatment under CAI's policy: "that she belongs to the protected class, that she sought accommodation,

that the employer did not accommodate her, and that the employer did accommodate others similar in

their ability or inability to work." <u>Young v. United Parcel Serv., Inc.,</u> 135 S. Ct. 1338, 1354 (2015).

115.    The discrimination caused her significant emotional harm and resulted in her constructive

discharge.  Ms. Rodriguez reasonably understood as of February 11, 2019 when she made the choice to

forsake her job, that she would continue to accrue occurrences and receive discipline under the "no

fault" attendance policy due to her pregnancy, and that the minimal protections from termination that

*should* have been available to her under the policy were <u>not</u> actually available to her as a pregnant

employee.


### COUNT III – 42 U.S.C. § 12112(b)(5)(A) and RSA 354-A:7, VII (a)
### Failure to Make Reasonable Accommodation to Substantially Limiting Pregnancy-Related Impairment

116.    The preceding paragraphs are re-alleged and incorporated herein.

117.    Title 1 of the ADAA and RSA 354-A: 7, VII (a) require  employers to make "reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual with

a disability who is an ... employee...."   42 U.S.C. § 12112(b)(5)(A).

118.    To state a claim for failure to make reasonable accommodation under the ADAA, the plaintiff

must allege that "(a) she is disabled within the ADA's definition; that (b) she could perform the job's

essential functions either with or without a reasonable accommodation; and that (c) the employer knew

of her disability, yet failed to reasonably accommodate it.  <u>Lang v. Wal-Mart Stores E., L.P.</u>, 813 F.3d

447 (1st Cir. 2016).

119.    An employee is disabled within the meaning of the ADAA if she suffers any physical or mental

impairment that substantially limits a major life activity.  29 CFR § 1630.2.

120.    Physical impairment includes any "physiological ... condition" affecting a "body system,"

including the "digestive" and "reproductive" systems.  <u>Id.</u>   Physical impairment also includes

"premature rupture of membranes, [and] vaginal bleeding."  <u>Hernandez v. City of Hartford</u>, 959 F.

Supp. 125, 130 (D. Conn. 1997).

121.    "Substantially limits" as used in the ADAA is construed broadly in favor of finding "disability." 29 CFR § 1630.2.  The effects of an impairment lasting or expected to last fewer than six months can be "substantially limiting." Id.

122.    "Major life activity" is defined as the operation of a major body function including digestion and reproductive function.  Id.  Interacting with others, concentrating, and working are also identified "major life activities" under the ADA.

123.    EEOC interpretive guidance establishes that "pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the [ADAA disability] definition." Emphasis added.

124.    Ms. Rodriguez Morel was "disabled" where for months she suffered the confluence of severe and recurring nausea and vomiting, migraine, threatened miscarriage, vaginal bleeding, and placental abnormality in the second trimester.   These pregnancy related conditions together substantially limited her ability to engage in the major life activities of concentrating, interacting with others, and working.

125.    Ms. Rodriguez Morel was capable of performing the essential functions of her job with accommodation, as demonstrated by the superior performance reviews she received prior to disclosing her pregnancy but which were notably not released to her at her termination meeting.

126.    Ms. Rodriguez Morel disclosed her pregnancy-related impairment to multiple supervisors CAI's Manchester location as of the close of December 2018, and she informed CAI headquarters of her conditions on or before January 9, 2019.  Ms. Rodriguez Morel also asked her supervisors and human resources representatives at the Manchester office, and human resources representatives in Ohio, for the reasonable accommodation of exception to discipline under the "no fault" attendance policy for her disability related absences.

127.    CAI refused to afford her this reasonable accommodation though it would have presented no undue burden to CAI.  This refusal resulted in significant emotional harm to Ms. Rodriguez Morel and

ultimately her constructive discharge. Ms. Rodriguez Morel had repeatedly asked multiple CAI

supervisors and human resources employees for accommodation under CAI's attendance policy, and

she was repeatedly denied, such that she could reasonably foresee looming emotional distress and

termination if she accepted reinstatement to her position at CAI.

### COUNT IV – Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(k)(1)(A)(i)
### Use of an Employment Practice that Caused a Disparate Impact Based on Sex/Pregnancy

128.    The preceding paragraphs are re-alleged and incorporated herein.

129.    Title VII "proscribes not only overt discrimination but also practices that are fair in form, but

discriminatory in operation." Rodriguez v. United States, 852 F.3d 67 (1st Cir. 2017).   Under Title

VII, a claim for "disparate impact" covers "practices that are not intended to discriminate but in fact

have a disproportionately adverse effect on minorities." Id. (citing Ricci v. DeStefano , 557 U.S. 557,

577, (2009)).

130.    To make a prima facie showing of disparate impact, a plaintiff starts by identifying the

employment practice being challenged.   Jones v. City of Boston, 752 F.3d 38 (1st Cir. 2014).   A

plaintiff must then show that the identified practice causes a disparate impact on the basis of

sex/pregnancy.   See id. (citing 42 U.S.C. § 2000e–2 (k)(1)(A)(i))

131.    CAI's "no fault" attendance policy, though facially neutral, caused a disparate impact to

pregnant employees, including Ms. Rodriguez Morel.

132.    Under the policy, an employee received an "occurrence" for a single workday absence

regardless of illness, medical need, or temporary disability causing the absence from work.   See e.g.

Exhibit ___ and Exhibit ___.

133.    CAI issued Ms. Rodriguez Morel a final written warning after only 5.5 occurrences, indicating

that under the "no fault" policy an employee faced final warning for as few as 5.5 absences.

134.    CAI also issued Ms. Rodriguez Morel: a first warning after it counted 3.5 occurrences; a second warning after an additional counted occurrence; and a final written warning after just one more occurrence. This demonstrated that under the "no fault" policy, once an employee was placed on warning status for having greater than three "occurrences," three subsequent "occurrences" would bring about termination.

135.    Under the policy, then, an employee could be terminated for being absent from work for just six days total, even with valid medical excuse for each absence.

136.    While six days of permitted leave under the policy undoubtedly would accommodate some temporary disabilities, the policy falls considerably short of the period generally recognized in human experience as the respite needed to carry and bare a child.  See Abraham v. Graphic Arts Intern. Union, 660 F.2d 811, 819 (D.C. Cir. 1981).  In short, a six-day absolute ceiling on leave portended a drastic effect on pregnant employees, an impact that no male would ever encounter. See e.g. id.

137.    Ms. Rodriguez Morel suffered repeated adverse disciplinary action due to the disparate impact of CAI's no fault attendance policy on pregnant employees.  She suffered emotional losses and, ultimately, constructive discharge due to the impact of the policy.

138.    Ms. Rodriguez Morel was constructively discharged where, at the time she left employment on February 11, 2019: she remained pregnant and suffering from pregnancy related medical conditions; she had received repeated discipline under the "no fault" policy for reasons known to be related to her pregnancy; the policy had caused her significant emotional distress over attending a basic check-up (well visit) for her and her baby; and CAI had failed to make any concessions to her pregnancy under its "no fault" or 6-maximum-absences attendance policy.  She reasonably foresaw looming emotional distress and termination if she accepted reinstatement to her position at CAI.

## COUNT V – Wrongful Discharge
### Wrongful Discharge for Performing an Act Encouraged by RSA 354-A:7, VI (b)

139.   The preceding paragraphs are re-alleged and incorporated herein.

140.   A plaintiff states a claim for wrongful discharge in two parts.   First, the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment.   Cloutier v. Great Atlantic & Pac. Tea Co., Inc., 121 N.H. 915, 922 (1981).   Second, the plaintiff must demonstrate she was discharged because she performed an act that public policy would encourage.   Id.

141.   As discussed supra, a plaintiff is "constructively" discharged, including for a wrongful discharge claim, where her "working conditions [are] so intolerable that a reasonable person would feel compelled to forsake her job rather than to submit to looming indignities."

142.   CAI was motivated by bad faith, malice, or retaliation in wrongfully discharging the plaintiff, as shown by the following.   CAI disparately applied exceptions to accruing occurrences under its "no fault" attendance policy, so that Ms. Rodriguez Morel accrued more occurrences than she should have under CAI's policy.   Moreover, when it became clear that Ms. Rodriguez Morel might nevertheless avoid termination under the policy, by obtaining disability certification which would allow her to take leave from work and would effectively bar her termination under the policy, CAI immediately terminated Ms. Rodriguez Morel for a shifted policy reason, "no call, no show."   CAI did this despite that Ms. Rodriguez Morel had, in fact, called in to report the pregnancy-related absences relied upon to terminate her, just as she had for her multiple, pregnancy-related absences in the months preceding her termination.

143.   Additionally showing bad faith is CAI's failure to deliver Ms. Rodriguez Morel's superior performance evaluations, when it delivered her other personal effects at her termination meeting. CAI cherry picking and removing the evaluations shows consciousness of the liability that CAI faced in terminating a pregnant and disabled Ms. Rodriguez Morel, before she had fair opportunity to submit her disability accommodation paper work.

23

144.    Lastly, CAI's callous statement to a distraught Ms. Rodriguez Morel, that it would not discipline her for the absence that it caused by humiliatingly terminating her, shows bad faith, retaliation, or malice.

145.    Ms. Rodriguez Morel performed an act that public policy would encourage.  She took the temporary disability leave that RSA 354-A:7, VI (b) encourages pregnant women to take.  Taking leave is an "act encouraged by public policy" where an employee has an enforceable right to take the leave under state law.  See Gage v. Rymes Heating and Oils, Inc., Memorandum and Order March 1, 2016, 14-cv-480-PB (D.N.H)(citing Faulkner v. Mary Hitchcock Mem'l Hosp., 2013 DNH 152).

145.    Though CAI purported to terminate for "no call no show," CAI actually terminated Ms. Rodriguez Morel for taking the temporary disability leave encouraged by public policy.  At the time of the termination, CAI was patently unhappy with Ms. Rodriguez Morel for taking the pregnancy-related disability leave; it had issued her first, second and final written warnings to her for taking the leave in just the few weeks immediately preceding the termination.

146.    Alternatively, CAI constructively discharged Ms. Rodriguez Morel.  When CAI falsely offered Ms. Rodriguez Morel reinstatement, communicating that it nevertheless would continue to take adverse action against her for taking pregnancy-related temporary disability leave, up to and including termination, her termination loomed such that she reasonably forsook the opportunity of reinstatement.

### COUNT VI – 42 U.S.C. §§ 12112(a), 2000e-2(a)(1) and RSA 354-A:7, I and 19
### Discriminatory/Retaliatory Discharge Due to Sex and/or Disability

147.    The preceding paragraphs are re-alleged and incorporated herein.

148.    It is unlawful for an employer to discriminate against an employee by discharging her due to disability, or pregnancy or related medical conditions.  See 42 U.S.C. §§ 12112(a), 2000e(k) and 2000e-2(a)(1).  See also RSA 354-A:7, I and VI (a).

149.    It is also unlawful for an employer to retaliate against an employee, by discharging the

employee, for engaging in the protected activity of requesting accommodation to disability.  See e.g.

Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016).

150.    To state a claim for discharge on the basis of disability or pregnancy, in violation of the

ADAA, Title VII, or RSA 354-A:7, the employee must allege, she "(1) was within a protected class;

(2) met the employer's legitimate performance expectations; (3) was actually or constructively

discharged; and (4) was replaced by another with similar skills and qualifications.  Landrau-Romero v.

Banco Popular De Puerto Rico, 209 F.3d 10 (1st Cir. 2000).

151.    To state a claim for retaliation for engaging in the protected activity of requesting

accommodation under the ADAA and RSA 354-A:7, VII (a), an employee must plead that she

requested accommodation, suffered and adverse action, and that there was a causal connection between

that protected activity and the adverse action taken by the employer. See Murray, 821 F.3d at 87.

152.    Close temporal proximity between protected conduct and termination satisfies the causal

connection requirement.

153.    Ms. Rodriguez was pregnant and disabled with disclosed substantially limiting pregnancy-

related impairment as well as anxiety and depression in the relevant time period of late December 2018

through February 11, 2019.

154.    Alternatively, CAI *regarded* Ms. Rodriguez Morel as disabled when it gave her disability

paperwork for completion.

155.    Ms. Rodriguez Morel met her employer's legitimate work expectations as shown by her

superior performance evaluations that were withheld from her at her termination on February 11, 2019.

There is also further no evidence of poor performance in Ms. Rodriguez Morel's personnel file

subsequently produced to her.

25

156.    CAI terminated Ms. Rodriguez Morel asserting a <u>false</u> reason: "no call no show." The "no call no show" reason was pretext for the CAI's discriminatory and retaliatory reasons for termination.

157.    CAI eventually admitted that its asserted "no call no show" reason for termination was <u>false</u>.

158.    CAI admitted the falseness of its original reason for termination when it attempted to reverse its actually discriminatory and retaliatory termination decision <u>after</u> Ms. Rodriguez Morel demanded a termination letter suggesting that she might sue CAI.

159.    At Ms. Rodriguez Morel's termination meeting in Manchester, her supervisors made <u>no</u> attempt, before effectuating her termination, to confirm with CAI Human Resources in Ohio that Ms. Rodriguez Morel had indeed "no called no showed," even where Ms. Rodriguez Morel vigorously protested that she had called in, as was her proven pattern or practice. This lack of basic courtesy to Ms. Rodriguez Morel demonstrates that CAI was actually inconvenienced by Ms. Rodriguez Morel's pregnancy, disability, her request for accommodation, and the likelihood that she would qualify for intermittent leave as a disability accommodation. CAI accordingly terminated Ms. Rodriguez Morel less than 10 days after identifying her as a potential candidate for workplace accommodation.

160.    The very close proximity between the discussion surrounding accommodation to Ms. Rodriguez Morel's pregnancy and disability, held on February 1, 2019, and her termination on February 11, 2019, shows a causal connection between Ms. Rodriguez Morel's request for accommodation and her termination.

161.    Upon information and belief, based on Exhibit R, Ms. Rodriguez Morel was replaced by a worker with skills and qualifications similar to hers.

162.    Ms. Rodriguez Morel may be considered to be constructively discharged where her work conditions were so intolerable that she reasonably forsook CAI's reinstatement offer. Due to her pregnancy, related medical conditions, disclosure of her condition to her supervisors, and attempts to obtain accommodation to her pregnancy-related disability, and to a lesser extent to her mental health

disability, Ms. Rodriguez Morel found herself repeatedly and unjustifiably disciplined, perpetually in a state of having to choose between her and her child's health and her income, and ultimately terminated from her position. CAI communicated in offering reinstatement that it <u>would persist</u> in taking adverse action against Ms. Rodriguez Morel due to her pregnancy and disability.

WHEREFORE, the Plaintiff, Juliana Rodriguez Morel, respectfully prays that this Honorable Court:

A.    Schedule this matter for trial by jury, and after trial;

B.    Order employment of the Plaintiff after trial;

C.    Award the Plaintiff damages for her economic losses, including without limitation lost wages (back and front pay), lost employment benefits, and lost earning capacity;

D.    Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience and loss of enjoyment of life;

E.    Award enhanced compensatory damages;

F.    Award the Plaintiff punitive damages;

G.    Award the Plaintiff his reasonable attorney's fees;

H.    Award the Plaintiff interest and costs;

I.    Award all other damages available to the Plaintiff at law, and

J.    Award the Plaintiff such other relief as this court deems equitable and just.

Respectfully submitted,

JULIANA RODRIGUEZ MOREL,

By her attorneys,

DOUGLAS, LEONARD & GARVEY, P.C.

Date:  November ___, 2020          By:    /s/ Megan Douglass
                                          Megan Douglass #19501
                                          14 South Street, Suite 5
                                          Concord, NH 03301
                                          (603) 224-1988
                                          mdouglass@nhlawoffice.com

27

**Megan Douglass**

**PLAINTIFF'S EXHIBIT**

| From: | ecf_bounce@nhd.uscourts.gov |
|---|---|
| Sent: | Thursday, February 18, 2021 2:14 PM |
| To: | nef@nhd.uscourts.gov |
| Subject: | Activity in Case 1:21-cv-00040-AJ Morel v. Credit Adjustments, Inc. Waiver of Service Executed |

[EXTERNAL MESSAGE]

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of New Hampshire**

**Notice of Electronic Filing**

The following transaction was entered by Douglass, Megan on 2/18/2021 at 2:14 PM EST and filed on 2/18/2021

| **Case Name:** | Morel v. Credit Adjustments, Inc. |
|---|---|
| **Case Number:** | 1:21-cv-00040-AJ |
| **Filer:** | Juliana Rodriguez Morel |
| **Document Number:** | 4 |

**Docket Text:**
**WAIVER OF SERVICE Returned Executed as to Credit Adjustments, Inc. by Juliana Rodriguez Morel. Served/Mailed on 1/19/2021. Answer Follow Up on 3/23/2021. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Douglass, Megan)**

**1:21-cv-00040-AJ Notice has been electronically mailed to:**

Megan E. Douglass    mdouglass@nhlawoffice.com, denise@nhlawoffice.com, stacey@nhlawoffice.com, susan@nhlawoffice.com

**1:21-cv-00040-AJ Notice, to the extent appropriate, must be delivered conventionally to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**

1

[STAMP dcecfStamp_ID=1045603718 [Date=2/18/2021] [FileNumber=2312781-0
] [7518fc5cf814399798df0081b68b8912715935504229ebd81f3dad056ec8260e5b1
e48ae8b280ee6a88714349aedd8846d33badac839e06f8533f3aa7d2f03cc]]

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
## for the
### District of New Hampshire

| | | |
|---|---|---|
| Juliana Rodriguez Morel f/k/a Juliana Morel Mariano | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.  21-cv-40-AJ |
| Credit Adjustments, Inc. d/b/a CAI of Ohio | ) | |
| _Defendant_ | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:  Megan E. Douglass, Esq,.
     _(Name of the plaintiff's attorney or unrepresented plaintiff)_

    I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

    I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

    I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

    I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _1/19/2021_ , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:  2/17/2021

                                      /s/Richard J. Lehmann
                                   _Signature of the attorney or unrepresented party_

Credit Adjustments, Inc. d/b/a CAI of Ohio
_Printed name of party waiving service of summons_

                              Richard Lehmann, Esq.
                                   _Printed name_

Lehmann Major List, pllc
6 Garvins Falls Road
Concord, NH 03301
                                  _Address_

rick@nhlawyer.com
                                  _E-mail address_

(603) 731-5435
                                  _Telephone number_

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

    Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

    "Good cause" does _not_ include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

    If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

    If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Print      Save As...      Reset

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JULIANA RODRIGUEZ MOREL | |
| f/k/a JULIANA MOREL MARIANO, | |
| Plaintiff | |
| v. | JURY TRIAL REQUESTED |
| CREDIT ADJUSTMENTS INC. | |
| d/b/a CAI of Ohio | |
| Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## **COMPLAINT**

## I.    INTRODUCTION

This is an ADAA, Title VII, RSA 354-A, and wrongful discharge case.  Plaintiff Juliana Rodriguez Morel suffered debilitating pregnancy symptoms at work, including bleeding, headaches, nausea, and vomiting.   Ms. Rodriguez Morel had to take intermittent leave from work due to her symptoms.  Defendant Credit Adjustments, Inc. (Ms. Rodriguez Morel's employer) disciplined and ultimately terminated Ms. Rodriguez Morel for taking the leave.  When Ms. Rodriguez Morel demanded a termination letter, to aid in proving that she had been terminated due to her pregnancy, Credit Adjustments, Inc. (only then) offered reinstatement, and significantly its offer came without any accommodation under its attendance and discipline policies to Ms. Rodriguez Morel's pregnancy or pregnancy-related medical conditions.  Ms. Rodriguez Morel therefore reasonably understood, that if she accepted reinstatement, she would continue to suffer discipline and she would again be terminated

1

due to her pregnancy. In lieu of suffering a second termination, she filed a charge of discrimination and now files this complaint.

## II.     PARTIES

1.     The Plaintiff, Juliana Rodriguez Morel ["Ms. Rodriguez Morel"] resides in Manchester, New Hampshire.

2.     Defendant, Credit Adjustments, Inc. ["CAI"], is a foreign profit corporation with a principal office in Defiance, Ohio, doing business in New Hampshire as CAI of Ohio.

3.     CAI operates branch offices in California and in Manchester, New Hampshire, and it employs greater than five hundred employees.

4.     CAI is a "receivables management" company known for healthcare and student loan collections.

5.     CAI has a contract for federal student loan collections requiring it to take affirmative action to recruit, hire, promote, and retain individuals with disabilities. See 29 U.S.C. § 793. See 41 C.F.R. § 60-741.44.

## III.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over Ms. Rodriguez Morel's ADAA and Title VII claims under 28 U.S.C. § 1331, providing for district court jurisdiction over civil actions arising from the laws of the United States.

7.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Rodriguez Morel's RSA 354-A and wrongful discharge claims. The state law claims so relate to the ADAA and Title VII claims that they form the same case or controversy.

8.     Alternatively, this Court has jurisdiction over the state law claims under 28 U.S.C. § 1332 (a)(1). The claims in controversy each exceed the sum or value of $75,000, exclusive of interest and costs, and each is between citizens of different States.

9.    This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

**IV.    STATEMENT OF FACTS**

    **A.    <u>Background</u>**

10.    Ms. Rodriguez Morel was employed by CAI under her former name, Juliana Morel Mariano.

11.    Prior to her hire, Ms. Rodriguez Morel disclosed to CAI that she had a disability, which was diagnosed depression and anxiety.  <u>See</u> Exhibit A.

12.    CAI employed Ms. Rodriguez Morel as an "Administrative Team Member" in its Manchester office, from approximately August 27, 2018 until February 11, 2019.

13.    Ms. Rodriguez Morel's duties included maintaining collection accounts.

14.    Ms. Rodriguez Morel worked full time and was scheduled to work 8AM to 5PM, on Mondays, Wednesdays, and Fridays, and 12PM to 9PM, on Tuesdays and Thursdays.

15.    Ms. Rodriguez Morel was a conscientious employee who received superior performance evaluations which she stored in her locker at work.

    **B.    <u>CAI's "No Fault" and "Call In" Attendance Policies</u>**

16.    While CAI employed Ms. Rodriguez Morel, CAI had a "no fault" attendance policy.  <u>See</u> Exhibit B.

17.    Under the "no fault" policy, CAI counted "occurrences" of employee absence from work.  An "occurrence" was counted <u>regardless of the reason for absence</u>, with the only exceptions being for absence due to work-related illnesses or injury, or absence permitted under the Family Medical Leave Act or the Americans with the Disabilities Act.  <u>See</u> <u>id.</u>

18.    The policy did <u>not</u> exempt from penalty absences permitted by *state* law.  <u>See</u> <u>id</u>.

19.     Under the "no fault" policy, two consecutive workday absences taken <u>for the same reason</u> (that was not work-related or was not permitted by the FMLA or ADAA) were counted as a <u>single</u> occurrence.  <u>See id.</u>

20.     "An occurrence of three consecutive days or more" required medical verification and/or a request for leave of absence.  <u>See</u> <u>id</u>.

21.     Employees were advised that "repeated occurrences" would result in them being placed "on the Company's Disciplinary Program."  <u>See</u> <u>id</u>.

22.     CAI additionally had a "call in" policy requiring employees to notify CAI of their anticipated absences.

23.     In advance of absence, employees were to call in to a dedicated attendance line at CAI headquarters and identify themselves, the date or dates of their anticipated absence, and the reason for their absence.

24.     Employees generally left this information in voice mail messages to the dedicated line.

**C.     <u>Ms. Rodriguez Morel's Pregnancy Symptoms and Their Effect on Her Ability to Work</u>**

25.     On December 10 and 11, 2018, Ms. Rodriguez Morel sought medical care for abdominal pain and vaginal bleeding.  Her providers confirmed she was approximately seven weeks pregnant and cautioned that she was at risk for miscarriage.

26.     Ms. Rodriguez Morel relayed this information to her friend and direct supervisor, Suzanne Guzman.  She asked Ms. Guzman whether she should report her condition to CAI upper management. Ms. Guzman suggested that Ms. Rodriguez Morel <u>wait to disclose her pregnancy</u> to upper management because she suspected that <u>management would be displeased to learn of the pregnancy</u>.

27.     On Monday, December 17 and Tuesday, December 18, 2018, Ms. Rodriguez Morel worked partial days.

4

28.    On Thursday, December 20, 2018, Ms. Rodriguez Morel was suffering from a pregnancy-related headache at work and needed to go home but didn't, because she was afraid to leave work without knowing her "occurrence" total.  She contacted Stacy Morrision, a Human Resources Administrator at headquarters in Ohio, to ask for her total.

29.    The following day, on December 21, 2018, Ms. Morrison reported to Ms. Rodriguez Morel that she had accrued one occurrence.  See Exhibit C.

30.    On or about that same day, Friday, December 21, 2018, Ms. Rodriguez Morel told Ms. Guzman that she was experiencing debilitating "morning sickness," including headaches, nausea, and vomiting.  Anticipating her inability to work due to these symptoms, Ms. Rodriguez Morel asked Ms. Guzman about CAI's maternity leave policies.

31.    Ms. Guzman advised Ms. Rodriguez Morel that she might be entitled to leave time due to her pregnancy symptoms, and she suggested consultation with "Doug," the Manchester office's Human Resources contact.

32.    Ms. Guzman took vacation leave, from December 26 to 28, 2018, and in her absence Steven Snarski supervised Ms. Rodriguez Morel.

33.    On Wednesday, December 26, 2018, Ms. Rodriguez Morel became violently ill at work with a severe headache, recurrent nausea, and vomiting.  Ms. Rodriguez Morel was not permitted to have a trash can at her work area, so she had to repeatedly get up and run to the bathroom to vomit.

34.    Ms. Rodriguez Morel decided to inform Mr. Snarski that she was pregnant and very ill due to her pregnancy.  She identified her symptoms and asked to go home.  Mr. Snarski instructed Ms. Rodriguez Morel to email both Ms. Guzman and Administrative Manager, Lauren Cochrane, as to her need to leave work before leaving work.

35.    Remembering Ms. Guzman's concern about disclosing her pregnancy to management, Ms. Rodriguez Morel sent an email identifying her symptoms but not specifically her pregnancy.  See

5

Exhibit D. Ms. Rodriguez Morel next left work, and called out sick on Thursday, December 27 and

Friday, December 28, 2018, following "call in" protocols for these days. She reported to the

attendance line that she needed to remain out of work because her symptoms from the 26th persisted.

36.     Though she was still quite ill with vomiting, Ms. Rodriguez Morel returned to work on her next

scheduled workday, Monday, December 31, 2018. She again found herself frequently having to leave

her work station to vomit in the ladies room. Her vomiting, at times, was so loud that other workers

noticed and inquired into her well-being.

37.     On one occasion Ms. Rodriguez Morel was walking back to her work area and supervisor

Cochrane stopped her and asked whether she was okay. Ms. Cochrane mentioned that an employee

had notified her that Ms. Rodriguez Morel was vomiting in the bathroom.

38.     Ms. Rodriguez Morel initially replied only that she was "fine." However, as her vomiting

continued throughout the day, Ms. Rodriguez Morel felt compelled to explain her behavior in running

to the bathroom. Accordingly, Ms. Rodriguez Morel disclosed to Ms. Cochrane, she was pregnant and

that she was suffering from severe morning sickness, including headache, nausea and vomiting.

39.     Ms. Cochrane offered little support or suggestion other than to ask Ms. Rodriguez Morel

whether she was sure she was pregnant because, she said, "birth control pills can sometimes cause

pregnancy tests to be false positive."

40.     Ms Rodriguez Morel left Ms. Cochrane's office humiliated and anxious, but she worked her

next scheduled workdays, vomiting throughout, because she understood she had to, to keep her job.

41.     On Tuesday, January 8, 2019, Ms. Rodriguez Morel was at work, continuing to experience

vomiting and abdominal pain, when she also noticed blood in her urine.

42.     Very alarmed, she reported these symptoms to Ms. Cochrane who allowed her to leave work to

go to the hospital.

6

43.    At the hospital, Ms. Rodriguez Morel was treated with an anti-nausea injection and tested for urinary tract and kidney conditions.    After determining her symptoms stemmed from her pregnancy, doctors discharged Ms. Rodriguez Morel with a doctor's note taking her out of work until Friday, January 11, 2019.    See Exhibit E.

44.    Ms. Rodriguez Morel was thus absent from work on Tuesday, January 8; Wednesday, January 9; and Thursday, January 10, 2019.    The absence on the 8th had been authorized by Ms. Cochrane.    For the absences on January 9 and 10, Ms. Rodriguez Morel notified of her absences on the attendance line by, calling in on the 9th and advising that she was suffering illness related to her "pregnancy" and that she would be out of work under doctor's orders until the 11th.

45.    From this point forward, when Ms. Rodriguez Morel called the attendance line to report pregnancy-related absences, she clearly advised that she was "pregnant" and that she was suffering illness related to her "pregnancy."    Moreover, whenever Ms. Rodriguez Morel was taken out of work by her doctors for her symptoms expected to last several days, she reported her multiple anticipated absences on only the first day of her anticipated absence period.

46.    At no time did any CAI employee advise Ms. Rodriguez Morel that it was against CAI policy for her to report her entire anticipated period of absence on only the first day of absence, nor did any CAI employee advise Ms. Rodriguez Morel that she was required to call in to the absence line each day of an absence period.

### D.    Ms. Rodriguez Morel Suffers First and Second Written Warnings Due to Her Pregnancy-Related Incapacity and Absences

47.    Ms. Rodriguez Morel returned to work on Friday, January 11, 2019 and gave her doctor's note to Ms. Cochrane.    See id.    Later that day, she was called to a meeting with Ms. Cochrane and Michelle McNeil, CAI Vice President of Contract Administration, wherein Ms. Cochrane issued Ms. Rodriguez Morel two written warnings.

7

48.     The first warning was for 3.5 "occurrences" deriving from absences as far back as December 17, 18, 26, 27, and 28.  See Exhibit F.  Notably, the warning tallied *2.5* occurrences for absences on the 26th, 27th, and 28th.

49.     The second written warning was for a single occurrence deriving from absences on January 8 and 9.  See Exhibit G.

50.     Applying its policy properly (and blindly) in considering the first warning, CAI should have had tallied just 1.5 occurrences for Ms. Rodriguez Morel's absences on the 26th, 27th, and 28th: .5 for the 26th, and 1 for the 27th and 28th.  The no fault policy specified that absences on two consecutive workdays for the same underlying reason (e.g. on the 27th and 28th) should count for just one occurrence.

51.     After reviewing the warnings, Ms. Rodriguez Morel questioned why she received them for absences related to pregnancy complications.  Ms. Cochrane explained that for absences to not give rise to "occurrence" and warnings under the "no fault" policy, Ms. Rodriguez Morel would have had to have obtained medical verification for leave "for three days."

52.     Remarkably, Ms. Rodriguez Morel, did have a doctor's note covering absences for three workdays - January 8, 9 and 10.  See Exhibit E.   Despite CAI's policy exempting Ms. Rodriguez Morel from occurrence and discipline, and Ms. Cochrane's awareness and approval of Ms. Rodriguez Morel's pregnancy-related hospital visit on January 8, 2019, Ms. Cochrane nevertheless counted 1 occurrence for Ms. Rodriguez Morel's absences on January 8 and 9 (ignoring the 10th) and issued the second warning based on that occurrence.   See Exhibit G.

53.     Further explaining the warnings, Ms. McNeil interjected her beliefs that New Hampshire was a "no fault state" and that this meant there was "no good or bad reason for not coming to work under the law."

8

54.    Ms. Cochrane offered a "no fault" example, stating: "It's like when I locked my keys in my car at Dunkin Donuts and was late to work.  I was not excused for my lateness."

55.    Ms. Rodriguez Morel responded that her situation was different because she had to leave work to go to the hospital because she was pregnant, in pain, bleeding, and potentially miscarrying.  Her supervisors answered that <u>none</u> of these excused an employee from discipline under the "no fault" policy.

56.    Ms. Rodriguez Morel emailed Ms. Morrison at CAI headquarters to determine if Ms. Cochrane's and Ms. McNeil's information was accurate.   Ms. Morrison confirmed that, in CAI's view, Ms. Rodriguez Morel had no pregnancy-related leave entitlement, and that she could be disciplined under the "no fault" attendance policy if supervisors prohibited her from taking leave and she took leave for pregnancy reasons.  <u>See</u> Exhibit H.

### E.    Ms. Rodriguez Morel Receives a Final Written Warning Due to Her Pregnancy-Related Incapacity and Absence

57.    On Friday, January 18, 2019 Ms. Rodriguez Morel had been extremely ill for two days.  She called out of work complying with CAI's protocols, including by advising of her pregnancy-related symptoms, and she again sought care in an emergency room.

58.    Ms. Rodriguez Morel was again diagnosed with vomiting, headache, and lower abdominal pain due to pregnancy.  She was given a doctor's note removing her from work for <u>four</u> days or until January 22, 2018.  <u>See</u> Exhibit I.  On the very next workday, Monday January 21, 2019, Ms. Rodriguez Morel called the attendance line to advise of her medically recommended absence from work, due to pregnancy-related illness, until Tuesday, January 22, 2019.

59.    Ms. Rodriguez Morel returned to work on Tuesday, January 22, 2019 and emailed her doctor's note to Ms. Guzman and Ms. Cochrane, stating explicitly her pregnancy, her symptoms, and her hospitalization for these symptoms.  <u>See</u> Exhibit J.

60.    Ms. Rodriguez Morel did not anticipate discipline related to this leave, relying on Ms.

Cochrane's representation that leave for three days or longer with medical verification would not result

in occurrence or discipline.    Nevertheless, Ms. Cochrane issued Ms. Rodriguez Morel a "final written

warning" due to an occurrence being levied for absences on Friday, January 18 and Monday, January

21. See Exhibit K.

61.    Ms. Rodriguez Morel asked Ms. Cochrane why she received an occurrence and discipline for

her absences on Friday, January 18 and Monday, January 21 when her doctor's note removed her from

work for greater than three days (January 18, 19, 20 and 21).  Ms. Cochrane responded that an

occurrence was counted and discipline issued because only two of the days covered by the note -

January 18 and January 21 - were scheduled workdays for Ms Rodriguez Morel.  Ms. Cochrane

explained, for the first time, that to qualify for the three-day, medical-verification exception to

occurrence and discipline, an employee's doctor's note had to cover three scheduled workdays.

62.    CAI's policy, as written, does not actually require medical verification for specifically three

consecutive *work*-day absences in order to trigger occurrence exemption.  See Exhibit B.

63.    Ms. Rodriguez Morel emailed Ms. Morrison inquiring as to the accuracy of Ms. Cochrane's

representation as to the three-day, medical verification rule.  She received no response.

**F.    Ms. Rodriguez Morel's Supervisor Denies Her Discretionary Leave Due to Her Disciplinary Status**

64.    On Wednesday, January 23, 2019, Ms. Rodriguez Morel was again extremely sick at work with

vomiting.  She contacted her physician who instructed her to she seek medical care.

65.    Ms. Rodriguez Morel consulted "Doug," the Manchester Human Resources employee, to

obtain permission to leave work to see her doctor.  She explained to Doug that she was pregnant and

very ill with vomiting, and asked if she would receive another occurrence if she left work to obtain

medical care.  Doug responded that he would need to consult with Human Resources in Ohio before

offering advice.

10

66      While waiting for Doug's response, Ms. Rodriguez Morel emailed both Ms. Guzman and Ms.

Cochrane, to inform of her symptoms and to ask for permission to take any *vacation* leave available to

her so that she might seek immediate medical attention.  See Exhibit L.

67.    Ms. Cochrane responded icily, "we are unable to approve your vacation request due to

coverage.  Thank you."  See Exhibit M.

68.    Ms. Rodriguez Morel consulted with Ms. Guzman, who intimated that she thought an employee

should seek necessary medical care regardless of work consequences.  Ms. Rodriguez Morel thus left

work to obtain care.

69.    At the emergency room, Ms. Rodriquez Morel was treated for several hours for acute vomiting

and was issued a doctor's note taking her out of work from that day, Wednesday, January 23, through

Monday, January 28, 2019.  See Exhibit N.  Ms. Rodriguez Morel "called in" for this absence period

on Thursday, January 24th only.

70.    Ms. Rodriguez Morel returned to work on Tuesday, January 29, 2019, promptly submitted her

doctor's note to Ms. Cochrane, and she did not receive any discipline.

71.    However, Ms. Rodriguez Morel needed permission to attend an upcoming *well* doctor's visit

for the purpose of adjusting her anxiety and depression medications in light of her pregnancy.

72.    Doug reported on the 29th to Ms. Rodriguez Morel that headquarters had relayed to him that

because Ms. Rodriguez Morel was not FMLA eligible, she could face discipline if she left work for

medical care without supervisor approval.  Doug therefore suggested to Ms. Rodriguez Morel that she

seek supervisor approval for leave to attend her planned well doctor's visit; he recommended that Ms.

Rodriguez Morel submit a request via "UltiPro," CAI's online, leave-request system,

73.    Ms. Rodriguez Morel submitted an UltiPro request, for her visit scheduled for January 31,

2019.  She received a response indicating that Ms. Cochrane was denying the request because she was

"on attendance/production warning [and] not eligible for unapproved down time."  See Exhibit O.

11

74.     Out of concern for her and her child's health, Ms. Rodriguez Morel attended the visit anyway.

She obtained a doctor's note, evidencing that her visit was related to her previously disclosed mental

health disability.  See Exhibit P.   She anxiously submitted the note to Ms. Cochrane and waited for

repercussions under the "no fault" attendance policy.

### G.     Ms. Cochrane and Ms. McNeil Seek to Terminate Ms. Rodriguez Morel For Her Pregnancy-Related Absences

75.     Upon information and belief, after receiving the note, Ms. Cochrane and/or Ms. McNeil

contacted Keith Carr, CAI's Human Resources Manager, to inquire whether Ms. Rodriguez Morel

could be terminated under the "no fault" attendance policy due to her January 31, 2019 absence.

76.     Upon information and belief, Mr. Carr advised that if disabled, due to pregnancy or otherwise,

Ms. Rodriguez Morel must be afforded reasonable accommodation to her disability, including

accommodation with regard to her attendance.   Upon information and belief, Mr. Carr instructed that

Ms. Rodriguez Morel should be given disability certification paperwork, for completion by her

medical providers, in order to determine whether accommodation should be afforded.

77.     On Friday, February 1, 2019, at approximately 5 PM, Ms. Rodriguez Morel was again

summoned by management. Ms. McNeil ominously informed Ms. Rodriguez Morel that she knew Ms.

Rodriguez Morel left work on January 31, 2019 without approval.  Yet, rather than terminating Ms.

Rodriguez Morel (as Ms. Rodriguez Morel expected), Ms. McNeil handed over disability certification

paperwork for completion by Ms. Rodriguez Morel's medical providers.

78.     Ms. Rodriguez Morel told Ms. McNeil she would bring the paperwork to her next doctor's visit

scheduled for Friday, February 8, 2019.

### H.     Ms. Rodriguez Morel is Terminated Before She Can Submit to CAI Completed Disability Certification Paperwork

79.     On Monday, February 4, 2019, Ms. Rodriguez Morel was again seriously ill with morning sickness.   She called in following CAI's call-in protocol, including by notifying of her pregnancy-related symptoms.

80.      On Tuesday, February 5, 2019, Ms. Rodriguez Morel was again so debilitated with headache, nausea and vomiting that she again sought care in an emergency room.   Ms. Rodriguez Morel called the CAI attendance line to advise of her pregnancy-related absence.

81.     Consistent with her previous three visits for emergency care, in as many weeks, Ms. Rodriguez Morel was again diagnosed with chronic headache and vomiting associated with pregnancy.   Ms. Rodriguez Morel was additionally diagnosed with a "placental abnormality in [the] second trimester."

82.     Ms. Rodriguez Morel's emergency room treatment provider removed her from work, starting that same day, Tuesday, February 5, until Saturday, February 9, 2019.   Ms. Rodriguez Morel was given a doctor's note stating the same.

83.     On the very next workday, Wednesday, February 6, Ms. Rodriguez Morel called in to the attendance line, to notify CAI that her doctor, due to her pregnancy-related symptoms, had removed her from work for the remainder of the workweek (including Thursday, February 7 and Friday, February 8)

84.     CAI boxed up Ms. Rodriguez Morel's personal effects in her work area on Thursday, February 7, 2019.   Ms. Rodriguez Morel learned this from her co-workers on Friday, February 8, 2019.

85.     On Monday, February 11, 2019, Ms. Rodriguez Morel was highly anxious reporting to work, afraid that she would be terminated, but she promptly reported with her doctor's note.

86.     Ms. Rodriguez Morel arrived to discover that her key card had been deactivated, and she was ushered to a meeting with Ms. Cochrane and Ms. McNeil.  The supervisors informed her that she had been terminated for "no call no show" on Thursday, February 7 and Friday, February 8, 2019.

13

87.    Ms. Rodriguez Morel protested that she <u>had</u> properly left a message on the attendance line, informing of her medically verified, pregnancy-related absences on February 6th, 7th and 8th. She presented her doctor's note as evidence supporting the call, but Ms. Cochrane and Ms. McNeil refused to take the note, stating that the termination decision came from Human Resources and that there was nothing they could do.

88.    Ms. Rodriguez Morel, very upset and interested in vindicating her rights, requested a letter stating clearly that CAI had terminated her. Ms. Cochrane and Ms. McNeil again referred Ms. Rodriguez Morel to Human Resources in Ohio.

89.    The supervisors presented Ms. Rodriguez Morel with a collection of items from her locker that conspicuously <u>did not include</u> her superior performance evaluations. The supervisors next demanded that Ms. Rodriguez Morel leave the premises.

90.    That afternoon, Ms. Rodriguez Morel called Human Resources and left a voice mail message, stating that she had reported to work, that she had been terminated for "no call no show," and that she needed a letter confirming her termination. Ms. Rodriguez Morel further stated that the termination was unjust because she had, in fact, called in to the attendance line on Monday the 4th, Tuesday the 5th and Wednesday 6th, and that on the 6th she had advised that she would be absent, on February 7 and February 8, 2019, for pregnancy reasons, pursuant to a doctor's note,

91.    Nearly three hours later, a CAI Human Resource employee contacted Ms. Rodriguez Morel to inform her that Human Resources had made "a mistake." The employee explained that Human Resources had reviewed its attendance line messages and discovered that Ms. Rodriguez Morel had, in fact, reported her absences for February 7 and February 8, 2019. The employee added that she had already taken steps to reinstate Ms. Rodriguez Morel so that "it would be like nothing ever happened." The employee also unsettlingly advised that CAI would "not hold against" Ms. Rodriguez Morel "as

an occurrence" her *February 11* absence, which, of course, was caused by *CAI's* "mistaken"
termination of Ms. Rodriguez Morel.

92.     Ms. Rodriguez Morel tearfully responded that under the circumstances she could not go on
"like nothing ever happened"; that the stress of not knowing whether she would be fired under the
attendance policy was unbearable for her in her condition; and that she had been extremely
embarrassed and humiliated by the "mistaken" termination.

93.     The Human Resources employee responded only that if Ms. Rodriguez Morel failed to report to
work the following workday, she would be marked as having abandoned her job and she would be
terminated.

94.     Ms. Rodriguez Morel replied that she needed to consider her situation.  She called the New
Hampshire Commission for Human Rights, extremely distraught, and after consultation with the
Commission decided not to return to CAI and to instead file a complaint of discrimination against CAI.
See Exhibit Q.

95.     CAI recruited and hired an administrative team member to replace Ms. Rodriguez Morel with
the same skills and qualifications as Ms. Rodriguez Morel.  See Exhibit R.

96.     Ms. Rodriguez Morel removed her charge from the Commission after 180 days in order to
proceed with a civil action, as is permitted by RSA 354-A:21-a.

97     Ms. Rodriguez additionally received a right to sue notice from the EEOC, see Exhibit S, and
this complaint is timely filed within 90 days of her receipt of the notice.

## COUNT I – Violation of RSA 354-A:7, VI (b)
### Denial of Leave of Absence Due to Temporary Disability due to Pregnancy

98.     The preceding paragraphs are re-alleged and incorporated herein.

15

99.    RSA 354-A:7, VI (b) provides "An employer shall permit a female employee to take leave of absence for the period of temporary physical disability resulting from pregnancy… or related medical conditions."

100.    CAI's "no fault" attendance policy conflicted with 354-A:7, VI (b).  Instead of "permitting" employees to take leave for temporary disability resulting from pregnancy and related medical conditions, the policy *penalized* employees for taking such leave.  Specific to this case, CAI supervisors applied the policy to count "occurrences" and issue discipline to Ms. Rodriguez Morel for her absences due to pregnancy-related temporary disability.

101.    The facts are as follows.  As of late December 2018, Ms. Rodriguez Morel was rendered unable to work, by headache, nausea, vomiting, abdominal pain and bleeding, all due to her pregnancy and medical conditions related to her pregnancy.  She was temporarily disabled due to pregnancy or related medical conditions.

102.    Ms. Rodriguez Morel formally notified Ms. Cochrane of her temporary disability due to pregnancy on or about December 31, 2018.

103.    Ms. Rodriguez Morel's temporary disability due to pregnancy caused her to be absent from work for several days in late December 2018, several days in January 2019, and several days m February 2019.

104.    Though Ms. Rodriguez Morel sufficiently notified of her pregnancy-related temporary disability beginning in late December 2018 and continuing until her termination on February 11, 2019, Ms. Cochrane applied CAI's "no fault" attendance policy to count occurrences for Ms. Rodriguez Morel's absences which she knew to be due to her temporary disability.  On the basis of these occurrences, Ms. Cochrane issued Ms. Rodriguez Morel first, second and final written warnings.

105.    By applying its "no fault" policy to take repeated disciplinary action against Ms. Rodriguez

Morel, CAI violated NH RSA 354-A:7, VI (b) and caused Ms. Rodriguez Morel significant emotional

harm resulting in her constructive discharge.

106.    To sustain a claim for constructive discharge under Title VII, the plaintiff must prove that her

employer imposed "working conditions so intolerable that a reasonable person would feel compelled to

forsake his job rather than to submit to looming indignities." Landrau-Romero v. Banco Popular De

Puerto Rico, 209 F.3d 10 (1st Cir. 2000).   The New Hampshire Supreme Court finds Title VII cases

instructive in evaluating a claim of constructive discharge under New Hampshire law. See Order, Anna

Tilton & Andrew Christie v. N.H. Sec. of State, No. 2011-CV-407 at p. 8 n. 1 (Merrimack Super. Ct.)

(April 27, 2012).

107.    CAI's stated reason for terminating Ms. Rodriguez Morel, "no call no show," was directly

connected with her pregnancy-related absences in February 2019, and when CAI offered to reinstate

Ms. Rodriguez Morel, it failed to communicate any changes to its attendance and discipline policies to

accommodate her pregnancy.   Rather, CAI suggested to Ms. Rodriguez Morel that it would *persist* in

issuing her pregnancy-related "occurrences," up to termination, when it advised, without any

compunction, that it would not "hold against" her an "occurrence" that *it* had caused her by

terminating her.

108.    Ms. Rodriguez Morel, who remained pregnant and suffering from pregnancy-related medical

conditions at the time of CAI's disingenuous offer of reinstatement, reasonably foresaw looming

discipline and termination by application of CAI's "no fault" policy, and she thus reasonably felt

compelled to forsake employment at CAI.

109.    The Defendant's conduct was wanton, malicious and oppressive and therefore justifies an

award of liberal, or enhanced, compensatory damages.   Stewart v. Bader, 154 N.H. 75, 87 (2006).

17

**COUNT II – Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, VI (c)**
**Discrimination in Terms, Conditions, and Privileges of Employment due to Sex**

110.    The preceding paragraphs are re-alleged and incorporated herein.

111.    It is an unlawful for an employer to discriminate against an employee in terms, conditions, and privileges of employment because of the employee's sex.  See 42 U.S.C § 2000e-2(a)(1).  See RSA 354-A:7, VI (c).

112    "Because of sex" includes because of "pregnancy, childbirth, or related medical conditions." See 42 U.S.C § 2000e (k).  See RSA 354-A:7, VI (a).

113.    CAI's "no fault" attendance policy incorporated the term, condition, or privilege of employment, of *avoiding* "occurrences" (and discipline resulting from occurrences) if employees fulfilled certain conditions.  For example, if an employee met the condition of being absent for two consecutive workdays for the same reason, an employee could avoid an occurrence being counted for each absence.  Similarly, if an employee met the condition of medical need for absence for "three consecutive days or more," and provided medical verification or submitted a request for leave for the absence, an employee could avoid any occurrence being counted at all.

114.    Notwithstanding that Ms. Rodriguez Morel met these conditions and qualified for exception to occurrences under the policy, CAI nevertheless counted occurrences for her, its female and pregnant employee, and issued first, second, and final written warnings based on these occurrences.

115.    For example, after Ms. Rodriguez Morel notified Ms. Cochrane of her pregnancy and pregnancy-related symptoms on or about December 31, 2018 and again on January 8, 2019, and after she notified *headquarters* of her pregnancy and pregnancy-related symptoms on the "call in" line on January 9, 2019, CAI issued Ms. Rodriguez Morel a first written warning based on 2 occurrences counted for absences on December 27 and 28, 2018, when it should have counted just 1 occurrence for these dates per its policy of counting just one occurrence for two workdays missed for the same reason.

18

116.    CAI also issued a second written warning based on an occurrence counted for Ms. Rodriguez

Morel's absences on January 8, 9, and 10, 2019, though <u>no</u> occurrence should have been counted

because Ms. Rodriguez Morel had medical need for these absences of "three consecutive days or

more," and she requested leave for these days, on the attendance line on January 9, 2019, with medical

verification for the leave in hand.

117.    CAI additionally issued a final written warning based on an occurrence counted for Ms.

Rodriguez Morel's absences on January 18 and 21, 2019, even though she requested on the attendance

line a leave of absence from January 18 through January 21, 2019 (*four* days of medical need), and she

submitted to CAI medical verification for her inability to work for these four days.

118.    CAI discriminated against Ms. Rodriguez Morel on the basis of her sex/pregnancy by denying

her, as opposed to its other employees, the term, condition or privileged of employment of avoiding

discipline under its "no fault" attendance policy.  Ms. Rodriguez Morel has stated a prima facie case

for disparate treatment, i.e. "that she belongs to the protected class, that she sought accommodation [in

the form of exception to discipline], that the employer did not accommodate her, and that the employer

<u>did</u> accommodate others similar in their ability or inability to work." <u>Young v. United Parcel Serv.,</u>

<u>Inc.,</u> 135 S. Ct. 1338, 1354 (2015)(emphasis added).

119.    The discrimination caused Ms. Rodriguez Morel significant emotional harm and resulted in her

constructive discharge.  Ms. Rodriguez reasonably understood as of February 11, 2019 when she made

the choice to forsake her job, that she would continue to accrue occurrences and receive discipline

under the "no fault" attendance policy due to her pregnancy, and that the minimal protections from

termination that *should* <u>have been available to her under the "no fault" policy were not actually</u>

<u>available to her as a pregnant employee.</u>

120.    The Defendant's conduct was wanton, malicious and oppressive and therefore justifies an

award of liberal, or enhanced, compensatory damages. <u>Stewart v. Bader</u>, 154 N.H. 75, 87 (2006).

## COUNT III – 42 U.S.C. § 12112(b)(5)(A) and RSA 354-A:7, VII (a)
## Failure to Make Reasonable Accommodation to Substantially Limiting Pregnancy-Related Impairment

121.    The preceding paragraphs are re-alleged and incorporated herein.

122.    Title 1 of the ADAA (42 U.S.C. § 12112(b)(5)(A)) and RSA 354-A: 7, VII (a) require employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an … employee….".

123.    To state a claim for failure to make reasonable accommodation under the ADAA, the plaintiff must allege that "(a) she is disabled within the ADA's definition; that (b) she could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of her disability, yet failed to reasonably accommodate it." See Lang v. Wal-Mart Stores East. L.P., 813 F.3d 447, 454 (1st Cir. 2016).

124.    An employee is "disabled" within the meaning of the ADAA if she suffers any physical or mental impairment that substantially limits a major life activity. See 29 CFR § 1630.2 (g).

125.    Physical impairment includes any "physiological … condition" affecting a "body system," including the "digestive" and "reproductive" systems. See 29 CFR § 1630.2 (h). Physical impairment also includes "premature rupture of membranes, [and] vaginal bleeding." Hernandez v. City of Hartford, 959 F. Supp. 125, 130 (D. Conn. 1997).

126.    "Substantially limits" as used in the ADAA is construed broadly in favor of finding "disability." See 29 CFR § 1630.2 (j)(1). The effects of an impairment lasting or expected to last fewer than six months can be "substantially limiting." Id.

127.    "Major life activity" is defined as the operation of a major body function including digestion and reproductive function. See 29 CFR § 1630.2 (i). Interacting with others, concentrating, and working are also identified "major life activities" under the ADA. Id.

128.    EEOC interpretive guidance also establishes that "pregnancy-related impairment that

substantially limits a major life activity is a disability under the first prong of the [ADAA disability]

definition." See 29 CFR Appendix to Part 1630 - Interpretive Guidance on Title I of the Americans

With Disabilities Act (discussing Section 1630.2(h) Physical or Mental Impairment)(emphasis added).

129.    Ms. Rodriguez Morel was "disabled" where for months she suffered the confluence of severe

and recurring nausea and vomiting, migraine, threatened miscarriage, vaginal bleeding, and placental

abnormality in the second trimester, affecting the operation of her digestion and reproduction major

body functions.   These pregnancy related conditions together also substantially limited her ability to

engage in the major life activities of concentrating, interacting with others, and working.

130.    Ms. Rodriguez Morel was capable of performing the essential functions of her job with

accommodation, as demonstrated by the superior performance reviews she received prior to disclosing

her pregnancy but which were notably not released to her at her termination meeting.

131.    Ms. Rodriguez Morel disclosed her pregnancy-related impairment to multiple supervisors at

CAI's Manchester location as of the close of December 2018, and she informed CAI headquarters of

her conditions on or before January 9, 2019.  Ms. Rodriguez Morel also repeatedly asked her

supervisors and human resources representatives at the Manchester office, and human resources

representatives in Ohio, for the reasonable accommodation of exception to discipline under the "no

fault" attendance policy for her disability related absences.

132.    CAI refused to afford her this reasonable accommodation though it would have presented no

undue burden to CAI.  This refusal resulted in significant emotional harm to Ms. Rodriguez Morel and

ultimately her constructive discharge.  Ms. Rodriguez Morel had repeatedly asked multiple CAI

supervisors and human resources employees for accommodation under CAI's attendance policy, and

she was repeatedly denied, such that she could reasonably foresee looming discipline, emotional

distress, and ultimate termination if she accepted reinstatement to her position at CAI.

133.    The Defendant's conduct was wanton, malicious and oppressive and therefore justifies an award of liberal, or enhanced, compensatory damages. Stewart v. Bader, 154 N.H. 75, 87 (2006).

### COUNT IV – Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(k)(1)(A)(i)
### Use of an Employment Practice that Caused a Disparate Impact Based on Sex/Pregnancy

134.    The preceding paragraphs are re-alleged and incorporated herein.

135.    Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Rodriguez v. United States, 852 F.3d 67, 75 (1st Cir. 2017).   Under Title VII, a claim for "disparate impact" covers "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." Id. (citing Ricci v. DeStefano , 557 U.S. 557, 577, (2009)).

136.    To make a prima facie showing of disparate impact, a plaintiff starts by identifying the employment practice being challenged.   Jones v. City of Boston, 752 F.3d 38, 46 (1st Cir. 2014).   A plaintiff must then show that the identified practice causes a disparate impact on the basis of sex/pregnancy.  See id. (citing 42 U.S.C. § 2000e–2 (k)(1)(A)(i)).

137.    CAI's "no fault" attendance policy, though facially neutral, caused a disparate impact to female, pregnant employees, including Ms. Rodriguez Morel.

138.    Under the policy, an employee received an "occurrence" for a single workday absence regardless of illness, medical need, or temporary disability causing the absence from work. See e.g. Exhibits F and G.

139.    CAI issued Ms. Rodriguez Morel a final written warning after only 5.5 occurrences, indicating that under the "no fault" policy an employee faced final warning for as few as 5.5 absences. See Exhibit K.

140.    CAI also issued Ms. Rodriguez Morel: a first warning after it counted 3.5 occurrences, see

Exhibit F; a second warning after an additional counted occurrence, see Exhibit G; and a final written

warning after just one more occurrence, see Exhibit K.  This demonstrated that under the "no fault"

policy, once an employee was placed on warning status for having greater than three "occurrences,"

three subsequent "occurrences" would bring about termination.

141.    Under the policy, then, an employee could be terminated for being absent from work for just

six days total, even with valid medical excuse for each absence.

142.    While six days of permitted leave under the policy undoubtedly would accommodate some

temporary disabilities, the policy falls considerably short of the period generally recognized in human

experience as the respite needed for a woman to carry and bare a child.  See Abraham v. Graphic Arts

Intern. Union, 660 F.2d 811, 819 (D.C. Cir. 1981).   In short, a six-day absolute ceiling on leave

portends a drastic effect, or impact, on female, pregnant employees, an impact no male would ever

encounter.  See id.

143.    Ms. Rodriguez Morel, herself, suffered repeated adverse disciplinary action due to the disparate

impact of CAI's no fault attendance policy on pregnant employees.  She suffered emotional losses and,

ultimately, constructive discharge due to the impact of the policy.

144.    Ms. Rodriguez Morel was constructively discharged where, at the time she left employment on

February 11, 2019: she remained pregnant and with pregnancy related medical conditions; she had

received repeated discipline under the "no fault" policy due to her pregnancy and pregnancy-related

medical conditions; the policy had caused her significant emotional distress over attending even a basic

well visit for her and her baby; and CAI had failed to make any concessions to her pregnancy under its

"no fault" (or 6-maximum-absences) attendance policy.  She reasonably foresaw looming discipline,

emotional distress, and termination if she accepted reinstatement to her position at CAI.

## COUNT V – Wrongful Discharge
### Wrongful Discharge for Performing an Act Encouraged by RSA 354-A:7, VI (b)

145.    The preceding paragraphs are re-alleged and incorporated herein.

146.    A plaintiff states a claim for wrongful discharge in two parts.   First, the plaintiff must show that the defendant was motivated by bad faith, malice, or retaliation in terminating the plaintiff's employment.  Cloutier v. Great Atlantic & Pac. Tea Co., Inc., 121 N.H. 915, 922 (1981).   Second, the plaintiff must demonstrate she was discharged because she performed an act that public policy would encourage.  Id.

147.    As discussed supra, a plaintiff is "constructively" discharged, including for a wrongful discharge claim, where her "working conditions [are] so intolerable that a reasonable person would feel compelled to forsake her job rather than to submit to looming indignities."

148.    CAI was motivated by bad faith, malice, or retaliation in wrongfully discharging the plaintiff, as shown by the following.  CAI disparately applied exceptions to accruing occurrences under its "no fault" attendance policy, so that Ms. Rodriguez Morel accrued more occurrences than she should have under CAI's policy.   Moreover, when it became clear that Ms. Rodriguez Morel might nevertheless avoid termination under the policy, by obtaining disability certification which would allow her to take leave from work and would effectively bar her termination under the policy, CAI immediately terminated Ms. Rodriguez Morel for a shifted policy reason relating to her pregnancy absences, "no call, no show."  CAI did this despite that Ms. Rodriguez Morel had, irrefutably, actually called in to report the pregnancy-related absences used to terminate her, just as she had for her multiple, pregnancy-related absences in the months preceding her termination.

149.    Additionally showing bad faith is CAI's failure to deliver Ms. Rodriguez Morel's superior performance evaluations, when it delivered her other personal effects at her termination meeting. CAI cherry picking and removing the evaluations shows its consciousness of its liability in terminating a

24

pregnant and disabled Ms. Rodriguez Morel before she had fair opportunity to submit her disability accommodation paperwork.

150.    Lastly, CAI's callous statement to a distraught Ms. Rodriguez Morel, suggesting that it could, but would not, discipline her for the absence that it caused by humiliatingly terminating her, shows bad faith, retaliation, or malice.

151.    Ms. Rodriguez Morel performed an act that public policy would encourage. She took the leave that RSA 354-A:7, VI (b) encourages pregnant women to take. Taking leave is an "act encouraged by public policy" where an employee has an enforceable right to take the leave under state law. See Gage v. Rymes Heating and Oils, Inc., Memorandum and Order March 1, 2016, 14-cv-480-PB (D.N.H)(citing Faulkner v. Mary Hitchcock Mem'l Hosp., 2013 DNH 152).

152.    Though CAI purported to terminate for "no call no show," CAI actually terminated Ms. Rodriguez Morel for taking pregnancy leave encouraged by public policy. At the time of the termination, CAI was patently unhappy with Ms. Rodriguez Morel for taking pregnancy-related leave; it had issued her first, second and final written warnings to her for taking the leave in just the few weeks immediately preceding the termination.

153.    Alternatively, CAI constructively discharged Ms. Rodriguez Morel. When CAI falsely offered Ms. Rodriguez Morel reinstatement, communicating that it nevertheless would continue to take adverse action against her for taking pregnancy-related temporary disability leave, up to and including termination, her termination loomed such that she reasonably forsook the opportunity of reinstatement.

154.    The Defendant's conduct was wanton, malicious and oppressive and therefore justifies an award of liberal, or enhanced, compensatory damages. Stewart v. Bader, 154 N.H. 75, 87 (2006).


## COUNT VI – 42 U.S.C. §§ 12112(a), 2000e-2(a)(1) and RSA 354-A:7, I and 19 Discriminatory/Retaliatory Discharge Due to Sex and/or Disability

155.    The preceding paragraphs are re-alleged and incorporated herein.

156.    It is unlawful for an employer to discriminate against an employee by discharging her due to

disability, or pregnancy or related medical conditions.  See 42 U.S.C. §§ 12112(a), 2000e(k) and

2000e-2(a)(1).  See also RSA 354-A:7, I and VI (a).

157.    It is also unlawful for an employer to retaliate against an employee, by discharging the

employee, for engaging in the protected activity of requesting accommodation to disability.  See e.g.

Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016).

158.    To state a claim for discharge on the basis of disability or pregnancy, in violation of the

ADAA, Title VII, or RSA 354-A:7, the employee must allege, she "(1) was within a protected class;

(2) met the employer's legitimate performance expectations; (3) was actually or constructively

discharged; and (4) was replaced by another with similar skills and qualifications."  Landrau-Romero

v. Banco Popular De Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000).

159.    To state a claim for retaliation for engaging in the protected activity of requesting

accommodation under the ADAA and RSA 354-A:7, VII (a), an employee must plead that she

requested accommodation, suffered an adverse action, and that there was a causal connection between

that protected activity and the adverse action taken by the employer. See Murray, 821 F.3d at 87.

160.    As a matter of law, close temporal proximity between protected conduct and termination

satisfies the causal connection requirement for retaliation claims.

161.    The following facts support that CAI discriminatorily and/or retaliatorily discharged Ms.

Rodriguez Morel.

162.    Ms. Rodriguez Morel was pregnant and disabled with disclosed substantially limiting

pregnancy-related impairment, as well as anxiety and depression, in the relevant time-period of late

December 2018 through February 11, 2019.

163.    Alternatively, CAI regarded Ms. Rodriguez Morel as disabled when it gave her "disability"

paperwork for completion.

164.    Ms. Rodriguez Morel met her employer's legitimate work expectations as shown by her

superior performance evaluations that were withheld from her at her termination on February 11, 2019.

There is also further no evidence of poor performance in Ms. Rodriguez Morel's personnel file

subsequently produced to her.

165.    CAI terminated Ms. Rodriguez Morel asserting a false reason: "no call no show."  The "no call

no show" reason was pretext for the CAI's discriminatory and retaliatory reasons for termination.

166.    CAI eventually admitted that its asserted "no call no show" reason for termination was false.

167.    CAI admitted the falseness of its original, stated reason for termination when it attempted to

reverse its actually discriminatory and retaliatory termination decision, after Ms. Rodriguez Morel

suggested she might sue CAI (by demanding that CAI provide her a termination letter).

168.    At Ms. Rodriguez Morel's termination meeting in Manchester, her supervisors conspicuously

made no attempt, before effectuating her termination, to confirm with CAI Human Resources in Ohio

that Ms. Rodriguez Morel had indeed "no called no showed," even where Ms. Rodriguez Morel

vigorously protested that she had called in, as was her proven pattern or practice.  This lack of basic

courtesy to Ms. Rodriguez Morel demonstrates that CAI was truly inconvenienced by Ms. Rodriguez

Morel's pregnancy, her disability, her request for accommodation, and the likelihood that she indeed

would legally qualify for intermittent leave as a disability accommodation.  CAI accordingly

terminated Ms. Rodriguez Morel just approximately 10 days after identifying her as a potential

candidate for disability accommodation.

169.    The very close proximity between the discussion surrounding accommodation to Ms.

Rodriguez Morel's pregnancy and disability, held on February 1, 2019, and her termination on

February 11, 2019, shows a causal connection between Ms. Rodriguez Morel's request for

accommodation and her termination.

27

170.    Upon information and belief, based on Exhibit R, Ms. Rodriguez Morel was replaced by a worker with skills and qualifications similar to hers.

171.    Ms. Rodriguez Morel may be considered to have been constructively discharged where her work conditions were so intolerable that she reasonably forsook CAI's reinstatement offer.  Due to her pregnancy, related medical conditions, disclosure of her condition to her supervisors, and attempts to obtain accommodation to her pregnancy-related disability, and to a lesser extent to her mental health disability, Ms. Rodriguez Morel found herself repeatedly and unjustifiably disciplined, perpetually in a state of having to choose between her and her child's health and her income, and she was ultimately terminated from her position.  CAI further communicated in offering reinstatement that it would persist in taking adverse action against Ms. Rodriguez Morel due to her pregnancy and disability.

172.    The Defendant's conduct was wanton, malicious and oppressive and therefore justifies an award of liberal, or enhanced, compensatory damages.  Stewart v. Bader, 154 N.H. 75, 87 (2006).

WHEREFORE, the Plaintiff, Juliana Rodriguez Morel, respectfully prays that this Honorable Court:

      A.    Schedule this matter for trial by jury, and after trial;

      B.    Order employment of the Plaintiff after trial;

      C.    Award the Plaintiff damages for her economic losses, including without limitation lost wages (back and front pay), lost employment benefits, and lost earning capacity;

      D.    Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience and loss of enjoyment of life;

      E.    Award enhanced compensatory damages;

      F.    Award the Plaintiff punitive damages;

      G.    Award the Plaintiff his reasonable attorney's fees;

      H.    Award the Plaintiff interest and costs;

      I.    Award all other damages available to the Plaintiff at law, and

J.      Award the Plaintiff such other relief as this court deems equitable and just.

Respectfully submitted,

JULIANA RODRIGUEZ MOREL,

By her attorneys,

DOUGLAS, LEONARD &
GARVEY, P.C.

Date: January 15, 2021          By:     /s/ Megan Douglass
                                        Megan Douglass #19501
                                        14 South Street, Suite 5
                                        Concord, NH 03301
                                        (603) 224-1988
                                        mdouglass@nhlawoffice.com

29



Park Center Plaza, II, Suite 500
6150 Oak Tree Blvd.
Independence, OH 44131

Michael Kozimor
Claim Counsel
Bond & Specialty Insurance Claim
Phone: (216) 643-2286
Fax: (216) 348-5509
Email: MKOZIMOR@travelers.com

February 4, 2022

**PLAINTIFF'S EXHIBIT**

**6**

Ricardo King
Mammoth Tech, Inc.

| Re: | Insureds: | Mammoth Tech, Inc. (formerly Credit Adjustments, Inc.) |
|-----|-----------|--------------------------------------------------------|
|     | Policy No.: | 002-LB-107298906 |
|     | Reference No.: | 002-EPL-T2116983-NR |
|     | Subject: | Juliana Mariano |

Dear Ricardo:

This letter further acknowledges Travelers Casualty and Surety Company of America's ("Travelers") receipt of the above-captioned matter. Based on our review of the materials provided to us, and for the reasons set forth below, Travelers must disclaim coverage for this matter under the above-referenced 002-LB-107298906 (the "Policy"). Please note that certain terms in this letter are defined terms under the Policy. Kindly refer to the Policy for the specific meanings of those terms.

The Policy

Travelers issued the Policy to Credit Adjustments, Inc. ("Credit Adjustments") for the Policy Period from August 5, 2020, to August 5, 2021. Credit Adjustments added coverage under the Employment Practices Liability Policy ("EPL Policy") effective December 4, 2020. The Policy provides coverage, subject to its terms, conditions, limitations and exclusions, for Claims first made during the Policy Period against the Insureds for Wrongful Acts.

The Company's Limit of Liability, inclusive of Defense Expenses, is $2,000,000. Payment of defense costs and expenses under the Policy reduces, and may exhaust, the Policy's Limit of Liability. The EPL Policy is subject to a $25,000 retention.

Background

This determination is based on information provided to Travelers to date, including the notice of right to sue regarding the charge of discrimination filed by Juliana Mariano against Credit Adjustments ("Right to Sue Letter") and the letter of representation dated November 19, 2020, sent to Credit Adjustments by its outside legal counsel at Lehmann Law Office, PLLC ("Attorney Representation Letter"). While it is necessary to review the allegations as they relate to coverage under the Policy, Travelers does not wish to suggest that they have any merit.

The Right to Sue Letter dated October 30, 2020, issued by the Equal Employment Opportunities Commission ("EEOC") advises that the EEOC closed its file regarding

************************ **Our toll-free number is 800-842-8496** ************************
If possible, please send future communications and documents concerning this claim via email to MKOZIMOR@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                              L-15

**Travelers**

February 4, 2022
Page 2

Mariano's charge of discrimination. The Right to Sue Letter shows that the charge number of Mariano's claim is 16D-2019-00151, indicating that the charge was originally filed in 2019.[1]

With your consent, I spoke with your outside legal counsel, Richard Lehmann, regarding this claim. Mr. Lehmann sent me a copy of the Attorney Representation Letter dated November 19, 2020, confirming his engagement to represent Credit Adjustments in defense of the claims brought by Mariano. The Attorney Representation Letter evidences that Credit Adjustments first had notice of this claim on or before November 19, 2020.

<u>Coverage Discussion</u>

**Definition of Claim**

Section II.A of the EPL Policy defines "Claim" as follows:

> Claim means an Employment Claim or, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, a Third Party Claim. A Claim is deemed to be made on the earliest date that any Executive Officer first receives written notice of such Claim. However, if any Insured Person who is not an Executive Officer first receives written notice of a Claim during the Policy Period, but no Executive Officer receives written notice of such Claim until after the Policy Period has expired, then such Claim will be deemed to have been made on the date such Insured Person first received written notice of the Claim.

Per the Attorney Representation Letter, Travelers understands that Credit Adjustments first received notice of this matter on or before November 19, 2020. Pursuant to the definition of Claim, this Claim is deemed to have been first made on or before November 19, 2020. As stated above, coverage under the EPL Policy did not begin until December 4, 2020. Since the Claim was not first made during the Policy Period, it falls outside the scope of the Policy's Insuring Agreement. Accordingly, Travelers will not pay for any Loss, including Defense Expenses, relating to this matter. Please take all appropriate steps to ensure that the Insureds' interests are protected, including, but not limited to, submitting this matter to all other potential insurance carriers that may provide coverage for the allegations asserted.

Because we view the foregoing as dispositive of coverage for this matter, we have not raised other Policy terms, conditions, limitations or exclusions that may further limit or exclude coverage for this matter. As I am sure you can appreciate, Travelers' attention to this matter is subject to a full and complete reservation of all rights, remedies and defenses under the Policy or otherwise including but not limited to the right to raise other Policy terms and conditions as defenses to coverage in the future as appropriate. Neither this letter, nor any actions by Travelers or any of its agents shall constitute or be deemed a waiver of any right or defense available to Travelers under the Policy or applicable law.

---

[1] Mammoth Tech has advised Travelers that it does not have the original charge documents in its possession.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **Our toll-free number is 800-842-8496** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

If possible, please send future communications and documents concerning this claim via email to MKOZIMOR@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

**Travelers**

February 4, 2022
Page 3

We regret we are unable to advise you more favorably regarding this matter and invite you to submit any other information you may have which may bear on our coverage decision.  Of course, please do not hesitate to contact us if you have any questions regarding Travelers' position in this matter.

Sincerely,

Michael Kozimor

cc:    FIRST INS GRP OF MIDWEST

*********************** **Our toll-free number is 800-842-8496** ************************

If possible, please send future communications and documents concerning this claim via email to MKOZIMOR@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                                           L-15

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | **PLAINTIFF'S EXHIBIT** H |

**New Hampshire Commission for Human Rights** and EEOC

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Juliana Mariano** | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **224 Grove Street #1, Manchester, NH 03103** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CAI OF OHIO D/B/A CREDIT ADJUSTMENTS, INC.** | **15 - 100** | **(800) 544-6359** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **228 Maple Street 2nd Floor, Manchester, NH 03103** | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CAI OF OHIO** | **15-100** | **(419) 782-3709** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **330 Florence Street, Defiance, OH 43512** | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN

[X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION

[X] OTHER (Specify)  **RSA 354-A**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **01-11-2019**  Latest **02-11-2019**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

1. I identify as female.
2. On September 4, 2018, I was hired as an Administration Representative with Credit Adjustments, Inc.
3. In December 2018, I informed Supervisor, Suzanne Guzman, and Manager, Lauren Cochrane, of my pregnancy.
4. On January 8, 2019, I left work early to seek medical attention for pregnancy related symptoms.
5. On January 9, 2019, I informed Human Resources I would be out of work until January 11, 2019, per doctor's orders.
6. On January 11, 2019, I received two warnings for my pregnancy related absences.
7. I informed Director, Michelle McNeil, of the medical complications I was experiencing. Ms. McNeil stated there was no valid reason for leaving early and/or missing work.
8. Additionally, Ms. Cochrane compared my absences to being late due to locking ones keys in

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **3-19-19** Date / Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) *March 19th, 2019* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | 16D-2019-00151 |

**New Hampshire Commission for Human Rights** — and EEOC

*State or local Agency, if any*

their car and stated it doesn't matter if the reason for missing work is big or small, it is unacceptable.

9.  I emailed Human Resources and inquired about my employer's maternity policy, specifically, pregnancy related absences.

10. Human Resource Representative, Stacey Morrison, stated there was no such policy.

11. On January 18, 2019, I was taken out of work until January 22, 2019. I informed Human Resources of my doctor's decision.

12. Upon my return to work I received a final warning for the absences incurred as a result of my doctor's orders.

13. I was informed by Ms. Cochrane that had I been absent three consecutive work days I would not have received discipline. However, I had only missed two days of work due to the weekend and therefore received the warning.

14. On January 23, 2019, I was advised by my doctor to immediately leave work and seek medical attention.

15. Ms. Guzman and Ms. Cochrane stated I was not permitted to leave early.

16. Out of concern for myself and my baby, I left work anyways and subsequently was taken out of work until January 29, 2019.

17. Upon my return to work I submitted a request for a partial day off due to a scheduled doctor's appointment.

18. My request was denied.

19. On February 5, 2019, I informed Human Resources I had been admitted to the hospital and taken out of work until February 9, 2019.

20. Upon my return to work on February 11, 2019, I was informed my employment was terminated as a result of two no call/no show absences for February 7 and February 8, 2019.

21. I informed Human Resources that not only had I called to inform of my absences, I had a doctor's note as well.

22. Later that day, Ms. Morrison called and stated she discovered I had provided notice of my absences and that my employment would be reinstated.

23. I explained the emotional turmoil this experience had put me through, and was informed if I did not come in to work the following day it would be considered my resignation.

24. I made the decision to constructively discharge from my employment.

25. I assert I was discriminated against by way of failure to accommodate, differential treatment and retaliation.

26. I have and continue to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience, and loss of enjoyment of life. I seek all damages to which I am entitled.

---

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

3-19-19
Date

_____
Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

March 19th, 2019

**Megan Douglass**

**From:** Richard Lehmann <rick@nhlawyer.com>
**Sent:** Tuesday, December 22, 2020 11:22 AM
**To:** Megan Douglass
**Subject:** Juliana Rodriguez v. Credit Adjustments Inc.



Megan,

After communicating your demand to my client, we are not at this time interested in entering into settlement negotiations.

If I do not speak to you before the upcoming break, I hope you enjoy the holidays.

Richard J. Lehmann (Bar No. 9339)
Lehmann Law Office, PLLC
3 North Spring Street
Suite 200
Concord, NH 03301
(603) 731-5435
rick@nhlawyer.com

Plaintiff's Exhibit

J

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Natasha Urena</u>
<u>Daniel Rodriguez</u>

       v.                              Case No. 21-cv-40-AJ

<u>Mammoth Tech, Inc.,</u>
<u>f/k/a/ Credit Adjustments, Inc.</u>
<u>f/k/a CAI of Ohio</u>

**<u>ORDER</u>**

    Juliana Rodriguez Morel sued her former employer, Mammoth Tech, Inc. ("MTI")[1], asserting that it violated state and federal laws when it discriminated against her on the basis of her pregnancy. On July 15, 2022, the court entered default against the defendant. (Doc. No. 34). Before the court is the plaintiffs' motion for default judgment in the amount of $478,016.50 (Doc. No. 37), pursuant to Fed. R. Civ. P. 55(b)(2).[2] Having reviewed Ms. Rodriguez Morel's filings and conducted a

---

[1]During the period of Ms. Rodriguez Morel's employment, MTI was known as Credit Adjustments, Inc. The court will use the entity's most recent name in this Order.

[2]Ms. Rodriguez Morel passed away on September 19, 2022. <u>See</u> Notice of Plaintiff's Death (Doc. No. 39). On December 2, 2022, the court granted a motion to substitute the administrators of her estate -- Daniel Rodriguez and Natasha Urena (Ms. Rodriguez Morel's husband and sister, respectively) -- as parties. <u>See</u> Motion to Substitute Parties (Doc. No. 40); Fed. R. Civ. P. 25 ("Substitution of Parties"). For the sake of clarity, the court refers to the original plaintiff, Ms. Rodriguez Morel, rather than the administrators of her estate, when discussing the merits of the instant motion.

damages hearing,[3] and as explained more fully below, the court grants the motion for default judgment and awards her $303,592.20 in damages and attorneys' fees and costs.

### STANDARD OF REVIEW

When a party moves for a default judgment under Rule 55(b)(2), the court "may examine a plaintiff's complaint, taking all well-pleaded factual allegations as true, to determine whether it alleges a cause of action." Ramos-Falcon v. Autoridad de Energia Electrica, 301 F.3d 1, 2 (1st Cir. 2002). The defaulting party is "taken to have conceded the truth of the factual allegations in the complaint." Ortiz-Gonzalez v. Fonovisa, 277 F.3d 59, 62 (1st Cir. 2002). Admitting the truth of the factual allegations, however, "does not admit the legal sufficiency of [the] claims." 10 James W. Moore, Moore's Federal Practice § 55.32[1][b] (3d ed. 2013). For that reason, the court reviews the admitted facts in light of the elements of the claims pleaded before entering a default judgment. Sampson v. Lambert, 903 F.3d 798, 805-06 (8th Cir. 2018); Neff v. Mediation Processing Servs., LLC, No. 21-CV-310-JL, 2021 WL 7082838, at *1

---

[3]The substituted plaintiffs attended the damages hearing but chose not to testify. In addition to the legal arguments she presented at the hearing, plaintiffs' counsel indicated that she would rely on her previously filed memoranda and affidavits from, among others, Ms. Rodriguez Morel and Mr. Rodriguez.

(D.N.H. Sept. 27, 2021), report and recommendation adopted, No. 21-CV-310-JL, 2021 WL 7082833 (D.N.H. Oct. 14, 2021).

## BACKGROUND

By virtue of the default, MTI is deemed to have admitted the following facts alleged in the First Amended Complaint. (Doc. No. 14). Ms. Rodriguez Morel began working for MTI on August 27, 2018 as an administrative team member. Her duties included "maintaining collection accounts." Prior to her employment with MTI, Ms. Rodriguez Morel was receiving Social Security Disability Insurance ("SSDI") benefits, as a result of anxiety and depression. Ms. Rodriguez Morel accepted employment with MTI in August 2018 as part of a trial-work program for SSDI benefit recipients, wherein if recipients manage gainful employment, they cease receiving benefits. However, if recipients in the program lose employment due to inability to manage their position (due to their disability), or through no fault of their own (i.e., at the employer's discretion), recipients may be restored to receiving benefits. After her termination by MTI, Ms. Rodriguez Morel was restored to receiving SSDI benefits. In 2019 and 2020, she sought and obtained self-employment income at a level which allowed her to retain her SSDI benefits.

As MTI's attendance policies bear on several of Ms. Rodriguez Morel's claims, the court first provides an overview of those policies.

**MTI's Attendance Policy**

Under its "no fault" attendance policy, MTI kept track of employee absences by counting "occurrences." An occurrence was accrued for each absence, regardless of the reason, with the exception of an absence stemming from a work-related illness or injury, or an absence permitted under the Family Medical Leave Act ("FMLA") or the Americans with Disabilities Act ("ADA"). Absences permitted under state law were not exempt from penalty. Absences on two consecutive workdays for the same reason counted as a single occurrence. Any occurrence that lasted three or more consecutive days required medical verification or a request for a leave of absence. "Repeated occurrences" would result in an employee being placed on MTI's "Disciplinary Program."

MTI also had a "call in" policy, which required employees to notify MTI of anticipated absences. Employees were expected to call the attendance line to identify themselves, the date(s) of their absence, and the reason for the absence; this information was usually left in a voicemail message.

**Ms. Rodriguez Morel's Pregnancy-Related Absences**

On December 10 and 11, 2018, Ms. Rodriguez Morel received medical care for abdominal pain and vaginal bleeding; her

medical providers told her that she was approximately seven weeks pregnant and was at risk for miscarriage. Ms. Rodriguez Morel shared this information with her supervisor at MTI, Suzanne Guzman. When Ms. Rodriguez Morel asked whether she should report her pregnancy to MTI management, Guzman told her she should wait to tell management because she believed "management would be displeased" at the news.

On December 17 and 18, 2018, Ms. Rodriguez Morel worked partial days. On December 20, 2018, she was suffering from a headache at work and needed to go home but did not because she did not know how many occurrences she had. She reached out to Human Resources ("HR") Administrator Stacy Morrison to ask for her total. The next day, Morrison informed Ms. Rodriguez Morel that she had one occurrence. That same day, December 21, 2018, Ms. Rodriguez Morel told Guzman that she had "morning sickness," including headaches, nausea, and vomiting, and asked about MTI's maternity leave policies. Guzman said she might be entitled to leave and suggested contacting "Doug," the Manchester office's HR contact.[4]

Guzman was on vacation from December 26 to December 28, 2018; while she was away, Steven Snarski served as Ms. Rodriguez Morel's supervisor. On December 26, Ms. Rodriguez Morel became

---

[4]Doug's last name is not in the record.

ill at work; she had to repeatedly go to the restroom to vomit. Ms. Rodriguez Morel told Snarski that she was pregnant and that her illness was caused by her pregnancy and asked to go home. Snarski told Ms. Rodriguez Morel to email Guzman and Administrative Manager Lauren Cochrane before leaving.  Ms. Rodriguez Morel sent an email discussing her symptoms but not mentioning that she was pregnant.  She left work on December 26 and called out sick on December 27 and 28, following the "call in" protocol.

When Ms. Rodriguez Morel returned to work on December 31, 2018, she frequently left her workstation to vomit in the bathroom.  Other employees took notice and one co-worker told Cochrane, who approached Ms. Rodriguez Morel to ask if she was okay.  She initially told Cochrane that she was "fine" but later in the day she disclosed to Cochrane that she was pregnant and suffering from severe morning sickness.  Cochrane asked if she was sure she was pregnant, because "birth control pills can sometimes cause pregnancy tests to be false positive."

On January 8, 2019, Ms. Rodriguez Morel continued to experience symptoms at work and noticed blood in her urine.  She reported her symptoms to Cochrane, who allowed her to leave work to go to the hospital.  After treating her, Ms. Rodriguez Morel's medical providers discharged her with a note excusing her from work until January 11, 2019.  Ms. Rodriguez Morel was

6

absent from work from January 8-10.  The absence on January 8 was authorized by Cochrane.  As to the absences on January 9 and January 10, Ms. Rodriguez Morel called the attendance line on January 9 and indicated that she was suffering pregnancy-related illness and that she would be out of work until January 11.

In her voicemail messages to the attendance line from this point forward, Ms. Rodriguez Morel clearly stated that she was pregnant and that her symptoms were related to her pregnancy. Additionally, when Ms. Rodriguez Morel was taken out of work for symptoms that were expected to last several days, she reported her multiple absences on the first day of the absence period. Ms. Rodriguez Morel was never advised that it was against MTI policy to report her entire absence period on the first day or that she was required to make separate calls each day she was absent.

When Ms. Rodriguez Morel returned to work on January 11, 2019, she gave her doctor's note to Cochrane.  Later that day, she met with Cochrane and Michelle McNeil, Vice President of Contract Administration, and was issued several attendance-based "occurrences."  The first was for 3.5 occurrences for her absences on December 17, 18, 26, 27, and 28, including 2.5

occurrences for the absences on December 26-28.[5]  The second
warning was for one occurrence based on her January 8 and 9
absences.

Ms. Rodriguez Morel asked why she was receiving warnings
for pregnancy-related absences.  Cochrane explained that to
avoid the occurrences, Ms. Rodriguez Morel would have had to
have obtained medical verification for three days of leave.  Ms.
Rodriguez Morel asserts that she did have a doctor's note
covering the three-day period from January 8-10, but still
received an occurrence for January 8 and 9.  McNeil stated that
New Hampshire was a "no fault state," which meant that there was
"no good or bad reason for not coming to work under the law."
Cochrane offered an example: "It's like when I locked my keys in
my car at Dunkin Donuts and was late to work. I was not excused
for my lateness."  Ms. Rodriguez Morel stated that her situation
was different because she had to leave work because she was
suffering symptoms related to her pregnancy.  The supervisors
responded that those reasons did not excuse an employee from
discipline under the policy.  Ms. Rodriguez Morel emailed
Morrison to confirm the information she had received from
Cochrane and McNeil.  Morrison confirmed that Ms. Rodriguez

---

[5] Morel asserts that under MTI's policy, MTI should have
tallied only .5 for December 26 and 1 for December 27 and 28 for
a total of 1.5 occurrences.

Morel had no pregnancy-related leave entitlement and that she could be disciplined under the policy if supervisors prohibited her from taking leave and she did so anyway.

On January 18, 2019, Ms. Rodriguez Morel had been very ill for two days; she called out of work according to MTI policy and again went to the emergency room. Ms. Rodriguez Morel was diagnosed with vomiting, headache, and lower abdominal pain resulting from pregnancy and was given a doctor's note excusing her from work until January 22, 2019.[6] On January 21, 2019, Ms. Rodriguez Morel called the attendance line to report that she would be absent until January 22, 2019. She returned to work on January 22 and emailed her doctor's note to Guzman and Cochrane, explaining her pregnancy, symptoms, and hospitalization.

Cochrane issued Ms. Rodriguez Morel a "final written warning" based on an occurrence for her absences on January 18 and 21. When Ms. Rodriguez Morel asked Cochrane why she received discipline for these absences when her note removed her from work for more than three days, Cochrane responded that only two of the days were scheduled workdays (January 18 and 21). For the first time, Cochrane explained that to qualify for the three-day exception to the attendance policy, the doctor's note

---

[6]The complaint states that the note removed her from work through January 22, 2018, but from context it appears that this was a typo.

had to cover three scheduled workdays. Ms. Rodriguez Morel asserts that the written policy does not require medical verification for three consecutive workday absences to trigger the exception. Ms. Rodriguez Morel emailed Morrison about Cochrane's explanation and received no response.

On January 23, 2019, Ms. Rodriguez Morel was sick at work and contacted her doctor, who told her to seek medical care. She consulted Doug (the HR contact) to obtain permission to leave work. Doug said that he would need to consult with corporate HR in Ohio before providing guidance. While waiting, Ms. Rodriguez Morel emailed Guzman and Cochrane to inform them of her symptoms and to ask for permission to take vacation leave so that she could seek medical attention. Cochrane responded that "we are unable to approve your vacation request due to coverage. Thank you." Guzman told her that she thought an employee should seek medical care regardless of work consequences. Ms. Rodriguez Morel left work to seek medical attention.

At the emergency room, Ms. Rodriguez Morel was treated and received a doctor's note excusing her from work from that day (January 23) through January 28. Ms. Rodriguez Morel called in for this period only on January 24. On January 29, 2019, she returned to work and submitted her doctor's note to Cochrane; she did not receive discipline.

Ms. Rodriguez Morel needed permission to attend a doctor's visit scheduled for January 31.  On January 29, Doug reported that headquarters had indicated that Ms. Rodriguez Morel was not FMLA-eligible; Doug therefore advised that she seek supervisor approval for leave by submitting a request through MTI's leave-request system.  She did so.  Cochrane denied the request because Ms. Rodriguez Morel was "on attendance/production warning [and] not eligible for unapproved down time."  Ms. Rodriguez Morel attended the well visit on January 31, 2021 anyway.  She obtained a doctor's note and submitted it to Cochrane.

At this point, Cochrane and/or McNeil contacted Keith Carr, MTI's HR Manager, to inquire whether Ms. Rodriguez Morel could be terminated under the attendance policy based on the January 31 absence.  Carr informed them that if Ms. Rodriguez Morel was disabled, due to pregnancy or otherwise, she must be afforded reasonable accommodation for her disability, including accommodation regarding her attendance.  He stated that Ms. Rodriguez Morel should be given disability certification paperwork for her medical providers to complete to determine whether accommodation was appropriate.

On February 1, 2019, Ms. Rodriguez Morel was summoned by her supervisors.  McNeil told Ms. Rodriguez Morel she knew that Ms. Rodriguez Morel left work on January 31 without approval.

McNeil then gave her disability certification paperwork. Ms. Rodriguez Morel said she would bring it to her next doctor appointment on February 8, 2019.

On February 4, 2019, Ms. Rodriguez Morel was ill with morning sickness and called in an absence. The next day, February 5, Ms. Rodriguez Morel again sought care in an emergency room and called the attendance line again to report an absence. She was diagnosed with headache and vomiting, as well as a "placental abnormality in [the] second trimester." The treatment provider removed her from work for that day, February 5, through February 9 and provided her a doctor's note indicating the same. On February 6, Ms. Rodriguez Morel called the attendance line to report her absences for the rest of that week.

**Termination and Aftermath**

On February 7, MTI boxed up Ms. Rodriguez Morel's personal effects. On February 11, she went to work and discovered that her key card had been deactivated. She was immediately taken to meet with Cochrane and McNeil, who informed her that she had been terminated for a "no call no show" on February 7 and 8. Ms. Rodriguez Morel stated that she had left a message on the attendance line reporting her absences on February 6-8 and presented her doctor's note. Cochrane and McNeil refused to accept the note, stating that the termination decision came from

HR and that there was nothing they could do.  Ms. Rodriguez
Morel was very upset and requested a letter stating that MTI had
terminated her; Cochrane and McNeil referred her to HR in Ohio.
They then presented Ms. Rodriguez Morel with the items from her
locker, which did not include her performance reviews, and
demanded that she leave the premises.

Later that day, Ms. Rodriguez Morel called corporate HR and
left a voicemail indicating that she had reported to work, been
fired for "no call no show," and needed a letter confirming her
termination.  She also said that the termination was unjust
because she had properly called the attendance line on February
4, February 5, and February 6, and on the 6th advised that she
would be absent on February 7 and 8 for reasons related to her
pregnancy.  Almost three hours later, an HR employee called Ms.
Rodriguez Morel and told her that HR had made a mistake; it had
reviewed the attendance line messages and found that Ms.
Rodriguez Morel had indeed reported her February 7 and 8
absences in the proper manner.  The employee stated that she had
taken steps to reinstate Ms. Rodriguez Morel and that "it would
be like nothing ever happened."  The employee also said that MTI
would "not hold against" Ms. Rodriguez Morel the occurrence for
her February 11 absence, which was caused by the termination.

Ms. Rodriguez Morel responded that she could not go on
"like nothing ever happened," that the stress and uncertainty

13

were unbearable in her condition, and that she had been humiliated by the termination. The employee said that if Ms. Rodriguez Morel failed to report to work, she would be considered to have abandoned her job and would be terminated. Ms. Rodriguez Morel said she needed to consider her situation. She called the New Hampshire Commission for Human Rights (the "Commission") and after consulting with the Commission, decided not to return to MTI. Instead, she filed a complaint of discrimination against MTI.

MTI recruited and hired a new employee with the same skills and qualifications to replace Ms. Rodriguez Morel. Ms. Rodriguez Morel removed her charge from the Commission after 180 days. She received a right to sue notice from the EEOC and filed a complaint in this court within 90 days of receiving the notice.

## DISCUSSION

The First Amended Complaint asserts six counts: "Violation of RSA 354-A:7, VI(b) Denial of Leave of Absence Due to Temporary Disability due to Pregnancy" (Count I); "Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, VI(c) Discrimination in Terms, Conditions, and Privileges of Employment due to Sex" (Count II); "42 U.S.C. § 12112(b)(5)(A) and RSA 354-A:7, VII (a) Failure to Make Reasonable Accommodation to Substantially Limiting Pregnancy-

14

Related Impairment" (Count III); "Unlawful Employment Practice Under 42 U.S.C. § 2000e-2(k)(1)(A)(i) Use of an Employment Practice that Caused a Disparate Impact Based on Sex/Pregnancy" (Count IV); "Wrongful Discharge for Performing an Act Encouraged by RSA 354-A:7, VI (b)" (Count V); and "42 U.S.C. §§ 12112(a), 2000e-2(a)(1) and RSA 354-A:7, I and 19 Discriminatory/Retaliatory Discharge Due to Sex and/or Disability" (Count VI).

A.  Adverse Employment Action

Each of plaintiff's statutory claims requires proof of an adverse employment action.  The court addresses this element first, before addressing her individual claims.

Most employment discrimination claims require the plaintiff to establish that she suffered an adverse employment action. See, e.g., Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017) (explaining that discrimination claims under Title VII and the ADA require a showing of adverse employment action). "Termination clearly constitutes an adverse employment action." Roderick v. New Hampshire Hosp., No. 98-543-M, 2000 WL 1466127, at *10 (D.N.H. Jan. 28, 2000).  A constructive discharge constitutes an adverse employment action.  See Cass v. Airgas USA, LLC, No. 17-CV-313-JD, 2018 WL 3682491, at *5 (D.N.H. Aug. 2, 2018) (citations omitted) ("A hostile work environment and

constructive discharge constitute adverse employment actions under the ADA.").

To establish a constructive discharge under Title VII, Ms. Rodriguez Morel "must show that (1) a reasonable person in [her] position would have felt compelled to resign and (2) [she] actually resigned." Cherkaoui, 877 F.3d at 29 (alternations in original) (internal quotation mark omitted) (quoting Vélez-Ramírez v. P.R. through Sec'y of Justice, 827 F.3d 154, 158 (1st Cir. 2016)). In assessing a constructive discharge claim, the court "must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Id. (quoting Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)). Workplace reprimands may qualify as adverse employment actions if they carry "tangible consequences." Bhatti v. Trustees of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011).

The court first acknowledges that Ms. Rodriguez Morel was actually discharged. MTI terminated Ms. Rodriguez Morel, then made her an offer of reinstatement, which she refused. The original discharge constitutes an adverse employment action. But even if Ms. Rodriguez Morel had not been terminated – or if MTI's offer of reinstatement negates the termination for

purposes of the court's analysis – the undisputed facts establish that she was constructively discharged.

Ms. Rodriguez Morel received an ongoing series of warnings and occurrences throughout December 2018 and January and February 2019, which all involved her pregnancy-related absences.  The warnings did carry "tangible consequences," as they were recorded by MTI and ultimately resulted in Ms. Rodriguez Morel's termination, even if she was later reinstated. Moreover, as highlighted by Ms. Rodriguez Morel, MTI appears to have applied their policy unfairly by assigning her more occurrences than she actually accrued under the terms of the policy.  Specifically, MTI allegedly over-calculated the number of occurrences for Ms. Rodriguez Morel's absences on December 26–28 and issued a "final written warning" for her absences on January 18 and 21, despite Ms. Rodriguez Morel obtaining a doctor's note that covered more than three days (January 18–21). Her supervisors also refused to grant her leave to seek medical attention despite their awareness of her pregnancy-related symptoms.

MTI provided Ms. Rodriguez Morel with disability certification paperwork on February 1, 2019.  She indicated she would have her provider complete the certification paperwork at her appointment on February 8, 2019.  Nonetheless, MTI boxed up her personal items on February 7, 2019 and deactivated her key

17

card before she returned to work from a pregnancy-related
absence on February 11, 2019, at which point she would have
presumably presented the completed paperwork.  MTI then
terminated Ms. Rodriguez Morel on February 11 based on a
purported "no call no show" on February 6.  After she challenged
her termination to HR, MTI took steps to reinstate her less than
three hours later, indicating that they had made a mistake.
Standing alone, the termination may have been no more than an
error.  However, considered within the context of the entire
narrative, MTI's actions are sufficient to establish
constructive discharge.

Moreover, when the HR representative said that she had
taken steps to reinstate Ms. Rodriguez Morel, she also stated
that MTI would not hold the occurrence for missing work on
February 11 against her; considering that that absence was the
result of her "mistaken" termination, that offer could
reasonably be interpreted as an empty promise.  Further, when
Ms. Rodriguez Morel said she could not live with the uncertainty
of the situation, the HR representative told her that if she
didn't show up for work, she would be terminated.  Considered as
a whole, the narrative arc of MTI's treatment of Ms. Rodriguez
Morel during her pregnancy satisfies her burden to set forth a
claim of constructive discharge.  Having found that Ms.
Rodriguez Morel has established that she suffered an "adverse

18

employment action," the court turns next to her individual causes of action.

## B.  Denial of Leave of Absence for Pregnancy (Count I)

In count I, Ms. Rodriguez Morel alleges that MTI violated N.H. Rev. Stat. Ann. § 354-A:7, VI(b), because it penalized employees who took leave for temporary disability related to their pregnancy, rather than permitting them to take such leave. The relevant statute states:

> An employer shall permit a female employee to take leave of absence for the period of temporary physical disability resulting from pregnancy, childbirth or related medical conditions.  When the employee is physically able to return to work, her original job or a comparable position shall be made available to her by the employer unless business necessity makes this impossible or unreasonable.

N.H. Rev. Stat. Ann. 354-A:7, VI(b).  The admitted factual allegations in this case demonstrate that Ms. Rodriguez Morel advised her supervisors at MTI that she was pregnant, needed leave for temporary physical disabilities resulting from her pregnancy, and that MTI failed to grant her request, informing her that such leave was unavailable.  Accordingly, Ms. Rodriguez Morel is entitled to judgment on Count I.

## C.  Employment Discrimination on the Basis of Sex (Count II)

Both federal and state law prohibit an employer's discrimination against an employee in terms, conditions, and privileges of employment on the basis of sex.  See 42 U.S.C. §

2000e-2(a)(1); N.H. Rev. Stat. Ann. § 354-A:7, VI(c).[7] "Because
of sex" includes "pregnancy . . . or related medical conditions.
See 42 U.S.C. § 2000e(k); N.H. Rev. Stat. Ann. § 354-A:7, VI
(a). The admitted facts on record establish that MTI was aware
of Ms. Rodriguez Morel's pregnancy, continued to dole out
occurrences, terminated her based on these occurrences, and,
after offering reinstatement, implied that it would continue to
apply the policy as it had up to that point. MTI issued multiple
attendance warnings to Ms. Rodriguez Morel, while it granted
temporary disability leave to employees for work-related
injuries and other medical reasons without disciplinary
consequences. These facts are sufficient to establish MTI's
liability on Count II. See Young v. United Parcel Serv., Inc.,
575 U.S. 206 (2015)(citing 29 CFR § 1604.10(b), "[d]isabilities
caused or contributed to by pregnancy . . . are, for all job-
related purposes, temporary disabilities" and . . . "the
availability of . . . benefits and privileges . . . shall be
applied to disability due to pregnancy or childbirth on the same
terms and conditions as they are applied to other temporary
disabilities.").

---

[7] "[T]he New Hampshire Supreme Court relies on cases
developed under Title VII to interpret claims under RSA 354-A."
Carney v. Town of Weare, No. 15-cv-291-LM, 2017 WL 680384, at *6
(D.N.H. Feb. 21, 2017) (alteration in original) (citation
omitted).

D.   Disability Discrimination (Failure to Accommodate)
     (Count III)

Title 1 of the ADAA (42 U.S.C. § 12112(b)(5)(A)) and N.H. Rev. Stat. Ann. § 354-A: 7, VII (a) require employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee . . . ."

The First Circuit Court of Appeals has defined an ADA failure-to-accommodate claim as follows:

> Generally stated, a disability discrimination claim based upon a failure to accommodate requires a plaintiff to show that: (1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request.

Henry v. United Bank, 686 F.3d 50, 59-60 (1st Cir. 2012).  Under normal circumstances, "the employee must prove that the request was sufficiently direct and specific so as to put the employer on notice of the need for an accommodation." Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008) (citations omitted).  However, "[d]ifferent rules may apply in situations where . . . the need for an accommodation is obvious." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 n.11 (1st Cir. 2007).

An employee is "disabled" within the meaning of the ADAA if she suffers any physical or mental impairment that substantially limits a major life activity.  See 29 CFR § 1630.2 (g).

21

Physical impairment includes any "physiological . . . condition" affecting a "body system," including the "digestive" and "reproductive" systems. See 29 CFR § 1630.2 (h). Physical impairment also includes "premature rupture of membranes, [and] vaginal bleeding." Hernandez v. City of Hartford, 959 F. Supp. 125, 130 (D. Conn. 1997). "Substantially limits" as used in the ADAA is construed broadly in favor of finding "disability." See 29 CFR § 1630.2 (j)(1). The effects of an impairment lasting or expected to last fewer than six months – such as debilitating morning sickness or other pregnancy complications -- can be "substantially limiting." Id. "Major life activity" is defined as the operation of a major body function including digestion and reproductive function. See 29 CFR § 1630.2 (i). EEOC interpretive guidance also establishes that "pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the [disability] definition." See 29 CFR Appendix to Part 1630 - Interpretive Guidance on Title I of the Americans With Disabilities Act (discussing Section 1630.2(h) Physical or Mental Impairment) (emphasis added).

Here, the totality of Ms. Rodriguez Morel's symptoms establish that she was disabled within the meaning of the applicable statutes. She suffered the confluence of severe and recurring nausea and vomiting, migraine, threatened miscarriage,

vaginal bleeding, and placental abnormality in the second trimester of her pregnancy, affecting the operation of her digestion and reproduction major body functions.  These conditions also substantially limited her ability to engage in the major life activities of concentrating, interacting with others, and working.  Her supervisors were aware of her pregnancy by December 31, 2018.  She requested time off for pregnancy-related conditions on December 26, January 8, January 23, and January 29.

Additionally, Ms. Rodriguez Morel expressed her belief that she should be entitled to pregnancy-related leave during her conversation with Cochrane and McNeil on January 11, 2019. MTI's knowledge that Ms. Rodriguez Morel may be entitled to an accommodation was further demonstrated by the fact that Cochrane and McNeil gave her disability certification paperwork on the advice of Keith Carr on February 1, 2019.  Those allegations, taken together, are enough to establish that Ms. Rodriguez Morel – who was, by all accounts, successfully performing her job -- either made a "direct or specific" request for an accommodation (or that her need for an accommodation was obvious to MTI) which MTI rejected, without any indication that an accommodation with respect to MTI's attendance policy would pose an undue burden to MTI.  Accordingly, the court finds that MTI is liable on Count III of the Amended Complaint.

E.  Sex/Pregnancy Discrimination - Disparate Impact (Count IV)

Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Rodriguez v. United States, 852 F.3d 67, 75 (1st Cir. 2017).  Ms. Rodriguez Morel claims that MTI's attendance policy, while facially neutral, had a "disproportionately adverse effect" on pregnant employees.

To succeed on this claim, Ms. Rodriguez Morel must identify a specific employment practice and show that the identified practice had a disparate impact on a protected group." Greene v. Walgreen E. Co., No. 16-2487, 2018 WL 8263947, at *2 (1st Cir. Nov. 15, 2018) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)); Jones v. City of Boston, 752 F.3d 38, 46 (1st Cir. 2014)).  Here, the facts show that MTI's attendance policy could result in termination for being out for six days, even if each absence was for a medical reason, and that pregnant women could need considerably more than six days off in the course of a normal pregnancy.  Specifically, she notes that MTI issued her a final written warning after only 5.5 occurrences, suggesting that under the "no fault" policy an employee faced final warning for as few as 5.5 absences.  She asserts that this "ceiling on leave" would have "a drastic effect, or impact, on female, pregnant employees, an impact no male would ever encounter."  Indeed, the prospect of looming termination for a

sixth "occurrence" was the driving force behind Ms. Rodriguez
Morel's departure from MTI.  These facts, admitted by MTI as a
result of its default, are sufficient to establish its liability
on Count IV.

F.  Wrongful Discharge

Under New Hampshire common law, an employer can be liable
for wrongful discharge if it: 1) discharged an employee for
performing an act that public policy would encourage or for
refusing to do something that public policy would condemn; and
2) was motivated by bad faith, retaliation, or malice.  Leeds v.
BAE Sys., 165 N.H. 376, 379, 80 A.3d 366 (2013).  As another
judge in this court has observed, [t]aking leave is an "act
encouraged by public policy" where an employee has an
enforceable right to take the leave under state law.  Gage v.
Rymes Heating and Oils, Inc., No. 14-cv-480-PB, 2016 WL 843262
(D.N.H March 1, 2016)(citing Faulkner v. Mary Hitchcock Mem'l
Hosp., No. 12-cv-482-SM, 2013 WL 6019318 (D.N.H. Nov. 13,
2013)).  This satisfies the first prong of the test outlined in
Leeds.

The admitted facts, taken together, are also sufficient to
satisfy Ms. Rodriguez Morel's burden to show bad faith, malice,
or retaliation.  For example, when it became clear that Ms.
Rodriguez Morel might avoid termination pursuant to MTI's
attendance policy by obtaining disability certification which

would allow her to take leave from work and would effectively
bar her termination under the policy, MTI immediately terminated
her for "no call, no show," even though Ms. Rodriguez Morel had
called in to report the pregnancy-related absences. Moreover,
upon attempting to reinstate Ms. Rodriguez Morel, MTI indicated
that it would continue to enforce the policy that had already
led to her discipline and termination in the first place.
Against this factual and legal backdrop, MTI is liable for
wrongful discharge as set forth in Count V.

G.   Retaliatory Discharge (Count VI)

It is unlawful for an employer to retaliate against an
employee for requesting an accommodation for a disability. See
e.g., Murray v. Warren Pumps, LC, 821 F.3d 77, 87 (1st Cir.
2016). An employee alleging retaliation must prove that that
she requested an accommodation, suffered an adverse action, and
that there was a causal connection between that protected
activity and the adverse action taken by the employer. See
Murray, 821 F.3d at 87. Close temporal proximity between the
request and the adverse action can suffice to prove causation.
Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25 (1st Cir.
2004). Here, Ms. Rodriguez Morel and MTI discussed her medical
situation on February 1, 2019. She was terminated only 10 days
later, then offered reinstatement – but threatened with further
attendance-related sanctions -- when the original termination

26

was deemed mistaken.  These facts are sufficient to entitle Ms. Rodriguez Morel to judgment on Count VI.

### DAMAGES

The Court must next make an independent determination of the damages to be awarded because the amount of damages in this case is not a sum certain.  See Pope v. United States, 323 U.S. 1, 12 (1944) ("It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."); see also Credit Lyonnais Sec. (USA), Inc., v. Alcantara, 183 F.3d 151, 155 (2nd Cir. 1999) ("Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed to be true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.") (citation omitted); Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc., 722 F.2d 1319, 1323 (7th Cir. 1983); Geddes v. United Fin. Grp., 559 F.2d 557, 560 (9th Cir. 1977).

A.  Economic Losses

Ms. Rodriguez Morel is entitled to recover lost wages that are causally connected to her discharge under any of her successful causes of action.  See 42 U.S.C § 2000e-5(g)(1)

(providing for the award of "back pay" upon a finding of unlawful employment practice under Title VII); 42 U.S.C § 12117 (a) (providing for ADAAA claimants all remedies available under 42 U.S.C § 2000e-5); RSA 354-A:21, I (d) and 354-A:21-a, I (allowing for both the Commission and New Hampshire Superior Courts to award "back pay" for violations of RSA 354-A:7 and 19); Albemarle Paper Co. v. Moody, 422 U.S. 405, 422 (1975) (permitting back pay award for unemployment practices implement without "bad faith" but with disparate "effect," because "Title VII is not concerned with the employer's good intent or absence of discriminatory intent" but rather the "consequences of employment practices, not simply the motivation."); Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016)(holding "The ADA and its state analog both forbid an employer from retaliating against a protected employee when that employee engages in protected activity," including "requests for reasonable accommodation"); Porter v. City of Manchester, 151 N.H. 30, 43-44 (2004)(providing that all "traditional tort remedies, including emotional distress damages, are generally recoverable" under a claim of wrongful discharge, including constructive wrongful discharge).

The record supports the following with respect to lost wages. At the time of her termination on February 11, 2019, Ms. Rodriguez Morel was working 40 hours a week earning $20.46/hour.

See Pltf. Aff. (Doc. No. 37-2). Her gross weekly pay was
$818.40. Id. She was told by her direct supervisor that she
would receive a raise of at least $3.00/hour after six months of
employment. Id. Where Ms. Rodriguez Morel started her
employment on August 27, 2018, see FAC ¶ 12, she would have
received a raise of at least $3.00/hour on or about February 27,
2019. See Id. Accordingly, for the roughly three weeks
following Ms. Rodriguez Morel's termination date, from February
11, 2019 until February 27, 2019, she would have earned
$2,455.20 ($818.40 x 3) from MTI employment.

The record further supports the conclusion that MTI ceased
operations in early March 2022. See Doc. No. 37-2 ("The Decline
and Fall of Mammoth Tech Inc."). Given her positive performance
reviews, the court finds that Ms. Rodriguez Morel would have
remained employed at MTI until its closure. Therefore, From
February 27, 2019 to March 2, 2022, 157 weeks, she would have
earned at least $938.40 gross per week (accounting for a $3/hour
raise). Accordingly, she would have earned $147,328.80 ($938.40
X 157) from MTI employment from March 4, 2019 to March 2, 2022.
Offsetting $17,353 of income Ms. Rodriguez Morel earned in 2019
through 2021, see Pltf. Mem. (Doc. No. 37-1) at 8-9, yields a
total of $131,975.50 in back pay. The court therefore awards
that sum to Ms. Rodriguez Morel.

B.  Compensatory Damages

     An injured party alleging unlawful intentional
discrimination under Title VII may recover compensatory damages
for "future pecuniary losses, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and
other nonpecuniary losses." 42 U.S.C. §§ 1981a(a)(1), (b)(3).
See also  RSA 354-A:21, I (d) and 354-A:21-a, I (allowing for
both the Commission and the New Hampshire Superior Courts to
award "compensatory damages" for violations under RSA 354-A:7
and 19).  After canvassing damage awards in pregnancy
discrimination cases within the First Circuit, plaintiff seeks
an amount identical to her back pay award -- $131,975.50 – for
her emotional harm.  Pltf. Mem. (Doc No. 37-1) at 9-11.

     A court may award compensatory damages for emotional
distress in a Title VII case even when the defendant's conduct
does not cause "concrete psychological harm." Harris v. Forklift
Systems, Inc., 510 U.S. 17, 22 (1993).  "[A]lthough emotional
damages are warranted even without medical or psychiatric
evidence, the lack of such evidence is relevant to the amount of
award." Koster v. Trans World Airlines, Inc., 181 F.3d 24, 35
(1st Cir. 1999) (citation omitted).  Ms. Rodriguez Morel's,
affidavit, (Doc. No. 37-2) indicates that MTI's actions did
cause her harm. Getting hired by MTI was the culmination of a
long battle with anxiety and depression, for which Rodriquez

Morel was receiving SSDI benefits. Id. ¶¶ 28-33.  She describes
anxiety "shame, humiliation and stress and pain" that was drawn
out over the weeks that she struggled to remain employed during
her pregnancy. Id. ¶¶ 40-41. She further stated that, on the day
she left her employment, her physician could not prescribe
anxiety medication due to her pregnancy, but instead monitored
her for an hour in her office before Ms. Rodriguez Morel called
a friend to take her home. Id. ¶¶ 43-47.  In addition, she
suffered from sleeplessness for months after her employment
ended. And she withdrew from her husband and family while trying
to hide her "frustration, humiliation, sadness and anxiety."
Id. ¶ 49.  Mr. Rodriguez's affidavit (Doc. No. 62-1), confirmed
Ms. Rodriguez Morel's account of her emotional distress.

When analyzed as a whole, the case law suggests a number of
factors that courts have considered when determining emotional
distress damages: the degree of mental pain and anguish (such as
feelings of depression, humiliation, or fear); physical
manifestations of emotional distress (such as disordered
sleeping or eating); the type of medical or other treatment, if
any, sought; the effect on family members and family
relationships; the economic hardships suffered as a result of
the employment practice (such as bankruptcy, depleted retirement
savings, or loss of housing); and the attachment that plaintiffs
felt to their workplace (such as length of tenure or seniority).

31

E.E.O.C. v. Aviation Port Servs., LLC, No. CV 18-10909-FDS, 2020
WL 1550564, at *9 (D. Mass. Apr. 1, 2020) (citing cases).

Here, in addition to the above referenced affidavits,
counsel submitted medical records from Ms. Rodriguez Morel's
doctors' visits between January 31, 2019 and May 26, 2019.  To
be sure, the post-termination records discuss her stress and
feelings of depression over the events at MTI.[8]  But an April 26,
2019, record mentions a "positive" mood and a May 23, 2019,
record indicates that "after an initial difficult period," she
is "doing well now."  These records – the most persuasive
evidence before the court -- suggest that, after a relatively
brief period of employment, Ms. Rodriguez Morel suffered from a
relatively brief period of emotional distress.

Taking into account the factors identified above, see
Aviation Port Servs., LLC, 2020 WL 1550564, at *9,  the court
finds that plaintiff's request for a compensatory damage award
equal to her lost wages award -- $131,975.50 – is excessive
under the circumstances.  The court does not disagree with
counsel's assertion that compensatory awards can permissibly
exceed the amount of a back pay award.  However, the cases she
relies upon do not substantially further her argument.  For
example, in Baez-Viera v. Cooperativa Abraham Rosa, No. 08-2045

---

[8]There is no medical record that corresponds to the date of
her termination, February 11, 2019.

(JAG), 2012 WL 4663664 (D.P.R. Oct. 1, 2012), the compensatory damages award represented a doubling pursuant to Puerto Rico Law.  Id. at * 1.  Without that statutory increase, the compensatory damages award would have been closer to half of the back pay award.  And while the jury in Pagan-Alejandro v. PR Acdelco Serv. Ctr., Inc, No. 05-1337 (CAG), 2007 WL 4787383 (D.P.R. Aug. 20, 2007) awarded approximately fifty percent more in compensatory damages than in back pay, only the verdict form from that case is cited, without any comparison of the facts of that case to this one.  Similarly, the cited decisions in Blake v. Purolite, No. 10-5253, 2013 WL 664193 (E.D. Pa. Feb 25, 2013) and Tabon v. Univ. of Pa. Health Syst., No. 10CV02781, 2012 WL 7160184 (E.D. Pa. Oct. 19, 2012) are in summary form and offer no details regarding the respective plaintiff's injuries to which the court can compare to those of Ms. Rodriguez Morel

Many of the reported cases reflect a judicial reticence to "second-guessing" a jury making a "monetary evaluation of intangible losses."  See, e.g., Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1161 (1st Cir. 1996).  That factor is absent here because the court, rather than a jury, is the finder of fact.  The record in this case reflects that Ms. Rodriguez Morel had battled mental health issues for much of her life.  Even her relatively brief employment at MTI took place against a backdrop of preserving the possibility of retaining her disability

33

benefits, for which she remained eligible after her termination. MTI, of course, would be liable for exacerbating her condition. See _Tobin v. Liberty Mut. Ins. Co.,_ No. CIV.A. 01-11979 DPW, 2007 WL 967860, at *8 (D. Mass. Mar. 29, 2007), aff'd and remanded, 553 F.3d 121 (1st Cir. 2009) (noting that a defendant can be held liable through an award of emotional distress damages for aggravating a pre-existing emotional condition). But, as previously noted, Ms. Rodriguez Morel's medical records (Doc. No. 64) suggest that her termination-related emotional distress symptoms had abated within a few months of her termination, long before the period of time for which she is being awarded lost wages.  Cf. _Tobin,_ 553 F.3d at 145 (upholding damage award based, in part on "lasting nature" of plaintiff's distress and "total incapacity").

In light of the foregoing, the court awards Ms. Rodriguez Morel $65,000 in compensatory damages.

C.  Enhanced Compensatory Damages[9]

New Hampshire law permits an award of enhanced compensatory damages if the defendant's behavior is "wanton, malicious, or oppressive."  See N.H. Rev. Stat. Ann. § 354-A:21-a; _Schneider v. Plymouth State Coll.,_ 744 A.2d 101, 107 (N.H. 1999).  Ms. Rodriguez Morel seeks $131,975.50 – an amount equal to her claim

---

[9]At the damages hearing plaintiffs' counsel withdrew her request for punitive damages.

for back pay – in enhanced compensatory damages.[10]  The court

finds that the plaintiff is not entitled to enhanced

compensatory damages in this case.

"When an act is wanton, malicious, or oppressive, the

aggravating circumstances may be reflected in an award of

enhanced compensatory damages." McDonald v. Jacobs, 201 A.3d

1253, 1261 (N.H. 2019 (quoting Figlioli v. R.J. Moreau Cos., 866

A.2d 962, 966 (N.H. 2005)).[11]  Enhanced compensatory damages,

sometimes called liberal compensatory damages, are awarded only

in exceptional cases.  Stewart v. Bader, 907 A.2d 931, 942 (N.H.

2006) (citing Figlioli, 866 A.2d at 962).  "The mere fact that

an intentional tort is involved is not sufficient; to show

malicious of oppressive actions there must be 'ill will, hatred,

hostility, or evil motive on the part of the defendant.'"  Id.

(quoting Aubert v. Aubert, 529 A.2d 909, 914-15 (N.H. 1987)).

---

[10]Plaintiff sought this amount in combined enhanced
compensatory and punitive damages.  Pltf. Mot. (Doc. No. 37-2)
at 11. Although she withdrew the claim for punitive damages,
counsel did not disaggregate the two categories at the damages
hearing or make a corresponding deduction in her damages
request.

[11]As plaintiff cites the common-law construction of enhanced
compensatory damages, the court will do the same.  But see
McPadden v. Wal-Mart Stores, East, L.P., No. 14-cv-475-SM
(D.N.H. Sept. 16, 2016) (certifying question to New Hampshire
Supreme Court, noting that burden of proving entitlement to
damages under New Hampshire's discrimination statute, N.H. Rev.
Stat. Ann. § 354-A:21-a "appears to be substantially lighter
than the burden imposed upon a plaintiff seeking enhanced
compensatory damages under New Hampshire's common law. . . .")

Unlike punitive damages, which are not permitted under New
Hampshire law,[12] enhanced compensatory damages compensate the
plaintiff, rather than punish the defendant.  See McKinnon v.
Harris, No. 05-CV-93-JAW, 2005 WL 2335350, at *2 (D.N.H. Sept.
21, 2005).  "Wanton conduct means that the actor is aware that
his actions are causing a great risk of harm to others,"
Johnson v. The Capital Offset Co., Inc., No. 11-cv-459-JD, 2012
WL 781000, at *1 (D.N.H. Mar. 6, 2012), or that the actor
recklessly creates a risk of great harm, see Minion Inc. v.
Burdin, 929 F. Supp. 521, 525 (D.N.H.1996).

     In Bader, for example, the court upheld an enhanced
compensatory damage award of more than $2 million to the estate
of a woman who was murdered by her husband.  Similarly, in
Aubert, the court upheld an award of enhanced compensatory
damages in favor of a man whose wife shot him in the face,
causing permanent injury.  By contrast, in Figlioli, the court
reversed an award of enhanced compensatory damages to a couple
who was injured when their deck collapsed, after having been
attached to their house with nails instead of lag bolts.

---

     [12]See Fay v. Parker, 53 N.H. 342, 383, 1872 WL 4394, at *41
(1872) ("What kind of a civil remedy for the plaintiff is the
punishment of the defendant? The idea is wrong. It is a
monstrous heresy. It is an unsightly and an unhealthy
excrescence, deforming the symmetry of the body of the law.")

Using these cases as guideposts, the court finds that, although MTI is liable for discrimination and retaliation, its actions, taken over a period of five weeks, fall short of requirements for enhanced compensatory damages. Much of Ms. Rodriguez Morel's allegations pertain to an attendance policy that, while facially neutral towards pregnant women, had a disparate impact on them. While Ms. Rodriguez Morel was the recipient of several insensitive comments regarding her pregnancy, MTI's liability is based largely on a misguided application of its attendance policy and apparent ignorance of the requirements of state and federal law relating to accommodations and leave available to pregnant women, rather than the type of egregious "ill will, hatred, hostility, or evil motive" that would warrant additional damages.

### Attorney's Fees and Costs

MTI's liability for discrimination, retaliation, and wrongful discharge entitles the Ms. Rodriguez Morel to reasonable attorneys' fees and costs. See 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117; N.H. Rev. Stat. Ann. § 354-A; see also Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (a "prevailing party" in a civil rights action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."). "The lodestar approach is the method of choice

for calculating fee awards." Matalon v. Hynnes, 806 F.3d 627, 638 (1st Cir. 2015) (citations omitted).

Under this approach, a district court first "calculate[s] the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are 'excessive, redundant, or otherwise unnecessary.'" Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'rs v. Ray Haluch Gravel Co., 745 F.3d 1, 5 (1st Cir. 2014) (quoting Hensley, 461 U.S. at 434). The court then determines "a reasonable hourly rate or rates — a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence." Id. (citation omitted). Multiplying the results of these two inquiries yields the lodestar amount. Id. The court may then adjust the potential award based on factors not captured in the lodestar calculation. See Hensley, 461 U.S. at 434 & n.9; Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 337 (1st Cir. 1997). "The party seeking the [fee] award has the burden of producing materials that support the request." Hutchinson ex rel. Julien v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011) (citing Hensley, 461 U.S. at 433).

The affidavit submitted by Ms. Rodriguez Morel's attorney is supported by billing records, and represents that she and her

firm[13] have incurred \$118,463 in fees and costs.  Pltf. Mem. (Doc. No 37-1) at 13-14; Douglass Aff. (Doc. No. 37-5); Pltf. Supp. (Doc. No. 68).  The Defendant, of course, has not objected to the reasonableness of the fees and costs.  The record reflects billing for 318.7 attorney hours, the vast majority of which were billed at \$250 per hour, and 28.9 non-attorney hours, billed at \$120 per hour.

Considering the factors listed above, the court finds that both the hours requested and the billing rates amounts are reasonable.  However, the court notes that several entries consist of "block billing," that is, "the time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." In re Volkswagen & Audi Warranty Extension Litig., 89 F. Supp. 3d 155, 176 (D. Mass. 2015).  Courts disfavor the use of block billing "because it requires decipher[ing] on the judges' part." Hermida v. Archstone, 950 F. Supp. 2d 298, 312 (D. Mass. 2013) (cleaned up).  Where the use of block-billing is prevalent, courts have imposed global fee reductions of ten to twenty percent.  Id. See, e.g., Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008)

---

[13]Recent filings indicate that plaintiffs' counsel is with a new firm.  As the court has not been asked to do otherwise, the court intends to issue a single attorney's fees award.  See Notice of Attorney's Lien (Doc. No. 61).

(upholding fifteen percent global fee reduction penalty for block billing); Equal Emp't Opportunity Comm'n, 934 F.Supp.2d at 354-56, 2013 WL 1277873, at *8 (reducing attorneys' reported hours by twenty percent "[g]iven the imprecise construction of many of the time entries and their frequent lack of task differentiation").

The court's review of counsel's invoices (Doc. Nos. 37-5 and 68-3) show that approximately ten percent of counsel's billing entries consist of block billing.  The court, therefore, will make a global reduction of ten percent, or $11,846.30.  This yields a total award for fees and costs of $106,616.70.

## CONCLUSION

Based on the foregoing, Ms. Rodriguez Morel's motion for default judgment (Doc. No. 37) is granted.  Judgment shall enter against MTI on all counts and in the amount of $303,592.20 to be awarded to Ms. Rodriguez Morel as follows:

- o $131,975.50 in back pay;

- o $65,000 in compensatory damages;

- o $106,616.70 in attorneys' fees and costs.

**SO ORDERED.**

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

March 27, 2023

cc:  Counsel of Record